IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **TAWANNA M. ROBERTS, on behalf of herself and all others similarly situated,**<br><br>    **Plaintiff,**<br><br>    vs.<br><br>**CAPITAL ONE FINANCIAL CORPORATION, doing business as CAPITAL ONE BANK,**<br><br>    **Defendant.** | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff Tawanna M. Roberts ("Plaintiff"), on behalf of herself and all others similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

### INTRODUCTION

1.      Plaintiff brings this action on behalf of herself and a class of all similarly situated consumers against Defendant Capital One Financial Corporation, doing business as Capital One Bank ("Capital One" or "Bank"), arising from its unfair and unauthorized assessment of overdraft fees on debit card transactions for which there were sufficient available funds in customers' accounts at the time the transactions were authorized and approved by the Bank.

2.      At the moment debit card transactions are authorized on an account with positive available funds to cover the transaction, Capital One immediately decrements consumers' checking accounts for the amount of the purchase and sets aside available funds in a checking

account to cover that specific transaction.  As a result, and with limited exceptions,[1] customers' accounts *always* have sufficient available funds to cover these transactions throughout their entire life-cycle.

3.      However, Capital One still assesses crippling $35 overdraft fees on many of these transactions, in violation of its contractual promises not to do so.

4.      Despite putting aside sufficient available funds for debit card transactions, the Bank charges overdraft fees on those same transactions if they purportedly settle—days later— into a negative balance ("Authorize Positive, Purportedly Settle Negative Transactions" or "APPSN Transactions").

5.      Here is how it works.  A customer's available funds are the funds that Capital One considers "available" for immediate use; available funds reflect a real-time snapshot of all account activity.  Therefore, "available funds" are adjusted, in real-time, to account for debit card transactions at the instant they are made.   When a customer makes a purchase with a debit card, Capital One sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available funds.  Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

6.      That means when any *subsequent*, intervening debit transactions are initiated on a checking account, they are compared against an available funds amount that has been reduced to account for earlier debit card transactions.  This means that many subsequent transactions incur overdraft fees due to the unavailability of the funds sequestered for those debit card transactions.

---

[1] A small number of debit card transactions settle for an amount different than the amount initially authorized.

7.     Still, despite keeping those held funds off-limits for other transactions, Capital One improperly charges overdraft fees on APPSN Transactions—the latter which always have sufficient available funds to be "covered."

8.     There is no justification for these practices, other than to maximize Capital One's overdraft fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce the "available funds" on an account. But Capital One is free to protect its interests and either reject those intervening transactions or charge overdraft fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Capital One was not content with these millions in overdraft fees. Instead, it sought millions *more* in overdraft fees on APPSN Transactions.

9.     Besides being deceptive, unfair and unconscionable, these practices breach contract promises made in the Bank's adhesion contracts—contracts which fundamentally misconstrue the true nature of the Bank's processes and practices. These practices also exploit contractual discretion to gouge consumers.

10.    In plain, clear, and simple language, the checking account contract documents repeatedly promise that the Bank will only charge overdraft fees on transactions with insufficient available funds to "cover" a given transaction. In fact, the Bank says this very thing twice in the contract:

> You can avoid Overdrafts on your account by always making sure that you have **sufficient available funds in your account to cover** all of the debits presented for payment against your account.

Ex. A, Capital One Rules Governing Deposit Accounts, at 2, 3 (emphasis added).

11.    The Bank also defines an "overdraft" as "withdrawals against your account for an amount in excess of your available balance." *Id.* at 3.

3

12.      The Bank also promises that for transactions where it "know[s] the time you made the transaction," it will "post" "close[] to the time you actually made the debit transaction[.]" *Id. at* 2.

13.      Moreover, the Bank promises to use a "processing order" for debit card transaction based on "date and time." *Id. at* 3.

14.      The Bank states that "Debits, like ATM withdrawals and debit card transactions, decrease your balance." Of course, this "decrease" only happens at the moment a transaction is authorized, immediately.

15.      And the Bank makes yet another promise of immediate debit when it states that "If you provide your ATM card or ATM/Debit Card and personal access code to a third party, you have authorized the third party to withdraw funds from your account at an ATM machine or point of sale terminal." Of course, a consumer is only at a machine or terminal at the time of purchase.

