**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| TAWANNA M. ROBERTS, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>  - against -<br><br><br>CAPITAL ONE FINANCIAL CORPORATION, doing business as CAPITAL ONE BANK,<br>        Defendant. | No. 16 Civ. 4841 (LGS) |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

James R. McGuire (*pro hac vice*)
Grant C. Schrader (*pro hac vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
jmcguire@mofo.com
gschrader@mofo.com

Jessica L. Kaufman
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jkaufman@mofo.com

*Attorneys for Defendant Capital One, N.A., erroneously sued as "Capital One Financial Corporation, doing business as Capital One Bank"*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

I.  PRELIMINARY STATEMENT ................................................................................. 1

II.  BACKGROUND ........................................................................................................ 2

    A.  The Account Agreements ................................................................................ 2

        1.  Overdrafts and Overdraft Fees.................................................... 3

        2.  Holds ............................................................................................. 5

    B.  Plaintiff's Allegations ..................................................................................... 5

III.  ARGUMENT .............................................................................................................. 6

    A.  Standard of Review.......................................................................................... 6

    B.  The Breach of Contract Claim Fails Because Overdraft Fees on
        APPSN Transactions Comply with the Parties' Agreement........................... 7

        1.  Capital One's Right to Overdraft Fees Can Be Triggered
            Only When Transactions Are "Presented for Payment," Not
            at "Authorization."...................................................................... 8

        2.  Nothing in the Account Agreements Requires Capital One
            to "Sequester" Funds for Particular Transactions.................... 11

        3.  Plaintiff's Authorization and Sequestration Theories Ignore
            the Processing Delays Associated with Debit Card
            Transactions. .............................................................................. 13

    C.  Plaintiff Cannot Use a Breach of Covenant Claim to Alter the
        Terms of the Account Agreements. ............................................................... 15

    D.  The Unjust Enrichment Claim Fails as a Matter of Law Because
        the Parties' Relationship Is Governed by the Account Agreements.................. 16

    E.  The Conversion Claim Fails as a Matter of Law. ............................................... 17

    F.  Plaintiff's Claim Under New York General Business Law § 349
        Fails................................................................................................................. 18

IV.  CONCLUSION......................................................................................................... 20

sf-3685697

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*,
No. 04-CV-8832 (KMK), 2007 WL 2962591 (S.D.N.Y. Oct. 10, 2007)...............................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................6, 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................................6, 7

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*,
448 F.3d 573 (2d Cir. 2006)...................................................................................................16

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005)............................................................................................15, 16

*Childers v. N.Y. & Presbyterian Hosp.*,
36 F. Supp. 3d 292 (S.D.N.Y. 2014)......................................................................................13

*Cohen v. JP Morgan Chase & Co.*,
498 F.3d 111 (2d Cir. 2007).................................................................................................18

*Cox v. NAP Constr. Co.*,
891 N.E.2d 271 (N.Y. 2008)..................................................................................................16

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
639 F.3d 557 (2d Cir. 2011).............................................................................................8, 11

*Gutierrez v. Wells Fargo Bank, NA*,
704 F.3d 712 (9th Cir. 2012) ...............................................................................................19

*ICD Holdings S.A. v. Frankel*,
976 F. Supp. 234 (S.D.N.Y. 1997).....................................................................................15, 16

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*,
1 F. Supp. 3d 34 (E.D.N.Y.), *on reconsideration*, 14 F. Supp. 3d 99 (E.D.N.Y. 2014)..........18

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995) .......................................................................................................3

*Johnson v. Nextel Commc'ns, Inc.*,
660 F.3d 131 (2d Cir. 2011)...............................................................................................7, 12

*Koch v. Acker, Merrall & Condit Co.*,
    967 N.E.2d. 675 (N.Y. 2012) ............................................................................... 18

*Kopel v. Bandwidth Tech. Corp.*,
    868 N.Y.S.2d 16 (App. Div. 1st Dep't 2008) ...................................................... 17

*L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*,
    558 F. Supp. 2d 378 (E.D.N.Y. 2008) ................................................................ 16

*Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*,
    481 F. App'x 622 (2d Cir. 2012) ........................................................................ 18

*Mark Patterson, Inc. v. Bowie*,
    654 N.Y.S.2d 769 (App. Div. 1st Dep't 1997) ............................................. 15, 16

*Mendez v. Bank of Am. Home Loans Servicing, LP*,
    840 F. Supp. 2d 639 (E.D.N.Y. 2012) ......................................................... 15, 19

*NY Medscan, LLC v. JC-Duggan Inc.*,
    837 N.Y.S.2d 80 (App. Div. 1st Dep't 2007) ...................................................... 17

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
    765 N.Y.S.2d 575 (App. Div. 1st Dep't 2003) .................................................... 17

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir. 2003) ................................................................................. 8

