G9DLROB1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TAWANNA M. ROBERTS,

        Plaintiff,

    v.                      16 CV 4841 (LGS)

CAPITAL ONE FINANCIAL
CORPORATION,

        Defendant.
------------------------------x
                              New York, N.Y.
                              September 13, 2016
                              10:41 a.m.

Before:

              HON. LORNA G. SCHOFIELD,

                        District Judge

                APPEARANCES

TYCKO & ZAVAREEI LLP
    Attorneys for Plaintiff
BY: JEFFREY D. KALIEL
    ANDREW SILVER

MORRISON & FOERSTER LLP
    Attorneys for Defendant
BY: JESSICA KAUFMAN
    JAMES R. McGUIRE (By Telephone)

1           (In the robing room)

2           (Case called)

3           MR. KALIEL:  Good morning.  My name is Jeffrey Kaliel
4   from Tycko & Zavareei in Washington, D.C.  I represent
5   plaintiff Roberts.

6           MR. SILVER:  Andrew Silver from Tycko & Zavareei also
7   on behalf of plaintiff Roberts.

8           THE COURT:  We don't have the right firm name for you
9   all.  Are you on ECF with all of your information, no recent
10  change of law firm?

11          MR. KALIEL:  No, your Honor.  I think we're both pro
12  hac'ed.

13          THE COURT:  Okay.  We'll get it.

14          MS. KAUFMAN:  Good morning, your Honor.  Jessica
15  Kaufman from Morrison & Foerster on behalf of Capital One Bank.

16          THE COURT:  Who's on the phone?

17          MR. McGUIRE:  Good morning, your Honor.  James McGuire
18  also with Morrison & Foerster for Capital One.

19          THE COURT:  Great.  We're here for an initial
20  conference and I have your joint letter, which is dated
21  September 6, and I have your proposed case management plan.
22  And I also have plaintiff's additional letter, which is dated
23  September 12, requesting an extension of time to respond to the
24  motion to dismiss.

25          So I guess where I will start out, let's do some

1   housekeeping first.  I gather there is an issue with naming the
2   correct defendant, and the parties have agreed that the correct
3   corporate defendant should be substituted.  So if you'd like to
4   do a stipulation for me to so order and submit it, I will do
5   that.
6              MR. KALIEL:  Thank you, your Honor.
7              MS. KAUFMAN:  Thank you.
8              THE COURT:  Okay.  Second issue is the extension of
9   time on the motion to dismiss.  I guess my first question is
10  why do you need more time and then I'll address the dates.
11             MR. KALIEL:  The answer is simply, your Honor, it's a
12  combination of vacation schedules and current briefs due in
13  other cases.  Those are the only reasons.  We could of course
14  always work late and get it done, but it would be certainly
15  better for us if we had a little more time.  And we agreed to
16  let the defendant seek an extension of time earlier, as well,
17  so we thought it would be fair, your Honor.
18             THE COURT:  In light of the courtesies that counsel
19  have extended to each other, it seems appropriate to extend the
20  time.  So I'll grant the extension of time you've requested.
21  Plaintiff's time to respond will be extended to October 10.
22  And defendant's reply will be October 26.  And I'll put that in
23  an order on ECF so that it's clear and official.
24             So it seems to me that the biggest issue here has to
25  do with whether or not discovery should be stayed.  I have not

1    had a chance to look at the motion to dismiss.  It's obviously

2    not fully briefed in any event.  But I will be interested in

3    what you have to say about the motion in order to decide where

4    we go with discovery.  So since defendant is the movant, I'll

5    hear from either Ms. Kaufman or Mr. McGuire first.

6             MS. KAUFMAN:  Okay.  Thank you, your Honor.  So simply

7    put, this is a contract dispute and before the Court on the

8    motion to dismiss are the contracts governing the plaintiff's

9    account.

10            The case has to do with overdraft fees that are

11   incurred on transactions that when the customer authorizes the

12   transaction, in other words, when he or she swipes his or her

13   card or provides his information or her information to a

14   merchant, there are sufficient funds available in the account

15   to cover the amount of authorization, but by the time the

16   transaction posts, in other words, by the time the merchant

17   actually seeks payment for the transaction, which can happen a

18   couple of days later, intervening account activity has

19   happened.  In other words, the customer might have taken out

20   money at an ATM, a check that she previously wrote may have

21   cleared, something has changed in the balance, and there's no

22   longer available funds to pay for the transaction when the

23   merchant requests payment.