16.      Yet the Bank does not only decrement the account once. Rather, it withdraws funds twice—not just at the moment of purchase, but later during a secret posting process described below.

17.      The Bank breaches these plain contractual promises when it assesses overdraft fees on APPSN Transactions that *did* have available funds to cover them at the "date and time" they were made and that *__do__* have sufficient available funds to "cover" them throughout their lifecycle.   By definition, there are always available funds sufficient to "cover" debit card transactions authorized into positive available funds, for the simple reason that those funds are sequestered at the instant of authorization.

4

18.     The contract also fundamentally misconstrues the process by which overdraft fees are determined—and, more generally, how debit card transactions are executed.

19.     In reality, debit card transactions take place in two parts:  part one is when the consumer initiates the transaction at a merchant.  Part two is when money is transferred to the merchant.  The latter takes place days after part one, and it happens in the middle of the night in a process the banking industry refers to as "nightly batch posting."

20.     Indeed, while the contract states that overdraft fees will be assessed on insufficient *available funds*—again, a term of art that refers to a real time, running, account balance—the Bank uses a different account balance to assess overdraft fees.  If it truly used "available funds" to determine overdraft fees, as it promises, it would not charge overdraft fees on APPSN Transactions.

21.     In actuality, the Bank does not actually use "available funds" to make overdraft determinations at all—rather, it uses a separate, secret balance during the "nightly batch posting" process in which many transactions are posted at once.

22.     The amount of "available funds" do not and cannot change for APPSN Transactions during nightly batch posting because that amount has already been decremented once—at the time that consumer actually initiated the transaction.

23.     In short, Capital One is not authorized by contract to charge overdraft fees on APPSN Transactions, but it has done so and continues to do so, to the tune of millions of dollars in consumer harm every year.

24.     Plaintiff and other Capital One customers have been injured by Capital One's practices.  On behalf of herself and the putative class, Plaintiff seeks damages, restitution and

injunctive relief for Capital One's breach of contract, unjust enrichment, conversion, and violation of the New York General Business Law.

## JURISDICTION AND VENUE

25.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Capital One.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Capital One is subject to personal jurisdiction here and regularly conducts business in the Southern District of New York, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## PARTIES

27.     Plaintiff is a citizen of the State of New York.  At all times relevant, Plaintiff patronized Capital One banking centers located in Bronx, NY.

28.     Defendant Capital One is a national bank with its headquarters and principal place of business located in McLean, Virginia.  Among other things, Capital One is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts.  Capital One operates banking centers, and thus conducts business, throughout the State of New York.

6

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

29.     Plaintiff has had a checking account with Capital One since 2014. Plaintiff opened her Capital One account at the banking center located at 575 Melrose Avenue, Bronx, NY 10455.

30.     Capital One issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

31.     Pursuant to its standard account agreement, Capital One charges fees (currently in the amount of $35) for debit card transactions that purportedly result in an overdraft.

### A.     Mechanics of a Debit Card Transaction

32.     A typical debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from the Bank. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to the customer's bank, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

33.     At this step, if the transaction is approved, Capital One immediately decrements the available funds/available balance in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

34.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account. This is referred to in the banking industry as "posting" or "settling"—something which may occur several days after the transaction was initially initiated.

35.     There is no change—no impact whatsoever—to the available funds in an account when posting or payment of a transaction that settles in the same amount for which it authorized

occurs. That is because available funds amounts do not change for debit card transactions that settle in the same amount for which they were authorized.

B.     **Capital One Account Documents**

36.     Plaintiff's checking account with Capital One was, at all relevant times, governed by Capital One's standardized contract for deposit accounts, the material terms of which are drafted by Capital One, amended by Capital One from time to time at its convenience and complete discretion, and imposed by Capital One on all of its customers.