*SPCP Grp., LLC v. Eagle Rock Field Servs., LP*,
    No. 12 Civ. 3610(PAC), 2013 WL 359650 (S.D.N.Y. Jan. 30, 2013) ................. 11

*Spread Enters., Inc. v. First Data Merch. Servs. Corp.*,
    No. 11-CV-4743(ADS)(ETB), 2012 WL 3679319 (E.D.N.Y. Aug. 22, 2012) ...... 16

*Subaru Distributors Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005) ................................................................................. 3

**RULES**

Fed. R. Civ. P.
    Rule 8 .................................................................................................................... 6
    Rule 12(b)(6) ......................................................................................................... 6

**STATUTES**

12 C.F.R.
    § 205.17(a) ............................................................................................................ 3
    § 7.4007(b)(3) ..................................................................................................... 20

sf-3685697

N.Y. Gen. Bus. Law
   § 349.................................................................................................................2, 6, 18, 19

**OTHER AUTHORITIES**

Debit, Merriam-Webster's Dictionary,
   http://www.merriam-webster.com/dictionary/debit (last visited Aug. 29, 2016).....................9

## I.     PRELIMINARY STATEMENT

The entire complaint in this action rests on a simple fact:  Plaintiff Tawanna M. Roberts spent more funds than she had in her checking account.  She did so by engaging in debit card transactions that the merchants with whom she did business did not present to Capital One for payment until days later.  In the interim, she spent the funds needed to pay those transactions. Capital One paid them anyway.  Paying these transactions overdrew Plaintiff's account, and Plaintiff incurred overdraft fees.  On this basis, Plaintiff sued Capital One.

The Complaint in this action is a confusing mix of unsupported, repetitive arguments and conclusory allegations that cannot hide the simple premise of this case:  Plaintiff spent money that was needed to pay transactions that were authorized—transactions of which she was well aware—but that had not yet posted to her account.  This action is, fundamentally, for breach of contract.  But Plaintiff's agreements with Capital One specifically afford Capital One the right to overdraw Plaintiff's account and impose a fee, while making clear to customers how to avoid overdrafts under the precise circumstances described in the Complaint, namely:  "You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account."  (Compl. Ex. A (Rules Governing Deposit Accounts) at 3, Overdrafts.)  Further, upon opening an account with a debit card, customers "agree not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against your account."  (Declaration of James R. McGuire ("McGuire Decl."), Ex. 1 (Electronic Fund Transfer Agreement and Disclosure) § 3(D).)  That is precisely what Plaintiff failed to do here.  Plaintiff's breach of contract claim fails not only because she is unable to point to any provisions of her agreements with Capital One that Capital One has breached, but because she alleges that she made purchases against funds that were needed to pay ATM/Debit Card

-1-

transactions that had not yet been presented for payment against her account. Her claim for breach of contract should be dismissed.

Plaintiff's other claims merely restate her breach of contract claim, and/or fail for other reasons. Plaintiff's implied covenant claim is substantively identical to her breach of contract claim and should be dismissed for the same reasons. Plaintiff's conversion claim is barred by the well-established rule preventing plaintiffs from recasting a contractual claim as a conversion claim sounding in tort, as Plaintiff attempts to do here. Moreover, Plaintiff cannot satisfy the elements of conversion because Capital One did not convert any property owned by Plaintiff. The Complaint also fails to state a claim for unjust enrichment because the subject matter of this action is governed by express written agreements—the Account Agreements. And finally, Plaintiff's claim under New York General Business Law § 349 fails because Plaintiff cannot show that Capital One's assessment of the overdraft fees at issue, which complied with the Account Agreements, was "materially misleading."

The Court should therefore dismiss the Complaint with prejudice.

## II.     BACKGROUND

### A.     The Account Agreements

Plaintiff alleges that she maintained a checking account and debit card with Capital One. (Compl. ¶¶ 29, 74-78.) As Plaintiff admits, this checking account was governed by the Rules Governing Deposit Accounts ("Deposit Agreement").[1] (Compl. § 36, Ex. A.) The first paragraph of the Deposit Agreement expressly refers to and incorporates other account documents, including, as relevant here, the New Account Information Card and Electronic Fund

---

[1] Plaintiff erroneously named "Capital One Financial Corporation, doing business as Capital One Bank" as the defendant in this action, but Capital One, N.A. is the proper defendant here. As shown by the Deposit Agreement, Capital One, N.A., is the entity with which plaintiff has contracted and at which she maintained her checking account.

sf-3685697

Transfer Agreement and Disclosure (the "EFT Agreement," and together with the Deposit Agreement, the "Account Agreements").[2]

Plaintiff agreed to abide by the terms and conditions of these Account Agreements. When she opened her account, she signed an "Account Information Card" in which she "ACKNOWLEDGE[D] RECEIPT OF A COPY" of the Deposit Agreement and EFT Agreement and "AGREE[D] TO THE TERMS AND CONDITIONS OF THIS ACCOUNT AS DESCRIBED IN SAID DISCLOSURES, INCLUDING ANY AND ALL AMENDMENTS THERETO." (McGuire Decl., Ex. 2 (Account Information Card); *see also* Deposit Agreement at 1 ("By opening or continuing to maintain a deposit account with us, each customer . . . agrees to be bound by the applicable provisions of these Rules, and all applicable agreements, disclosures, and other documents[.]").) Among other terms, she agreed to pay Capital One "Overdraft fees for each Overdraft item" drawn on Plaintiff's account that Capital One elected to pay. (Deposit Agreement at 3, Overdrafts.) As described below, the Account Agreements clearly disclose Capital One's procedures for processing these overdrafts and assessing overdraft fees.