24            THE COURT:  What is the intervening time about, why is

25   there a gap of a few days?

1          MS. KAUFMAN:  It has to do with the nature of debit

2    card processing, and this is true across the industry.  It's

3    not just unique to Capital One.  But the process is when you go

4    to a restaurant, for instance, the restaurant takes your card

5    and they swipe your card and they get what's called an

6    authorization.  And the authorization is not payment because at

7    that point, for instance, at a restaurant, you don't know how

8    much the bill is going to be.  They swipe your card before you

9    put the tip on.

10         So what the authorization is is the merchant is

11   seeking permission from the bank to later demand payment for an

12   amount that might be to be determined, and the bank, if it

13   authorizes the transaction, promises that it will be paid later

14   on.  So that is the first step in the process.  That's

15   authorization.  The transaction isn't often, in fact, isn't

16   anywhere paid instantly when the card is swiped.

17         Sometimes merchants seek payment for the transaction

18   the same day.  It depends on the merchant's practice.  And it's

19   not something Capital One has control over, totally up to the

20   merchant.

21         THE COURT:  How do they seek payment?

22         MS. KAUFMAN:  They seek payment by presenting the

23   transaction to the bank.  So it's a different step in the

24   process and it's something -- I'm not familiar with the

25   mechanics of it on the merchant's side, but every merchant does

1   it differently.  It's I assume an electronic request for
2   payment that goes to the financial institution at some point
3   after the transaction is authorized and that can take -- that
4   can be the same day, but often it can be a different day.  And
5   if you've ever looked at, if you use online banking, often
6   transactions that are sometimes referred to as pending or
7   processing are in this state between authorization and payment
8   of the transaction.
9           THE COURT:  Okay.  So just to sort of cut to the
10  chase, I saw in the letter that it's your position that the
11  contract explicitly says that Capital One can basically do what
12  you just described.  Do you have contract language you could
13  read to me or show me?
14          MS. KAUFMAN:  Sure, your Honor, and that's exactly
15  right.  Just to summarize what the contract says, it says
16  Capital One is empowered to overdraw the customer's account to
17  charge fees for overdrafts.  And I think there are two pieces
18  of language that we think are really key here and I think we
19  agree with the plaintiffs on what the first piece is, which is
20  on page 3 of the deposit agreement.  The deposit agreement
21  states:  To customers, you can avoid overdrafts on your account
22  by always making sure that you have sufficient funds available,
23  pardon me, sufficient available funds in your account to cover
24  all of the debits presented for payment against your account.
25  That's the first piece of language in the deposit agreement.

1      The second key piece of contractual language here and
2 that is important because --
3      THE COURT:  That doesn't sound like an agreement
4 though.  That sounds like advice.
5      MS. KAUFMAN:  Yeah.  Well --
6      THE COURT:  It implies we can overdraw your account.
7      MS. KAUFMAN:  Exactly.  There's more fundamental
8 language that I don't think is really in dispute here that says
9 that Capital One, earlier in that same paragraph, that Capital
10 One may in our sole discretion and without obligation --
11      THE COURT:  You need to go a little slower for the
12 court reporter.
13      MS. KAUFMAN:  -- elect to pay checks and other items
14 drawn on your deposit account or to permit automatic bill
15 payments and withdrawals against your account for an amount in
16 excess of your available balance.
17      THE COURT:  Okay.  Got that.
18      MS. KAUFMAN:  And because of the nature of this
19 contract, a lot of the language goes on to explain how
20 customers can avoid overdrafts, that piece of language cover
21 all of the debits presented for payment against your account
22 being part of that explanation.
23      And then in the agreement which is incorporated by
24 reference in the deposit agreement called the electronic funds
25 transfer agreement, there are a couple of other pieces of