37.     Capital One's "Rules Governing Deposit Accounts," the contact between the Bank and its consumer accountholders, contains the following relevant provisions:

> If you provide your ATM card or ATM/Debit Card and personal access code to a third party, you have authorized the third party to withdraw funds from your account at an ATM machine or point of sale terminal.
>
> […]
>
> You can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions.
>
> [….]
>
> Credits, like a check or cash deposit, increase your available balance. Debits, like ATM withdrawals and debit card transactions, decrease your balance. We will process credits and debits as follows:
>
> - []
> - After we have processed any credits to your account, we will process debits. First, we group any similar types of debits (like all checks) together into separate categories. Then, we process those debits within each category in a specific order such as by dollar amount. For some debits, we will know the time you made the transaction. This allows us to post the debit closer to the time you actually made the debit transaction instead of by dollar amount.
>
> […]
>
> Debit card transactions and fees [processed by] Date and time, if available[.]
>
> **Overdrafts.** We may in our sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and

withdrawals against your account for an amount in excess of your available balance (an "Overdraft"). Generally, we will not authorize and pay overdrafts for ATM transactions and everyday debit card transactions, unless you have authorized us to do so. . . . You acknowledge and agree that no oral or other statement made to you by any of our officers or employees . . . may be construed by you, or by any third person, or by any court or arbitrator, to in any way modify, amend, or contravene the foregoing provisions. . . . You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account.

Ex. A, at 2, 3.

38. The critical, and repeatedly used, contract term "to cover" is never defined.

39. No express language in any document states that the Bank may impose fees for overdrafts on APPSN Transactions.

## C. The Account Documents Fundamentally Misconstrue the Bank's True Overdraft Fee and Debit Processing Practices

40. The account documents misconstrue the Bank's true debit card processing and overdraft fee practices in at least four ways.

41. First, and most fundamentally, the Bank charges overdraft fees on debit card transactions for which there are sufficient available funds to "cover" the transactions. That is despite repeated contractual representations that the Bank will only charge overdraft fees on transactions with insufficient available funds to "cover" a given transaction.

42. The Bank assesses overdraft fees on APPSN Transactions that *do* have sufficient available funds to "cover" them throughout their lifecycle.

43. Those available funds are sequestered at the moment a debit card transaction is approved by Capital One.

44. The Bank's practice of charging overdraft fees even where sufficient available funds exist to "cover" a transaction violates a contractual promise not to do so. This discrepancy

9

between the Bank's actual practice and the contract causes consumers like Plaintiff to incur more overdraft fees than they should.

45.     Second, the account documents repeatedly state that overdraft assessments are based on available funds or "available balance."   But in reality, the Bank does not even use an "available funds" calculation or "available balance" to determine whether transactions are eligible for overdraft fees—it uses a different, secret balance to do so during nightly batch posting.

46.     When the Bank uses a balance other than available balance or funds available—a secret posting balance—to assess overdraft fees, it violates a contractual promise to use available balance or an available fund calculation as the exclusive method with which to determine whether overdraft fees will be assessed.

47.     Third, sufficient funds for APPSN Transactions are debited from the account immediately.

48.     Capital One promises it will do this:  The Bank states that "Debits, like ATM withdrawals and debit card transactions, decrease your balance."  Ex. A, at 2.  Of course, this "decrease" only happens at the moment a transaction is authorized, immediately.

49.     And the Bank makes yet another promise of immediate debit when it states that "If you provide your ATM card or ATM/Debit Card and personal access code to a third party, you have authorized the third party to withdraw funds from your account at an ATM machine or point of sale terminal."  Of course, a consumer is only at a machine or terminal at the time of purchase.

50.     If it truly complied with these provisions, no overdraft fees would be assessed on APPSN Transactions for which there was an available balance.

51.    Because these withdrawals take place upon initiation, then cannot be re-debited later.  But that is what Capital One does when it re-debits the account during nightly batch posting.

52.    In reality, the Bank's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and at the time of settlement.  (Indeed, some transactions never make it past the starting gate and generate an overdraft fee at the point of sale precisely because, at that assessment, they are overdrawn and because Capital One makes a determination, at authorization, pursuant to the contract.)  Then the Bank makes that determination again, at settlement.

53.    At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, Capital One cannot then charge an overdraft fee on such a transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

54.    The Bank's practice of assaying the same transaction twice violates a contractual promise not to do so.  This discrepancy between the Bank's actual practice and the contract causes consumers to incur more overdraft fees than they should.