### 1.      Overdrafts and Overdraft Fees

An "overdraft" occurs when the account holder spends more money than she has deposited in the account and the bank covers the difference. *See* 12 C.F.R. § 205.17(a) (defining "overdraft service"). For example, if a customer uses a debit card for a purchase and there are

---

[2] The Court may properly consider the Account Information Card and EFT Agreement because they are expressly incorporated into the Deposit Agreement, which Plaintiff attaches to the Complaint, and Plaintiff relies on the "terms and effect" of these documents in framing her allegations, given their clear relevance to the transactions at issue. *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint."); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (when complaint relies on "terms and effect" of documents, they are "integral" to Complaint, and can be considered on motion to dismiss).

insufficient funds in the account when the merchant presents the transaction to the bank for payment, but the bank honors its promise to pay the merchant, an overdraft results.

As the Deposit Agreement states, Capital One provides overdraft services to its customers, and charges fees for each "Overdraft item":

> We may in our sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an "Overdraft").  Generally, we will not authorize and pay overdrafts for ATM transactions and everyday debit card transactions, unless you have authorized us to do so.  You have no right to overdraw your account at any time, for any reason, and our decision to pay Overdraft items is solely within our discretion.  You understand and agree that if we elect to pay Overdraft items or to permit an Overdraft to exist in your account, you have no right to defer payment, and you must deposit additional funds into your account promptly in an amount sufficient to cover the Overdraft and to pay us Overdraft fees for each Overdraft item in accordance with our current Schedule of Fees and Charges. . . .  You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account.

(Deposit Agreement at 3, Overdrafts.)

An overdraft can occur *only* when there are insufficient available funds to cover a "debit[] presented for payment" against a customer's account, but Capital One "pay[s] it anyway"—that is, in the case of a debit card transaction, when Capital One processes cash withdrawals from the checking account or pays the merchant who accepted the customer's debit card.  (*Id.*; EFT Agreement § 5.)  Importantly, the Deposit Agreement advises customers to be mindful of the order that Capital One processes credits and debits to accounts—or how Capital One "decide[s] what posts first and last each day"—because that order "might not be the same as the order you make transactions and could result in overdraft transactions."  (Deposit Agreement at 2, Processing Order of Credits and Debits.)  That is why Capital One advises customers that they can avoid overdrafts and the associated fees as long as they "make[e] sure that you have

-4-

sufficient available funds in your account to cover *all* of the debits *presented for payment* against your account." (*Id.* at 3, Overdrafts (emphases added).)

## 2. Holds

Capital One processes millions of electronic debit card transactions every day, and the technology and procedures underlying that massive effort is more complex than any customer would want or need to understand his or her account.  The EFT Agreement does, however, specifically address how Capital One will handle funds held when it approves a request from a merchant to authorize a transaction conducted with Plaintiff's debit card:

> If we authorize the transaction, the funds will be debited from your primary checking account immediately or a hold may be placed on your account for up to several days after the purchase transaction has occurred, depending upon the promptness with which the merchant processes your transaction.
>
> Some purchases may result in a longer hold. Sometimes the preauthorization requests may be in amounts different from the total amount of the transaction. For example, a gas station typically requests authorization in the amount of $1.00. Also, restaurants typically request authorization for 20% more than the price of the meal. If the preauthorization request varies from the amount of the actual transaction, payment of the transaction may not remove the preauthorization hold immediately.

(EFT Agreement § 3(D).)  The EFT Agreement further explains that such holds "may affect the availability of funds from your designated account for other transactions." (*Id.*)  Accordingly, upon opening an account with a debit card, customers "agree not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against your account." (*Id.*)

## B. Plaintiff's Allegations

Plaintiff alleges that on at least five occasions between June 2015 and September 2015, she entered into "debit card transactions" that resulted in the assessment of $35 overdraft fees to her checking account.  (Compl. ¶¶ 74-79.)  She further alleges that she would have had sufficient

sf-3685697

funds in her account to cover each of these transactions on the date they were authorized, but that by the time each transaction posted to her account days later, her subsequent account activity had caused her account to carry a "negative available balance." (*Id.*)  As a result, when Capital One paid each of the transactions identified in the Complaint, Plaintiff's account was overdrawn, triggering the assessment of overdraft fees.[3]  (*Id.* ¶ 79.)  Plaintiff refers to these transactions as "Authorize Positive, Purportedly Settle Negative" or "APPSN" transactions.  (*Id.* ¶ 4.) Plaintiff purports to represent a putative nationwide class and New York sub-class of Capital One account holders "who, from June 22, 2010 through the date of class certification, were charged overdraft fees on transactions that were authorized into a positive available balance." (Compl. ¶ 82.)