1    language that we would regard as key here.  It states, you
2    agree not to withdraw -- this is to the customer -- you agree
3    not to withdraw, write checks, or make point of sale purchases
4    against funds that are needed to pay ATM debit card
5    transactions that have not yet posted against your account.
6    And that is in the context of explaining to customers in a
7    portion that I won't read in its entirety because it's a little
8    bit long that transactions that are authorized are subject to
9    what are called holds that may last, as we just discussed, may
10   last for multiple days.
11            So plaintiff's view is that --
12            THE COURT:  I'll hear your view.  Then I'll let
13   plaintiffs tell me their view.
14            MS. KAUFMAN:  Our view is that there's nothing in the
15   deposit agreement that supports the view that either
16   immediately a transaction is paid when the card is swiped or
17   that when a card is swiped, funds are sequestered to pay for
18   that particular transaction.  In fact what the contract says is
19   that Capital One can overdraw against a customer's account if
20   the customer withdraws in excess of her available balance.
21   That customer should keep sufficient available funds in their
22   accounts to cover all of the debits presented for payment
23   against their accounts and that the customer agrees not to
24   spend money that is needed to pay for ATM and debit card
25   transactions that have not yet posted to the account, in other

1    words, transactions that have authorized but not yet posted.

2             THE COURT:  Okay.  And so the dispute is about a

3    penalty that Capital One imposes when there are overdrafts and

4    it's $35 a transaction; is that right?

5             MS. KAUFMAN:  That's correct, your Honor.

6             THE COURT:  Okay.  So let me hear from plaintiffs.

7             MR. KALIEL:  Yes, your Honor.  There has been a

8    significant amount of litigation regarding overdraft fees in

9    the last six or seven years in this country and much of that

10   litigation has to do with the manner in which transactions are

11   posted to an account, after authorization but posted a few days

12   later.  And many of those cases allege that banks were changing

13   the order in which transactions -- from the order in which

14   transactions were made, changing the order and posting them in

15   a high to low order, not the order in which the transactions

16   were actually made.

17            THE COURT:  High to low meaning dollar amount?

18            MR. KALIEL:  Exactly. And so when you post a higher

19   dollar amount transaction first, it decreases the account

20   balance more quickly, causing smaller dollar transactions to

21   get overdraft fees, more overdraft fees than those cases allege

22   were justified.  Those cases have almost all wrapped up.

23            THE COURT:  Wrapped up meaning settled?

24            MR. KALIEL:  Mostly.  Those were say two or three

25   years ago.

| | |
|---|---|
| 1 | THE COURT:  Settled or dismissed? |
| 2 | MR. KALIEL:  The vast majority of them settled for |
| 3 | millions and millions of dollars.  There has been some |
| 4 | litigation on the practices we're talking about in this case, |
| 5 | which is a different practice.  And these cases -- this is one |
| 6 | of maybe two or three in the country so far -- these cases talk |
| 7 | about something entirely different. |
| 8 | What we're alleging is that at the moment you swipe |
| 9 | your debit card when you're in a grocery store, something real |
| 10 | happens and at that moment money is taken out of your account |
| 11 | in real time at the moment you're standing there.  The |
| 12 | available balance is decreased.  The money is set aside and |
| 13 | cannot be used for other purposes for that specific |
| 14 | transaction.  We say the contract then means, if you read the |
| 15 | contract fairly and you read it in conjunction with how the |
| 16 | process actually works in real life, we say that that means you |
| 17 | no longer are in jeopardy for an overdraft fee on that |
| 18 | transaction if there was enough money when you swiped your |
| 19 | card, enough money in your account when you swiped your card |
| 20 | when the transaction took place. |
| 21 | THE COURT:  I think I just heard Ms. Kaufman say that |
| 22 | that's not true as a factual matter, that the money isn't set |
| 23 | aside. |
| 24 | MR. KALIEL:  That is a factual dispute, your Honor. |
| 25 | We believe it is.  We allege it is. |

G9DLROB1

1       THE COURT:  Why do you think so?
2       MR. KALIEL:  A couple reasons.  We litigate against
3  banks routinely.  We litigated this identical case against Bank
4  of America and we did learn, your Honor, that the money is
5  taken out of the account immediately.
6       THE COURT:  Okay, at least in the case of Bank of
7  America.
8       MR. KALIEL:  Well, but we know just if we use common
9  sense, your Honor, we know that the available balance is
10 decreased immediately upon swiping because the bank wants to
11 keep track for subsequent transactions what is going on on the
12 account.  So there is a balance somewhere in the bank called an
13 available balance that reduces at the moment I swipe my card
14 and that money we believe and we allege is set aside for that
15 transaction and that it is, if you read the contract, unfair or
16 unjustified to later charge an overdraft fee on that
17 transaction.
18       (Continued on next page)
19
20
21
22
23
24
25