55.    Fourth, the Bank breaches a promises to process transactions "close[] to the time you actually made the debit transaction[.]" and to use a "processing order" for debit card transaction based on "date and time."  Ex. A, at 2.

56.    It does no such thing.  Indeed, Capital One in no way processes transactions "close to the time" that the debit card was actually swiped.  In the case of Plaintiff, Capital One did not process transactions until as many as *four days* after her debit card was swiped.

11

Therefore, contrary to its contractual representation, Capital One allows intervening transactions (debit or otherwise) that were initiated *after* the APPSN Transactions to process, causing the APPSN Transactions to "settle" into a negative balance despite there having been sufficient available funds at the time of purchase. Capital One is free to protect its interests and either reject those intervening transactions or charge overdraft fees (or insufficient funds fees) on those intervening transactions, but in light of its contractual promise to process debit card transactions "close to the time" they are actually made, to *also* charge overdraft fees on those transactions defies any reasonable expectation.

57.     Indeed, the entire debit card posting process is misconstrued in the account agreement. The only time Capital One even refers obliquely to nightly batch posting, it does so in a manner that promises consumers that it will "post" "close[] to the time you actually made the debit transaction[.]" Ex. A, at 2.

58.     This discrepancy between the Bank's actual practices and the contract causes consumers to incur more overdraft fees than they should.

59.     In sum, there is a yawning gap between the Bank's practices as described in the account documents and the Bank's practices in reality.

**D.      The Bank Abuses Contractual Discretion**

60.     The Bank's treatment of debit card transactions to charge overdraft fees is not simply a breach of the express terms of the numerous account documents. In addition, Capital One exploits contractual discretion to the detriment of accountholders when it uses these policies.

61.     First, the term "to cover" a transaction is undefined: *e.g.*, "You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in

your account to cover all of the debits presented for payment against your account." Ex. A, at 2, 3. The Bank uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term. In the Bank's definition, a transaction is not "covered" even if the Bank sequesters sufficient available funds for that transaction.

62. Second, the Bank maintains discretion to selectively charge overdraft fees on certain transactions it considers "overdrawn," but not others. It uses that discretion to charge overdraft fees on APPSN Transactions that no reasonable consumer would believe could cause overdraft fees—because those transactions were authorized into positive available funds.

63. Third, the Bank uses its contractual discretion to cause APPSN Transactions to incur overdraft fees by knowingly authorizing transactions it that it allows to consume available funds previously sequestered for APPSN Transactions: "**We may in our sole discretion,** and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an "Overdraft"). Generally, we will not authorize and pay overdrafts for ATM transactions and everyday debit card transactions, unless you have authorized us to do so*. You have no right to overdraw your account at any time, for any reason, and **our decision to pay Overdraft items is solely within our discretion.**" Ex. A, at 3 (emphasis added).

64. Capital One uses all of these contractual discretion points unfairly to extract overdraft fees on transactions that no reasonable consumer would believe could cause overdraft fees.

## E. Reasonable Consumers Understand Debit Card Transactions are Debited Immediately

65. The assessment of overdraft fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if

13

funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then they are necessarily applied to the debit card transactions for which they are debited.

66. Capital One was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

67. As discussed above, Capital One makes an affirmative promise that funds are removed immediately when it states "If you provide your ATM card or ATM/Debit Card and personal access code to a third party, you have authorized the third party to withdraw funds from your account *at an ATM machine or point of sale terminal*" (emphasis added). Ex. A, at 1. A consumer is only at a machine or terminal at the time of purchase.

68. Capital One well knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because they don't allow debt like credit cards do, and because the money comes directly out of a checking account.

69. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." See http://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited June 8, 2016) (emphasis added).

70.     Further, Consumer Action informs consumers that, "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."

71.     This is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[2]

72.     Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit cards purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly. The Capital One account agreement's statement that providing a debit card to a merchant "authorize[s] the third party to withdraw funds from your account at . . . [the] point of sale terminal," Ex. A, at 1, fully supports the reasonable belief that once a debit card is swiped and authorized into available funds, the purchase is complete, just like a cash purchase.   Despite this contractual representation, Capital One still manages to charge overdraft fees on the APPSN Transactions days after they settle into positive funds.