## III.   ARGUMENT

Plaintiff asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, unjust enrichment, and violation of New York General Business Law § 349.  (Compl. ¶¶ 93-142.)  None of her claims entitle her to relief.

### A.   Standard of Review

To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The purpose of this requirement and the pleading standard in Rule 8 is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  This "requires more than labels and conclusions, and

---

[3] Plaintiff alleges that this occurred "even though [Capital One] had sequestered available funds for those transactions at the time they were authorized," (Compl. ¶ 80), but as described below in Section III.B.2, this mischaracterizes the authorization and posting process described in Plaintiff's Account Agreements.

a formulaic recitation of the elements of a cause of action will not do." *Id.*  Thus, a complaint

will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"

*Iqbal*, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct," dismissal is warranted.  *Id.* at 679.

A complaint stating facts "merely consistent with" a defendant's liability "stops short of the line

between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 678 (quoting *Twombly*,

550 U.S. at 557).

### B.     The Breach of Contract Claim Fails Because Overdraft Fees on APPSN Transactions Comply with the Parties' Agreement.

To state a claim for breach of contract under New York law, "the complaint must allege:

(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure

of defendant to perform; and (iv) damages."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131,

142 (2d Cir. 2011).  Here, Plaintiff's claim fails because she has not offered any plausible

allegation that Capital One breached its obligations under the Account Agreements.

Plaintiff does not contest Capital One's right to charge overdraft fees under the Account

Agreements.  (*See* Compl. ¶ 56.)  Rather, she takes issue with the *timing* of overdraft

assessments, claiming in various repetitive and overlapping arguments that Capital One allegedly

breached its promise to make overdraft determinations based on only the "available funds" or

"available balance" in her account at the time a transaction was initially authorized, even though,

because of other transactions she initiated,[4] she had insufficient funds in her account by the time

---

[4] Notably, Plaintiff admits that Capital One was "free to" charge overdraft fees on these "intervening transactions" that caused her account to overdraw.  (Compl. ¶¶ 8, 56.)

a merchant requested payment and the transaction posted to her account (i.e., APPSN transactions).[5]  (Compl. ¶¶ 2-4, 41-46, 74-79.)

Plaintiff does not point to a provision in the Account Agreements that requires Capital One to assess overdrafts in the manner she alleges.  Nor can she—it does not exist.  Because the conclusory allegations underlying her authorization theory "strain the contract language beyond its reasonable and ordinary meaning" and contradict the plain terms of the provisions in the Account Agreements governing overdraft assessments, Plaintiff's breach of contract claim should be dismissed.  *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (the "court should not find [contract] language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning"); *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("[W]ords and phrases in a contract should be given their plain meaning" and a "contract should be construed so as to give full meaning and effect to all of its provisions").

## 1.    Capital One's Right to Overdraft Fees Can Be Triggered Only When Transactions Are "Presented for Payment," Not at "Authorization."

Plaintiff's authorization theory conflicts with the plain terms of the Account Agreements, which repeatedly describe overdrafts as triggered by a *payment* from a customer's account.  There is nothing technical about the term "payment."  A payment does not occur until funds change hands.  In the context of a checking account transaction, a transaction is paid when funds are debited from the customer's checking account and transferred to the merchant payee, rather

---

[5] Plaintiff makes this same argument in many different ways.  (*See* Compl. ¶ 96 (alleging Capital One breached promises in the Deposit Agreement by "making overdraft fee determinations on balances other than the 'available balance' or 'available funds;' assaying debit card transactions more than once to determine whether the transaction is overdrawn; and debiting an account in two different instances for the same transaction").)  But for each of these arguments, the underlying theory is always the same: overdrafts can *only* be determined once at the time of authorization, rather than at posting.

than when it is initially authorized, as Plaintiff claims.  As these terms show, whether a transaction will overdraw a customer's account can *only* be determined based on the amount of funds available to pay it at the time of payment, not at authorization.