1               THE COURT:  So tell me again how it violates the
2      contract?
3               MR. KALIEL:  Because we believe the contract
4      indicates -- in a couple of places we have alleged in the
5      complaint that it indicates and tells the consumers that the
6      money is taken out of the account immediately.
7               THE COURT:  The contract says money is taken out of
8      the account immediately?
9               MR. KALIEL:  It says, for example, debits, like ATM
10     withdrawals and debit card transactions, decrease your balance
11     immediately.  That is one example.
12              It also says, your Honor, that overdraft fees are only
13     charged where there are not sufficient available funds to cover
14     the transaction at issue.  There are two key terms in that
15     phrase, that sentence I just read you.
16              Available funds.  What does that mean?
17              That is a realtime running balance.  It is a term of
18     art in the banking industry.  It means, snapshot of time, what
19     money is in my account based on what happened up until that
20     moment.
21              The other term that is important is to cover.  What
22     does it mean to have available funds to cover a transaction?
23              We believe if you've swiped your card the bank has set
24     aside money for that transaction.  That money is to cover that
25     transaction, and you may no longer charge an overdraft fee on

1  it.

2  THE COURT: Sorry to be a broken record. If you just
3  told me what the contract says and you have explained that, I
4  lost that piece. Tell me what the contract says that you are
5  referencing now or that --

6  MR. KALIEL: Sure.

7  The contract says you can avoid overdrafts on your
8  account by always making sure you have enough available funds
9  in your account to cover your transactions.

10  MS. KAUFMAN: I don't actually think that is the exact
11  contractual language. I am reading it right now. I'm sorry to
12  correct you. I am sorry to interrupt.

13  THE COURT: That is fine.

14  MS. KAUFMAN: That is not the contractual language.

15  THE COURT: Read the contractual language.

16  MS. KAUFMAN: The contractual language says, You can
17  avoid overdrafts on your account by always making sure that you
18  have sufficient available funds in your account to cover all of
19  the debits presented for payment against your account.

20  MR. KALIEL: Perhaps we have a different earlier
21  version of a deposit agreement. I am not sure it changes much.

22  MS. KAUFMAN: It is attached.

23  THE COURT: It is attached to the complaint. OK.

24  MR. KALIEL: I am not sure what the discrepancy arises
25  from, but the key terms are the same. Sufficient funds

1    available to cover.  We believe when the money is taken out at
2    the time of the transaction it is there to cover that
3    transaction.  That is the whole purpose to take out that money.
4              what this points too, your Honor, is a fundamental
5    need to determine what the bank's posting and processing
6    practices are for debit card transactions and to determine what
7    some of these contested terms actually mean in the bank's own
8    parlance or what they should mean before there can be any
9    decision on a motion to dismiss, before there can ultimately be
10   a decision on a motion for summary judgment.
11             The Court in the similar Bank of America case on this
12   very issue that I am talking about, it is called Bodnar v. Bank
13   of America.
14             THE COURT:  Where is it pending?
15             MR. KALIEL:  It is no longer pending.  It was in the
16   Eastern District of Pennsylvania.
17             THE COURT:  What was its docket number?
18             MR. KALIEL:  Your Honor, may I hand you the denying
19   the motion to dismiss in that case.
20             THE COURT:  Sure.
21             MR. KALIEL:  Your Honor, in that case, similar facts,
22   similar contract, similar language, some differences.  The
23   Court heard argument on a motion to dismiss and essentially
24   said what I am saying to you now, which is that these questions
25   are something we are going to need discovery on in order to

1    actually determine.  We are going to need to understand how the
2    process actually works, and what the terms actually mean before
3    I, the court, am going be able to make a decision on what this
4    contract means.  And so denied the motion to dismiss in that
5    case and set us off on a eight- or nine month discovery
6    process.
7              We think that is going to need to happen here.  We
8    think it doesn't make sentence to delay that process while this
9    motion to dismiss is pending.
10             If I can make one last argument on why I think it
11   makes sense to start discovery now.  We know in discovery in a
12   case like this it is going to be a big undertaking.  It is
13   going to take a long time just to get that discovery process up
14   and running.
15             We have to issue discovery requests and meet and
16   confer and talk about electronic search protocols.  These
17   things take time.  They take two to three to four months.  We
18   think it makes sense to start that lengthy process now without
19   waiting for an order to the motion to dismiss, because even if
20   the Court disagrees with us and grants the motion to dismiss --
21   we hope and think it won't happen -- there hasn't been a
22   massive investment of resources , time in that initial starting
23   up of the process, the two to three months of meeting and
24   conferring.  Some attorney hours, but it probably hasn't gotten
25   to the point where the bank has started to have to produce