73.     Capital One was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the order the transactions are actually initiated— and its account agreement only supports this perception.

---

[2] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MARKETWATCH, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

**F.  Plaintiff's Experience**

74.     On June 4, 2015, Plaintiff was assessed an overdraft fee in the amount of $35.00 for a debit card transaction in the amount of $3.03 that occurred and was authorized on June 2, 2015, despite her having a positive balance in excess of that amount at all times on June 2, 2015.

75.     On June 29, 2015, Plaintiff was assessed two overdraft fees (each in the amount of $35.00) for two debit card transactions in the amounts of $38.62 and $208.00 that each occurred and were authorized on June 27, 2015, despite her having a positive balance in excess of the total of those transactions at all times on June 27, 2015.

76.     On July 13, 2015, Plaintiff was assessed an overdraft fee in the amount of $35.00 for a debit card transaction in the amount of $14.00 that occurred and was authorized on July 11, 2015, despite her having a positive balance in excess of that amount at all times on July 11, 2015.

77.     On August 17, 2015, Plaintiff was assessed an overdraft fee in the amount of $35.00 for a debit card transaction in the amount of $0.99 that occurred and was authorized on August 14, 2015, despite her having a positive balance in excess of that amount at all times on August 14, 2015.

78.     On September 8, 2015, Plaintiff was assessed three overdraft fees (each in the amount of $35.00) for two debit card transactions in the amounts of $76.56 and $88.20 that each occurred and were authorized on September 4, 2015, and one debit card transaction in the amount of $6.85 that occurred and was authorized on September 7, 2015, despite her having a positive balance in excess of the total of those three transactions as all times from September 4, 2015, through September 7, 2015.

79.     Thus, on no fewer than five separate occasions, Plaintiff's account was assessed overdraft fees (sometimes multiple fees on the same occasion) due to a negative "available balance" that was generated by transactions that occurred subsequent to the transactions which were authorized into a positive "available balance," but had not yet settled to Plaintiff's account.

80.     Capital One assessed overdraft fees on the held transactions even though it had sequestered available funds for those transactions at the time they were authorized.

## CLASS ALLEGATIONS

81.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

82.     The proposed classes are defined as:

All Capital One checking account holders in the United States who, from June 22, 2010 through the date of class certification, were charged overdraft fees on transactions that were authorized into a positive available balance (the "National Class").

All Capital One checking account holders in New York who, from June 22, 2010 through the date of class certification, were charged overdraft fees on transactions that were authorized into a positive available balance (the "New York Sub-Class").

The National Class and the New York Sub-Class are collectively referred to as the

"Class" or "Classes."

83.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

84.     Excluded from the Classes are Capital One, its parents, subsidiaries, affiliates, officers and directors, any entity in which Capital One has a controlling interest, all customers

who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

85.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Capital One's records.

86.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged overdraft fees by Capital One as a result of overdraft fees being charged on transactions that were authorized into a sufficient available balance, but whose available balances were insufficient at the time the transactions were settled. The representative Plaintiff, like all Class members, has been damaged by Capital One's misconduct in that they have been assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of Capital One's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

87.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

88.     Among the questions of law and fact common to the Classes are whether Capital One:

      a.     Imposed overdraft fees on debit card transactions when those transactions were authorized into sufficient available balances or funds available;

      b.     Breached its contract and the covenant of good faith and fair dealing with Plaintiff and other members of the Classes through its overdraft policies and practices on APPSN Transactions;

        c.     Converted money belonging to Plaintiff and other members of the Classes through its overdraft policies and practices;

        d.     Was unjustly enriched through its overdraft policies and practices; and

        e.     Violated the consumer protection acts of certain states through its overdraft policies and practices.

        Other questions of law and fact common to the Classes include:

        f.     The proper method or methods by which to measure damages, and

        g.     The declaratory relief to which the Classes are entitled.

89.     Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices of Capital One's Rules Governing Deposit Accounts. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

90.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

91.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Capital One, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Capital One's misconduct will proceed without remedy.

92.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of the Classes)

93.     Plaintiff repeats paragraphs 1 through 92 above.

94.     Plaintiff and Capital One have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in Capital One's Rules Governing Deposit Accounts.