For example, Plaintiff primarily bases her authorization theory on the admonition in the Deposit Agreement that customers can avoid overdrafts by "making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account."  (Compl. ¶¶ 41-46; Deposit Agreement at 3, Overdrafts.)  According to Plaintiff, whether a customer has "available funds" to "cover" a transaction is determined at the time of authorization.  (Compl. ¶¶ 41-46.)  But Plaintiff's unsupported interpretation of these terms is unreasonable in light of the critical language in the same sentence that plainly refers to "available funds" and "cover" in the context of "debits ***presented for payment***" against her account.  (Deposit Agreement at 3, Overdrafts (emphasis added).)  "Debits" are not "presented for payment" at the time of authorization; they are "presented for payment" when a transaction posts to an account and funds are transferred out of the account to pay the merchant.[6] The classic illustration of this difference is the restaurant bill that serves as an example in the EFT Agreement.  A restaurant that accepts tips will seek authorization for an assumed amount— typically 20% more than the price of the meal.  If the transaction is authorized, Capital One will promise to pay up to the authorized amount, but the amount the merchant presents for *payment* from the customer to the restaurant may be less, if for instance, a customer added a 5% tip instead.  Capital One does not, for instance, pay a 20% tip initially and require that the merchant refund the 15% difference.  On the other hand, a generous customer may leave a 50% tip.  Again,

---

[6] "Debit," by its plain meaning, refers to when a transaction is paid and the funds to pay it leave the account.  *See* Debit, Merriam-Webster's Dictionary, http://www.merriam-webster.com/dictionary/debit (last visited Aug. 29, 2016) (defining "debit" as a verb meaning "to enter upon the debit side of an account" or "to take money from (an account).").

sf-3685697

the transaction may be paid—and Capital One cannot know until the transaction is presented for payment whether it will overdraw the customer's account.

Indeed, the entire overdrafts provision in the Deposit Agreement repeatedly and unequivocally discusses and defines overdrafts in the payment—and not authorization—context:

> We may in our sole discretion, and without obligation, **elect to pay** checks and other items drawn on your deposit account or to **permit automatic bill payments and withdrawals** against your account for an amount in excess of your available balance (an "Overdraft"). Generally, we will not authorize and **pay** overdrafts for ATM transactions and everyday debit card transactions, unless you have authorized us to do so. You have no right to overdraw your account at any time, for **any** reason, and our decision to **pay** Overdraft items is solely within our discretion. You understand and agree that if we **elect to pay** Overdraft items or to permit an Overdraft to exist in your account, you have no right to defer payment, and you must deposit additional funds into your account promptly in an amount sufficient to cover the Overdraft and to pay us Overdraft fees for each Overdraft item in accordance with our current Schedule of Fees and Charges. . . . You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the **debits presented for payment** against your account.

(Deposit Agreement at 3, Overdrafts (emphases added).) Similarly, the EFT Agreement (which contains much of the same language) describes overdrafts as occurring "when you do not have enough money in your designated account to cover a transaction, but **we pay it anyway**." (EFT Agreement § 5 (emphasis added).)

Importantly, though Plaintiff complains about the assessment of overdraft fees, she ignores the fact that under the plain terms of both agreements, it is Capital One's *payment* of an overdraft item that triggers its right to charge overdraft fees. (*See* Deposit Agreement at 3, Overdrafts) ("You understand and agree that **if we elect to pay** Overdraft items . . . you must deposit additional funds into your account promptly in an amount sufficient to cover the Overdraft and to pay us Overdraft fees for each Overdraft item[.]"); EFT Agreement § 5 (same).) Yet, as Plaintiff admits, payment—i.e., when funds are transferred from the customer's account to the merchant's bank—does not occur at initial authorization; it occurs at posting. (*See* Compl.

-10-

¶¶ 33-34.) Thus, Plaintiff's theory that overdraft determinations must be based on the "available funds" at the time of authorization, when an overdraft does not even occur until posting—that is, when "debits" are "presented for payment" against the account—"strain[s] the contract language beyond its reasonable and ordinary meaning." *Fed. Ins. Co.*, 639 F.3d at 568.

To interpret the Account Agreements otherwise would lead to an absurd result. If it were the case that Capital One decided whether a transaction would overdraw at authorization (and it is not), Capital One could charge Plaintiff an overdraft fee for any transaction authorized into overdraft, regardless of whether a customer deposited funds sufficient to pay the transaction before the merchant asked to be paid. This absurd result is at odds with the plain terms of the agreement, and further suggests that Plaintiff's interpretation of the agreement is unreasonable. *See SPCP Grp., LLC v. Eagle Rock Field Servs., LP*, No. 12 Civ. 3610(PAC), 2013 WL 359650, at *6 (S.D.N.Y. Jan. 30, 2013) (courts must avoid interpreting a contract in a manner that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties").

### 2. Nothing in the Account Agreements Requires Capital One to "Sequester" Funds for Particular Transactions.

To get around this clear language in the Account Agreements governing the timing of overdraft assessments, Plaintiff next argues that APPSN transactions, by definition, always have sufficient "available funds" at <u>both</u> authorization and posting. (Compl. ¶¶ 2, 41-44.) She purports to base this theory on the disclosure in the Deposit Agreement that customers can avoid overdrafts by "making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account." (Compl. ¶¶ 41-46; Deposit Agreement at 3, Overdrafts.) According to Plaintiff, this provision requires Capital One to "sequester" funds at the time it authorizes a transaction, so they are "available" to "cover" that

particular transaction "throughout [the transaction's] entire life cycle." (Compl. ¶¶ 2, 41-46.) But there is no support for this conclusory assertion anywhere in the Account Agreements.