1  significant amounts of documents or that we are doing
2  depositions.
3          THE COURT: I can certainly order that it not include
4  that.
5          MR. KALIEL: I think that would also be fair, your
6  Honor.
7          THE COURT: Ms. Kaufman.
8          MS. KAUFMAN: Thank you, your Honor.
9          I would just like to respond to a couple of points
10 Mr. Kaliel has just raised concerning the motion to dismiss and
11 then discuss discovery.
12         First, regarding the Bodnar action, which is, as you
13 rightly pointed out, against Bank of America and not Capital
14 One, I understand that Mr. Kaliel has interpreted what the
15 Court ordered in response to the motion to dismiss, but what
16 the order actually says is that after reviewing the amended
17 complaint and the exhibits attached thereto, the Court is
18 constrained to find that the allegations of the plaintiff are
19 sufficient to survive dismissal at this stage of the case.
20         The Court later said on the record at a conference
21 about the amended complaint and subsequent motion to dismiss
22 the second amended complaint and this motion to dismiss that
23 complaint, that the Court had not considered the contracts,
24 even though they were attached to the complaint. The Court had
25 not considered the contracts on the first motion to dismiss and

1  on the second motion to dismiss the amended complaint would
2  consider the agreements.
3      So we think that that may be a matter of what the case
4  law is in the Eastern District of Pennsylvania and the Third
5  Circuit on incorporation by reference and what is before the
6  Court on the pleadings.
7      But I think this idea that the judge made some -- fact
8  discovery, all of this stuff is not in the order is all I want
9  to say.
10     Second, the deposit agreement does address
11 Mr. Kaliel's first point, which I think he said that the
12 posting order cases and this case are different.
13     He's right in a way. But, in a way, this case is also
14 about posting order because the idea behind the complaint is
15 you swipe your card at time X, we post it at time Y, it is a
16 different time than you might, you know than a customer swipes.
17     THE COURT: Yes.
18     MS. KAUFMAN: The rules governing deposit accounts
19 state expressly what the bank's processing order is on page 2
20 of the agreement.
21     It says, We process credits and debits to your account
22 in a specific order. We refer to this as the processing order,
23 and it is how we decide what posts first and last each day.
24 The processing order determines the order you will see items on
25 your statement. Our processing order might not be the same as

the order you make transactions and can result in overdraft transactions. I apologize. This is where you got your language from, you can avoid overdraft fees.

Here it says you can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions. The agreement does contemplate this idea, and disclosed to consumers clearly that the posting order may be different than the order in which the customer perceives they initiate the transaction.

THE COURT: I'm going to interrupt only because I have many conferences after and I think I have heard enough to figure out where we should go from here.

What I am going to do is I am not going to stay discovery, but I will allow discovery only to the extent of exchanging requests for documents, negotiating the scope of those requests, and agreeing to an ESI protocol.

If you would like a form of ESI protocol, if you don't have your own that you would like, there is one that is suggested or at least has a checklist attached to the Southern District of New York pilot program for complex cases, which is on the website.

I will set a deadline for that, which is two months. I expect you to have that done in two months. I am not positive I will have adjudicated your motion to dismiss by then because you have just asked for an extension of your dates, and

1    I also take motions generally first in first out, so it
2    probably will be longer than that.
3             Once that is completed, discovery is stayed.  If you
4    all want to agree to proceed on anything else, you of course
5    may do that, just let me know.  But, otherwise, and if
6    plaintiffs want to ask for some limited additional piece of
7    discovery at that point you may do so.  But discovery is
8    otherwise stayed as far as I am concerned right now.
9             Let me ask for a status letter at the end of that
10   period.  My rules say what goes into a status letter.  Remind
11   me in that letter that we don't have any other dates set and
12   that we need to have a conference as soon as the motion to
13   dismiss is decided, if the case survives.
14            Is there anything else we should discuss?
15            MS. KAUFMAN:  Not from Capital One's perspective,
16   thank you.
17            MR. KALIEL:  I don't think so, your Honor.
18            Thank you for your time.
19            THE COURT:  Sure.
20            MR. McGUIRE:  Thank you, your Honor.
21            THE COURT:  Thank you.
22            (Adjourned)
23
24
25