95.     The Bank misconstrued in the account documents its true debit card processing and overdraft fee practices and breached the express terms of the account documents.

96.     The Bank breached promises included in the account documents by: making overdraft fee determinations on balances other than the "available balance" or "available funds;" assaying debit card transactions more than once to determine whether the transaction is overdrawn; and debiting an account in two different instances for the same transaction.

97.     No contract provision authorizes Capital One to charge overdraft fees on APPSN Transactions.

98.     Therefore, Capital One breached the terms of its account documents by charging overdraft fees on transactions that were authorized into a sufficient available balance, but whose available balances were insufficient at the time the transactions were settled.

99.     Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Rules Governing Deposit Accounts.

100.     Plaintiff and members of the Classes have sustained damages as a result of Capital One's breach of the Rules Governing Deposit Accounts.

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of the Classes)

101.     Plaintiff repeats paragraphs 1 through 100 above.

102.     Plaintiff and Capital One have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in Capital One's Rules Governing Deposit Accounts.

103.     Under the laws of the states where Capital One does business, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract, in addition to its form. In short, the parties are obligated to not take action which will have the effect of injuring or destroying the other party's right to receive the benefit of the contract, and the duties of good faith and fair dealing imply any promise that a reasonable person in the position of the promise would be justified in understanding to be

included. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

104. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

105. Capital One has breached the covenant of good faith and fair dealing in the account agreement through its overdraft policies and practices as alleged herein. Specifically, Capital One harms consumers by abusing its contractual discretion in a number of ways which no reasonable consumer would anticipate. First, the term "to cover" a transaction is undefined: e.g., "You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account." Ex. A, at 2, 3. The Bank uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term. In the Bank's definition, a transaction is not "covered" even if the Bank sequesters sufficient available funds for that transaction.

106. Second, the Bank maintains discretion to selectively charge overdraft fees on certain transactions it considers "overdrawn," but not others. It uses that discretion to charge overdraft fees on APPSN Transactions that no reasonable consumer would believe could cause overdraft fees—because those transactions were authorized into positive available funds.

107. Third, the Bank uses its contractual discretion to cause APPSN Transactions to incur overdraft fees by knowingly authorizing transactions that it allows to consume available

funds previously sequestered for APPSN Transactions: "**We may in our sole discretion,** and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an "Overdraft"). Generally, we will not authorize and pay overdrafts for ATM transactions and everyday debit card transactions, unless you have authorized us to do so\*. You have no right to overdraw your account at any time, for any reason, and **our decision to pay Overdraft items is solely within our discretion.**" Ex. A, at 3 (emphasis added).

108.     Capital One uses all of these contractual discretion points to extract overdraft fees on transactions that no reasonable consumer would believe could cause overdraft fees.

109.     Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the account documents.

110.     Plaintiff and members of the Classes have sustained damages as a result of Capital One's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
#### Conversion
#### (On Behalf of the Classes)

111.     Plaintiff repeats paragraphs 1 through 110 above.

112.     Capital One had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

113.     Capital One has wrongfully collected overdraft fees from Plaintiff and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

114.     Capital One has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Classes, without legal justification.

23

115.    Capital One continues to retain these funds unlawfully without the consent of Plaintiff or members of the Classes.

116.    Capital One intends to permanently deprive Plaintiff and the members of the Classes of these funds.

117.    These funds are properly owned by Plaintiff and the members of the Classes, not Capital One, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Classes.

118.    Plaintiff and the members of the Classes are entitled to the immediate possession of these funds.

119.    Capital One has wrongfully converted these specific and readily identifiable funds.

120.    Capital One's wrongful conduct is continuing.

121.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Classes have suffered and continue to suffer damages.

122.    By reason of the foregoing, Plaintiff and the members of the Classes are entitled to recover from Capital One all damages and costs permitted by law, including all amounts that Capital One has wrongfully converted.

### FOURTH CLAIM FOR RELIEF
#### Unjust Enrichment
#### (On Behalf of the Classes)

123.    Plaintiff repeats paragraphs 1 through 122 above, excluding statements which allege that valid contractual terms govern the challenged conduct.

124.    Plaintiff, on behalf of herself and the Classes, asserts a common law claim for unjust enrichment, in the alternative.