Nothing in the overdrafts disclosure or the remaining provisions of the Account Agreements requires Capital One to permanently sequester funds for *particular transactions*. Indeed, not only does Plaintiff fail to cite *any* language that would support such an obligation, her interpretation contravenes the plain language of the overdrafts disclosure on which she purports to rely. The "available funds" language in this disclosure cautioned Plaintiff to keep sufficient available funds in her account to cover "**all**" of the "debits presented for payment on the account," not any particular transaction. (*See* Deposit Agreement at 3, Overdrafts (emphasis added).) Plaintiff does not and cannot allege that she had sufficient funds in her account to cover all of her transactions (or, indeed, that she was making any attempt to balance her checking account or otherwise monitor her balance at all).

Nor can Plaintiff blame Capital One for failing to "sequester" funds for each APPSN transaction that overdrew her account. It is *Plaintiff*, not Capital One, who agrees to "sequester" funds being held in response to an authorization request. Under the EFT Agreement, Plaintiff "agree[d] not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against [her] account." (EFT Agreement § 3(D).) Plaintiff violated this agreement when she made further purchases against the funds necessary to pay her APPSN transactions, causing her account to fall into a negative balance and her APPSN transactions to overdraw. Had Plaintiff complied with this provision, her APPSN transactions would not have incurred overdraft fees. Her failure to comply with this provision alone warrants dismissal of this claim. *See Johnson*, 660 F.3d at 142 ("performance by the plaintiff" is a necessary element of a breach of contract claim).

In any event, because Plaintiff does not and cannot identify any provision in the contract requiring Capital One to sequester funds for particular transactions, her theory cannot support a breach of contract claim.  *See Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014) ("[A] complaint must allege the essential terms of the parties' purported contract 'in nonconclusory language,' including the specific provisions of the contract upon which liability is predicated.")

>    **3.**     **Plaintiff's Authorization and Sequestration Theories Ignore the Processing Delays Associated with Debit Card Transactions.**

Plaintiff's authorization and sequestration theories also make little sense given the two-step authorization and posting process in place for debit card transactions, as clearly described in the EFT Agreement.  Initial authorization amounts from merchants frequently differ—often substantially—from the posted amounts that Capital One ultimately pays, as described in the EFT Agreement.  (*See* EFT Agreement § 3(D) ("Sometimes the preauthorization requests [from merchants] may be in amounts different from the total amount of the transaction. For example, a gas station typically requests authorization in the amount of $1.00.  Also, restaurants typically request authorization for 20% more than the price of the meal.").)  This fact highlights the absurdity of Plaintiff's position: how can Capital One sequester funds and determine if a transaction will overdraw an account at the time of authorization when it does not even know how much it will ultimately have to pay until posting?

Indeed, Plaintiff herself seems to acknowledge this problem, noting as "exceptions" to her authorization and sequestration theories the "small number of debit transactions [that] settle for an amount different than the amount initially authorized."  (Compl. ¶ 2 n.5.)  But, as the EFT Agreement makes clear, it is hardly a "small number" of transactions that are impacted.  In fact, the opposite is true.  (*See* EFT Agreement § 3(D) ("Sometimes the preauthorization requests

-13-

[from merchants] may be in amounts different from the total amount of the transaction. For example, a gas station **typically** requests authorization in the amount of $1.00.  Also, restaurants **typically** request authorization for 20% more than the price of the meal.") (emphasis added).)

That is why, as disclosed in the EFT Agreement, Capital One may place holds on the account "for up to several days after the purchase transaction has occurred, depending upon the promptness with which the merchant processes your transaction."  (*Id.*)  Because those holds "may affect the availability of funds from your designated account for other transactions," the EFT agreement required Plaintiff to "agree not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against your account."  (*Id.*)

Yet, as discussed above, that is precisely what Plaintiff did here.  Before the transactions she identifies in the Complaint posted against her account, she entered into intervening transactions against "funds that [were] needed to pay" those initial transactions.  (*Id.*)  Plaintiff blames Capital One for allowing her intervening transactions (debit or otherwise) to process before the initial transaction, thus causing her initial transactions to settle into negative balance. (Compl. ¶¶ 55-58.)  But under the plain terms of the agreement, the onus was on *Plaintiff* not to enter into those intervening transactions if she did not have the funds to pay them.  She may not like being charged for overdrafts, but it was her responsibility under the parties' contract to avoid them.  Because she failed to do so, and Capital One paid her overdrafts, it was contractually entitled to charge Plaintiff fees.

*     *     *

In sum, because Plaintiff has failed to allege any conduct by Capital One that breached her agreements with the bank, her breach of contract claim (and consequently, as discussed

-14-

below, all of her other claims) should be dismissed.  *See, e.g., Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 657 (E.D.N.Y. 2012) (dismissing breach of contract claim because there was "no plausible claim" that the default-servicing fees charged by the defendant violated any "express terms" of his mortgage contract).