24

125.    By means of Capital One's wrongful conduct alleged herein, Capital One knowingly provided banking services to Plaintiff and members of the Classes that was unfair, unconscionable, and oppressive.

126.    Capital One knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Classes. In so doing, Capital One acted with conscious disregard for the rights of Plaintiff and members of the Classes.

127.    As a result of Capital One's wrongful conduct as alleged herein, Capital One has been unjustly enriched at the expense of, and to the expense and detriment of, Plaintiff and members of the Classes.

128.    Capital One's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

129.    Under the common law doctrine of unjust enrichment, it goes against equity and good conscience for Capital One to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the Classes in an unfair, unconscionable, and oppressive manner. Capital One's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

130.    The financial benefits derived by Capital One rightfully belong to Plaintiff and members of the Classes. Capital One should be compelled to disgorge, in a common fund for the benefit of Plaintiff and members of the Classes, all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by Capital One traceable to Plaintiff and the members of the Classes.

131.    Plaintiff and members of the Classes have no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**New York General Business Law § 349**
**(On Behalf of the New York Sub-Class)**

132.    Plaintiff repeats paragraphs 1 through 131 above.

133.    This claim is asserted on behalf of the members of the New York Sub-Class under New York's consumer protection law, New York General Business Law § 349, *et seq.* ("GBL § 349").

134.    Capital One engaged in deceptive acts or practices relating to the imposition of overdraft fees on consumers, in violation of GBL § 349, N.Y. Gen. Bus. Law. § 349(a).

135.    GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." *Id.*

136.    Capital One engaged in deceptive acts or practices, unlawful conduct, made affirmative misrepresentations, or otherwise violated GBL § 349 by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance, and misrepresenting and failing to disclose its policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance in its Rules Governing Deposit Accounts.

137.    Capital One also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated GBL § 349 by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and beneficial to Capital One.

138.    Capital One's deceptive acts or practices were "consumer-oriented." *E.g.*, *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 532–33, 647

N.E.2d 741 (1995)).

139.   Capital One intended that Plaintiff and the members of the New York Sub-Class rely on the acts of concealment and omissions, so that Plaintiff and the members of the New York Sub-Class would continue to incur overdraft fees.

140.   Capital One's conduct caused Plaintiff and the members of the New York Sub-Class to suffer ascertainable losses in the form of excessive overdraft fees that, but for Capital One's unfair and deceptive policy of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance and using the available balance at both the time of a transaction's authorization and settlement to make two separate overdraft fee determinations for a single transaction, would not otherwise have been imposed.

141.   A causal relationship exists between Capital One's unlawful conduct and the ascertainable losses suffered by Plaintiff and the members of the New York Sub-Class. Had Capital One charged overdraft fees on transactions only if they were approved and authorized into an insufficient balance, and made only a single overdraft fee determination for each transaction, Plaintiff and the members of the New York Sub-Class would not have incurred excessive overdraft fees in violation of GBL § 349.

142.   As redress for Capital One's repeated and ongoing violations of GBL § 349, Plaintiff and the New York Sub-Class are entitled to, *inter alia*, actual damages, treble damages, declaratory relief, and reasonable attorney's fees.   N.Y. Gen. Bus. Law. § 349(h).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.   Declaring Capital One's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.    Restitution of all overdraft fees paid to Capital One by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.    Disgorgement of the ill-gotten gains derived by Capital One from its misconduct;

4.    Actual damages in an amount according to proof;

5.    Punitive and exemplary damages;

6.    Pre-judgment interest at the maximum rate permitted by applicable law;

7.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.    Such other relief as this Court deems just and proper.

Dated: June 22, 2016

/s/Laurie Rubinow
Laurie Rubinow (LR6637)
James E. Miller
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
lrubinow@sfmslaw.com
jmiller@sfmslaw.com

Hassan Zavareei (*pro hac vice* to be filed)
Jeffrey Kaliel (*pro hac vice* to be filed)
Andrew Silver (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com

Jeffrey M. Ostrow (*pro hac vice* to be filed)
**KOPELOWITZ OSTROW P.A.**
200 S.W. First Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
alperstein@kolawyers.com

*Counsel for Plaintiff and the Proposed Classes*