### C.    Plaintiff Cannot Use a Breach of Covenant Claim to Alter the Terms of the Account Agreements.

Plaintiff cannot circumvent the clear terms of her agreements with Capital One by relying on the implied covenant of good faith and fair dealing.  It is well-established that "the implied covenant can only impose an obligation *consistent* with other mutually agreed upon terms in the contract" and "does not add [ ] to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (emphasis added) (citations omitted); *Mark Patterson, Inc. v. Bowie*, 654 N.Y.S.2d 769, 771 (App. Div. 1st Dep't 1997) (implied covenant cannot be construed to conflict with express contract provision).  Further, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of the covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997).

Here, though she slightly reframes her allegations on Capital One's "discretion" under the parties' contract, Plaintiff's breach of the implied covenant and fair dealing claim is based on the exact same conduct she contends breached the Account Agreements—the imposition of overdraft fees for APPSN transactions—and the exact same theory of liability—that the parties' contract requires Capital One to make overdraft determinations only at the time a transaction authorizes, rather than when a transaction settles.  (*Compare* Compl. ¶¶ 41-57, 96 *with* ¶¶ 60-63, 105-107.)  Accordingly, this claim should be dismissed as duplicative of the breach of contract

-15-

claim.  *See, e.g.*, *ICD Holdings S.A.*, 976 F. Supp. at 243-44; *Spread Enters., Inc. v. First Data Merch. Servs. Corp.*, No. 11-CV-4743(ADS)(ETB), 2012 WL 3679319, at *4 (E.D.N.Y. Aug. 22, 2012) (rejecting plaintiff's argument that allegations concerning defendant's exercise of discretion to unilaterally charge fees under contract stated separate implied covenant claim). Further, as demonstrated above, the authorization theory underlying both claims is at odds with the clear and unambiguous terms of the Account Agreements.  Accordingly, Plaintiff's implied covenant claim should be dismissed for this reason as well.  *See Broder*, 418 F.3d at 198-99; *Mark Patterson, Inc.*, 654 N.Y.S.2d at 771.

>    **D.      The Unjust Enrichment Claim Fails as a Matter of Law Because the Parties'
>             Relationship Is Governed by the Account Agreements.**

Under New York law, unjust enrichment is a "quasi-contractual claim; an obligation that the law creates in the absence of any agreement."  *L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 558 F. Supp. 2d 378, 409 (E.D.N.Y. 2008) (citing *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 587 (2d Cir. 2006)).  Thus, an unjust enrichment claim—even if pled "in the alternative," as Plaintiff does (Compl. ¶ 124)—"can be maintained only in the absence of a valid, enforceable contract" that governs the subject matter of the dispute, which the parties indisputably have here.  *Spread Enters., Inc.*, 2012 WL 3679319, at *5-6 (dismissing unjust enrichment claim where the parties disputed the interpretation of the governing contract, but not its validity).  Plaintiff concedes that the Deposit Agreement with Capital One is enforceable, and that it forms the basis of her breach of contract claim.  (Compl. ¶¶ 37, 94-100.)  Accordingly, Plaintiff's unjust enrichment claim fails as a matter of law.  *See, e.g.*, *Cox v. NAP Constr. Co.*, 891 N.E.2d 271, 278 (N.Y. 2008) (holding a party may not recover in unjust enrichment where the parties have entered into a contract that governs the subject matter).

### E.       The Conversion Claim Fails as a Matter of Law.

The elements of a cause of action for conversion in New York are: (1) a plaintiff's "legal ownership or an immediate superior right of possession to specifically identifiable property," and (2) the defendant's exercise of "unauthorized dominion over that property to the exclusion of the plaintiff's rights." *NY Medscan, LLC v. JC-Duggan Inc.*, 837 N.Y.S.2d 80, 81 (App. Div. 1st Dep't 2007).  Plaintiff's conversion claim fails for two primary reasons.  First, the conversion claim merely restates her contractual claims.  And second, Plaintiff fails to plead ownership of the allegedly converted funds.

Plaintiff here seeks to recast her contractual arguments regarding the alleged "wrongful" collection of overdraft fees as a tort claim for conversion.  (Compl. ¶ 113.)  New York law, however, makes clear that a line should be maintained between conversion claims and contract claims.  *See Kopel v. Bandwidth Tech. Corp.*, 868 N.Y.S.2d 16, 17 (App. Div. 1st Dep't 2008) (A cause of action for conversion "cannot be predicated on a mere breach of contract."); *AD Rendon Commc'ns, Inc. v. Lumina Americas, Inc.*, No. 04-CV-8832 (KMK), 2007 WL 2962591, at *4 (S.D.N.Y. Oct. 10, 2007) ("[E]ven if a plaintiff meets all of the elements of a conversion claim, the claim will still be dismissed if it is duplicative of a breach of contract claim."); *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 590 (App. Div. 1st Dep't 2003) (holding that plaintiff's action for conversion, "while satisfying the technical elements of that tort, was properly dismissed as duplicative of the insufficient contract claims.") (internal citations omitted).  Here, Plaintiff's claims are governed by an enforceable contract that addresses the subject matter of this claim:  the Account Agreements.  Accordingly, she cannot state a claim for conversion.  *See, e.g., AD Rendon Commc'ns, Inc.*, 2007 WL 2962591, at *4 (dismissing conversion claim as duplicative of breach of contract claim).

-17-

Even if Plaintiff's conversion claim were not barred as duplicative, it would nevertheless fail because she cannot plead ownership of the deposit funds in question, an essential element of her claim.  The funds in Plaintiff's checking account are property of Capital One, not Plaintiff. *See In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 53 (E.D.N.Y.) (dismissing conversion claim based on assessment of overdraft fees because "depositors . . . cannot bring a conversion cause of action against . . . their bank, as the funds deposited therein 'are not sufficiently specific and identifiable, in relation to the bank's other funds, to support' such a claim." (quoting *Fundacion Museo de Arte Contemporaneo de Caracas v. CBI–TDB Union Bancaire Privee,* 160 F.3d 146, 148 (2d Cir. 1998) (per curiam))), *on reconsideration*, 14 F. Supp. 3d 99 (E.D.N.Y. 2014); *Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.,* 481 F. App'x 622, 627 (2d Cir. 2012) ("[M]oney deposited in a general account at a bank does not remain the property of the depositor.  Upon deposit . . . the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it . . . .").

Because Plaintiff's conversion claim is duplicative of her breach of contract claim and Plaintiff cannot plead ownership of the funds in question, Plaintiff's conversion claim should be dismissed.

### F.    Plaintiff's Claim Under New York General Business Law § 349 Fails.

To successfully assert a claim under GBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012).  To be misleading, the "alleged act must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).

-18-

Plaintiff alleges that Capital One violated GBL § 349 by misrepresenting and failing to disclose in the Deposit Agreement its practice of charging overdraft fees on APPSN transactions, and abusing its discretion to interpret undefined terms in the Deposit Agreement.  (Compl. ¶¶ 136-137.)  In other words, this claim is based on the same allegations as Plaintiff's contract claims (i.e., that overdraft fees on APPSN transactions violate the parties' contract), which, as discussed above, have no merit.  Because the overdraft fees charged to Plaintiff complied with the express terms of the Account Agreements, there is no "materially misleading" conduct supporting this claim.  *See, e.g.*, *Mendez*, 840 F. Supp. 2d at 659.

*Mendez* is instructive here.  In that case, the plaintiff brought breach of contract and GBL § 349 claims (among others) against his home mortgage servicer for charging allegedly excessive default-related servicing fees under the parties' mortgage contract.  840 F. Supp. 2d at 644, 656.  The plaintiff argued, as Plaintiff does here, that the fees were "deceptive and misleading" under GBL § 349 because they violated the parties' contract.  *Id.* at 657, 659.  But the Court properly rejected that argument and dismissed the plaintiff's GBL § 349 claim (and the breach of contract claim), reasoning that the parties' contract contained no "express limitation on the appropriate amount of default-related servicing fees," and was thus not misleading.  *Id.* at 659.  The same is true here with respect to Capital One's assessment of overdraft fees on Plaintiff's APPSN transactions—there was nothing misleading about charging fees to Plaintiff that fully complied with the parties' contract.  Accordingly, this claim should be dismissed.

Further, to the extent Plaintiff challenges Capital One's alleged failure to disclose its practice of charging overdraft fees on APPSN transactions, that claim is expressly preempted by federal banking regulations.  *See, e.g.*, *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 726 (9th Cir. 2012) ("The requirement to make particular disclosures falls squarely within the

purview of federal banking regulation and is expressly preempted." (citing 12 C.F.R. § 7.4007(b)(3))).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff has failed to state a claim as a matter of law against Capital One.  Therefore, Capital One respectfully requests that the Court dismiss each of Plaintiff's claims in their entirety and with prejudice.


Dated:  San Francisco, California          MORRISON & FOERSTER LLP
       September 2, 2016

By:    /s/ James R. McGuire

    James R. McGuire (*pro hac vice*)
    Grant C. Schrader (*pro hac vice*)
    425 Market Street
    San Francisco, California
    Telephone: (415) 268-7000
    jmcguire@mofo.com
    gschrader@mofo.com

    Jessica L. Kaufman
    250 West 55th Street
    New York, New York 10019
    Telephone: (212) 468-8000
    jkaufman@mofo.com

    *Attorneys for Defendant Capital One, N.A., erroneously sued as "Capital One Financial Corporation, doing business as Capital One Bank"*

-20-