## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **TAWANNA M. ROBERTS, on behalf of herself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**CAPITAL ONE, N.A.,**<br><br>**Defendant.** | **Case No.: 1:16-cv-04841-LGS** |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO
### DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Jeffrey Kaliel (*pro hac vice*)
Hassan A. Zavareei (*pro hac vice*)
Andrew Silver (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
jkaliel@tzlegal.com
hzavareei@tzlegal.com
asilver@tzlegal.com

Laurie Rubinow
James E. Miller
**SHEPHERD, FINKELMAN,**
**MILLER & SHAH, LLP**
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
lrubinow@sfmslaw.com
jmiller@sfmslaw.com

Jeffrey M. Ostrow (*pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
200 S.W. First Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
alperstein@kolawyers.com

*Counsel for Plaintiff and the Proposed Classes*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF FACTS ...................................................................... 6

III.    CAPITAL ONE BREACHED THE CONTRACT WHEN IT
       CHARGED OVERDRAFT FEES ON APPSN TRANSACTIONS ............................ 6

     A.    The Contract Never Says Overdraft Fees Are Determined *Only*
         at the Time of Payment .................................................................. 11

     B.    Capital One's Debit Hold Process Means APPSN Transactions
         Always Have Sufficient Available Funds to "Cover" Them ................................. 13

     C.    The Provision That Consumers Agree Not to Withdraw Funds
         Needed for Not-yet-Posted Transactions Authorizes Overdraft Fees
         on Subsequent Transactions Only .................................................. 15

IV.    CAPITAL ONE'S CONTRACT IS SIGNIFICANTLY MORE
       MISLEADING THAN THE CONTRACT AT ISSUE IN *BODNAR* ...................... 16

V.     CAPITAL ONE VIOLATES THE IMPLIED COVENANT OF GOOD
       FAITH AND FAIR DEALING .................................................................. 17

VI.    CAPITAL ONE VIOLATES GBL § 349 EVEN IF IT HAS NOT
       VIOLATED EXPRESS TERMS OF THE CONTRACT ........................................... 21

VII.   PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT ........................... 24

VIII.  PLAINTIFF STATES A CLAIM FOR CONVERSION ............................................ 25

IX.    CONCLUSION ....................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Bank Brussels Lambert v. Credit Lyonnais*,
  No. 93 CIV. 6876 LMM, 2000 WL 174955 (S.D.N.Y. Feb. 15, 2000) .................................... 25

*Bank of New York Trust, N.A. v. Franklin Advisors, Inc.*,
  522 F. Supp. 2d 632 (S.D.N.Y. 2007) .................................................................................. 11

*Broder v. Cablevision Sys. Corp.*,
  418 F.3d 187 (2d Cir. 2005) ................................................................................................ 20

*Casey v. Citibank, N.A.*,
  915 F. Supp. 2d 255 (N.D.N.Y. 2013) ................................................................................. 24

Childers v. N.Y. Presbyterian Hosp.,
  36 F. Supp. 3d 292 (S.D.N.Y. 2014) ..................................................................................... 7

*Claridge v. N. Am. Power & Gas, LLC*,
  No. 15-CV-1261 PKC, 2015 WL 5155934 (S.D.N.Y. Sept. 2, 2015) ............................. passim

*Consarc Corp. v. Marine Midland Bank, N.A.*,
  996 F.2d 568 (2d Cir. 1993) ................................................................................................ 10

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004) ................................................................................................ 11

*Farby's S.R.L. v. IFT Int'l, Inc.*,
  No. 02 Civ. 9855(SAS), 2003 WL 21203405 (S.D.N.Y. May 21, 2003) .............................. 25

*Gaidon v. Guardian Life Ins. Co. of Am.*,
  94 N.Y.2d 330 (1999) ................................................................................................... 21, 22

*Gaudion v. Guardian Life Ins. Co. of Am.*,
  96 N.Y.2d 201 (2001) .......................................................................................................... 22

ICD Holdings S.A. v. Frankel,
  976 F. Supp. 234 (S.D.N.Y. 1997) ....................................................................................... 21

*In re Checking Account Overdraft Litig.*,
  694 F. Supp. 2d 1302 (S.D. Fla. 2010) ................................................................................ 25

*Karlin v. IVF Am., Inc.*,
  93 N.Y.2d 282 (1999) ................................................................................................... 21, 22

*Koch v. Acker, Merall & Condit Co.*,
  18 N.Y.3d 940 (2012) .......................................................................................................... 22

*Kubin v. Miller*,
  801 F. Supp. 1101 (S.D.N.Y. 1992) ..................................................................................... 25

*M/A-COM Sec. Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990) ................................................................................................ 18

*Mark Patterson, Inc. v. Bowle*,
  654 N.Y.S.2d 769 (Add. Div. 1st Dep't 1997). .................................................................... 20

*Mendez v. Bank of America Home Loans Servicing, L.P.*,
  840 F. Supp. 2d 639 (E.D.N.Y. 2012)................................................................ 24

*Moses v. Martin*,
  360 F. Supp. 2d 533 (S.D.N.Y. 2004) ................................................................ 25

*Oppenheimer & Co., Inc. v. Trans Energy, Inc.*,
  946 F. Supp. 2d 343 (S.D.N.Y. 2013) ................................................................ 10

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
  85 N.Y.2d 20 (1995) .......................................................................................... 22

*Schatzki v. Weiser Capital Mgmt., LLC*,
  No. 10 Civ. 4685, 2012 WL 2568973 (S.D.N.Y. July 3, 2012)........................... 24

*SPCP Grp., LLC v. Eagle Rock Field Servs., LP*,
  No. 12 Civ. 3610 (PAC), 2013 WL 359650 (S.D.N.Y. Jan. 30, 2013)................. 14

*Spread Enters., Inc. v. First Data Merch. Servs. Corp.*,
  No. 11-CV-4743 (ADS)(ETB), 2012 WL 3679319 (E.D.N.Y. Aug. 22, 2012) ...... 21

*St. John's Univ., N.Y. v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010)............................................................ 24, 25

*Ward v. TheLadders.com, Inc.*,
  3 F. Supp. 3d 151 (S.D.N.Y. 2014) .................................................................... 22

**Statutes**

New York General Business Law § 349 ...................................................................... 6

**Regulations**

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration,
  Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009)................................. 2, 7

## I.    INTRODUCTION

Plaintiff does not dispute that Capital One was entitled to charge *some* overdraft fees on her account. What Plaintiff *does* dispute is the number of overdraft fees Capital One charged— and specifically the multiplication of overdraft fees by charging overdrafts on transactions authorized into a positive checking account balance ("APPSN Transactions"). It is this distinction—the one between justified overdraft fees and unjustified ones—that Capital One totally misses in its Motion to Dismiss ("Motion" or "Mot.") when it argues the case "rests on a simple fact" that "Plaintiff spent more funds than she had in her checking account." The case actually rests on a far more complex set of facts and the interrelation with an account contract that misstates Capital One's true overdraft fee and debit card processes. The "simple fact" that Plaintiff slightly overspent her account is not a meaningful defense for Capital One—and it certainly did not give Capital One *carte blanche* to multiply overdraft fees unjustifiably.

The form contract at issue promises that Capital One will *immediately debit* transactions performed with debit cards; that it will hold funds associated with those transactions until they are completed; that it will reduce the available balance of an account immediately in order to "cover" such transactions; that it will "process" debit card transactions "by date and time"; and that overdraft fees will be "avoid[ed]" as long as there are sufficient available funds to "cover" transactions. These express promises prohibit overdraft fees on APPSN Transactions:

1)      "If we authorize the transaction, the funds will be debited from your primary checking account immediately or a hold may be placed on your account for up to several days after the purchase transaction has occurred. . ." Doc. 20-1, ¶ 3(D).

2)      "You can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions."[1]

---

[1] Doc. 1-1 at 3; *see also id.* at 4 ("You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account.").

3)      "If you provide your ATM card or ATM/Debit Card and personal access code to a third party, you have authorized the third party to withdraw funds from your account *at an ATM machine or point of sale terminal*" (emphasis added). Doc. 1-1 at 2.

4)      "Debit card transactions and fees [are processed by] Date and time, if available[.]" *Id.* at 4.

The first provision promises an "immediate" withdrawal or hold of all debit card transactions made on positive account funds—something consistent with reasonable consumer understanding of how debit cards work, and which necessarily prohibits a later assessment of an overdraft fee on the same transaction, since positive funds have already been deducted or held for that transaction. Compl., ¶¶ 69-70 (discussing consumer research about preferences for debit cards). Indeed, according to the Federal Reserve Board, the entire purpose of such a "hold" is to ensure there are funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, *a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement.* This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices ("UDAP Regulation"), 74 FR 5498-01 (Jan. 29, 2009) (emphasis added). In other words, the whole point of an "immediate" hold is to ensure funds exist to pay the held transaction when it settles.[2] That should prevent overdraft fees on APPSN

---

[2] The situation is reminiscent of the rental car scene in the 1991 *Seinfeld* episode entitled "The Alternate Side":

> JERRY: I don't understand, I made a reservation, do you have my reservation?
> RENTAL CAR AGENT: Yes, we do, unfortunately we ran out of cars.
> JERRY: But the reservation keeps the car here. That's why you have the reservation.
> RENTAL CAR AGENT: I know why we have reservations.
> JERRY: I don't think you do. If you did, I'd have a car. See, you know how to take the

2

Transactions. Yet Capital One's Motion ignores this clear promise to immediately deduct or hold funds. That is because Capital One's practice cannot square with this contractual promise.

The second provision bolsters the first, and promises overdrafts will not be charged where sufficient available funds exist to "cover your transactions"—something that is guaranteed for APPSN Transactions at the moment of authorization when an immediate hold is placed. The third provision promises that such a withdrawal only happens once, at the time the transaction is made, since a consumer is only "at" an ATM machine or point-of-sale terminal at the time the transaction occurs. A single withdrawal, again, prohibits overdraft fees on APPSN Transactions, since Capital One is only able to engineer an overdraft fee on such transactions by deducting them from an account a *second* time, during its secret nightly "batch" process.[3] And the fourth provision is self-explanatory: since Capital One knows precise date and time information for every debit card transaction at issue in this lawsuit, it makes a promise to "process" those transactions chronologically. (Notably, the term "process" is never defined in the contract.)

In short, the above contract provisions prohibit Capital One from charging overdraft fees on APPSN Transactions. This is *especially* true when one considers that the very same holds/deductions have real effects on accounts, causing subsequently-made transactions to incur

---

reservation, you just don't know how to *hold* the reservation and that's really the most important part of the reservation, the holding. Anybody can just take them.

*See* https://www.youtube.com/watch?v=A7uvttu8ct0; *see also* "Seinfeld Scripts—The Alternate Side," *available at* http://www.seinfeldscripts.com/TheAlternateSide.htm. Similarly, the most important part of a hold, which Capital One ignores, is to ensure funds are later available.

[3] Compl., ¶¶ 21-22 ("[T[he Bank does not actually use 'available funds' to make overdraft determinations at all—rather, it uses a separate, secret balance during the 'nightly batch posting' process in which many transactions are posted at once. The amount of 'available funds' do not and cannot change for APPSN Transactions during nightly batch posting because that amount has already been decremented once—at the time that consumer actually initiated the transaction.").

overdraft fees because account funds have been made unavailable. There can be no justification for later pretending that those holds never existed. Capital One's contract prohibits the use of holds in this "gotcha" way.

As Plaintiff alleges, it is not just the contract that prohibits overdraft fees on APPSN Transactions, but Capital One's real-world processing practices. Capital One *actually does* set aside funds at the instant of processing; *does* place a "hold" on funds; and *does* make it impossible for other, later transactions to make use of those same funds. Compl., ¶ 2. Those actions are consistent with Plaintiff's understanding of the contract, and they make it *impossible* for APPSN Transactions to incur overdraft fees without later, secret machinations.

This all matters because overdraft fees strike at some of the nation's most economically vulnerable individuals. When extra $35 overdraft fees on APPSN Transactions are wrongly assessed to struggling consumers, the daily struggle to make ends meet becomes even harder. The low-balance checking accounts that incur APPSN Transactions are almost always in the midst of a larger, already-devastating overdraft event, sapping accounts of not just $35 dollars, but often cascading to upwards of $200. In short, there are major human consequences in the difference between one (justified) overdraft fee and two or three (unjustified) overdraft fees.

In response, Capital One hinges virtually its entire defense on the following provision:

> "You agree not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against your account." Doc. 20-1, ¶ 3(D).

But this provision captures the distinction between justified and unjustified overdraft fees perfectly. By its plain terms, the provision discusses subsequent transactions, those made after holds have been placed on previously-made transactions. But Plaintiff does *not* challenge the overdraft fees actually authorized by that provision: *viz.*, fees on *subsequent* transactions that

overdraw an account where available funds were set aside and "needed to pay" previously-authorized transactions. Rather, Plaintiff challenges overdraft fees nowhere authorized by that provision: initial transactions made on sufficient account balances.

Moreover, what Capital One fails to tell this Court is that immediately prior to its favored "you agree not to withdraw funds that are needed to pay not-yet-posted transactions" contract provision, the contract states that debit holds may "affect the availability of funds from your designated account *for other transactions,*" Doc. 20-1, ¶ 3(D)—in other words, the held funds may result in other (later) transactions incurring overdraft fees, but certainly not those for which holds were placed in the first place. The contract provision never authorizes overdraft fees on APPSN Transactions. If anything, it supports the four other provisions Plaintiff quoted above: holds/debits happen immediately and have real effects on later transactions.

It is for all these reasons that Judge Smith of the Eastern District of Pennsylvania, presiding over a similar case against Bank of America, denied that bank's motion to dismiss, which was based on arguments similar to those Capital One makes here. Ex. 1, Order Denying Motion to Dismiss, *Bodnar v. Bank of America, N.A.*, No. 14:cv-03224, Doc. 30 (E.D. Pa. Oct. 15, 2014). That was true even though, unlike here, the contract at issue arguably explained that APPSN Transactions could incur overdraft fees—and totally lacked the promise Capital One makes in its contract about the "immediate" nature of debit transactions. *See* Exs. 2 and 3, Excerpts of Contracts submitted with *Bodnar* Class Action Complaint, Doc. 1 (filed June 6, 2014).[4] After significant discovery, *Bodnar* resulted in a $27.5 million class settlement. In light of the contract provisions and the prior finding in *Bodnar*, the meaning of Capital One's contract

---

[4] Although the Plaintiff in *Bodnar* later filed an amended complaint, the court in that case ruled only on a motion to dismiss the initial complaint. Attached as Exs. 2 and 3 are excerpts of the Bank of America contracts that were subjected to a motion to dismiss in that case.

is, at the very least, an issue for a finder of fact.

Capital One is also incorrect to argue that Plaintiff's other claims "merely restate" her contract claims. Because, for all the reasons above, the contract is at the very least a miasma of misrepresentations and half-truths, Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and for violation of New York General Business Law § 349 ("GBL § 349" or "section 349") are actionable even if the Court determines there is no express breach. And Capital One is incorrect to argue that the contract *per se* negates Plaintiff's claims for unjust enrichment and conversion; at a minimum, it is too preliminary to dismiss these alternative theories of liability.

Capital One's motion should be denied in its entirety, and as in *Bodnar*, the Parties should proceed with discovery to determine the true nature of Capital One's practices and the true meaning of vague, ambiguous, and undefined terms and clauses in the contracts.

## II.   STATEMENT OF FACTS

In the interest of space and efficiency, Plaintiff largely adopts the statement of facts in the Bank's motion, except as discussed above, and with the following additional exceptions:

- Capital One claims that an overdraft determination is made based on whether sufficient funds exist to "cover" a transaction at the time it is "presented for payment." Mot. at 4. As discussed above and throughout Plaintiff's Complaint, however, the account documents indicate that the determination is made based on the "available balance" or "available funds" in an account at the time a transaction is authorized. Compl., ¶¶ 2, 10, 17, 41-42, 44.

- Capital One discusses how holds "may affect the availability of funds from your designated account for *other* transactions," (Mot. at 5) (emphasis added), but it in no way addresses the explicit contractual promises it makes to set aside held funds to cover specific transactions (and, by extension, not charge overdraft fees on them). Compl., ¶¶ 2, 4-7, 80.

## III.   CAPITAL ONE BREACHED THE CONTRACT WHEN IT CHARGED OVERDRAFT FEES ON APPSN TRANSACTIONS

Capital One argues that "Plaintiff does not point to a provision in the Account

Agreements that requires Capital One to assess overdrafts in the manner she alleges." Mot. at 8. Capital One is wrong. First, Capital One's contract promises that funds are debited and holds are placed *immediately*: "If we authorize the transaction, the funds will be debited from your primary checking account immediately or a hold may be placed on your account for up to several days after the purchase transaction has occurred . . ." Doc. 20-1, ¶ 3(D).  The only reasonable interpretation of this clause is that funds are set aside to pay debit card transactions, and that those once-available funds will be available to pay that same transaction.[5] Indeed, that is the entire purpose of a hold. Federal Reserve Board, UDAP Regulation, 74 FR 5498-01.

Second, making a firm promise that overdraft fees will be "avoided" where available funds exist to "cover" a transaction, Capital One states: "You can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions." Doc. 1-1, at 3. Notably, the term "cover" is never defined. In light of the contractual promise of immediate debit or hold; consumer perception of the "immediate" nature of debit cards; and Capital One's *actual* debit card processes, the only reasonable, common sense understanding of that term is that held funds are always available to "cover" the transaction that generated the hold in the first place.

Third, promising both that withdrawals occur *immediately* and that they occur only *once* for a given transaction, Capital One states: "If you provide your ATM card or ATM/Debit Card and personal access code to a third party, you have authorized the third party to withdraw funds

---

[5] Capital One claims that Plaintiff identifies no contractual provision requiring it to sequester funds for particular transactions. Mot. at 13. However, this very provision does precisely that. Capital One references this Court's decision in *Childers v. New York Presbyterian Hosp.* in support of its argument, but in that case, the plaintiff "fail[ed] to allege any specific provisions of the contract." 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014). Here, conversely, Plaintiff identified numerous contract terms.

from your account *at an ATM machine or point of sale terminal*." Doc. 1-1, at 2. Obviously, a consumer is only "at" an ATM machine or point of sale terminal at the time of purchase. No reasonable reading of the contract could authorize what Capital One actually does in order to engineer overdraft fees on APPSN Transactions: debit the same transaction *twice*—once at the point of sale terminal, then once again during secret nightly batch processing when the transaction finally settles.

Fourth, expressly promising chronological treatment for real-time, electronic transactions like debit card transactions, Capital One expressly promises it will eliminate or minimize any manipulation of "processing" of debit card transactions when it states: "Debit card transactions and fees [processed by] Date and time, if available[.]" Doc. 1-1, at 4. "Date and time" are always available for debit card transactions, so they should always be withdrawn in that order, according to this provision.

A later discussion of overdraft fees furthers the only reasonable, common sense understanding of the contract—that debit card transactions are debited *once*, and debited immediately: "**Overdrafts.** We may in our sole discretion . . . *permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance* (an 'Overdraft')." Doc. 1-1 at 4 (italics added). This provision necessarily indicates overdraft fees on positive-funds transactions are determined *immediately*. A bit of background on debit card transactions shows why. According to network rules, once a bank like Capital One authorizes a transaction at the point of sale, that bank is duty bound to pay the merchant for that transaction, no matter what—including if the customer's checking account does not subsequently have funds in it. They are "must pay" transactions. Indeed, this is one of the reasons banks like Capital One place holds on funds in the first place.

8

That is all important because the only time Capital One may decide to "permit . . . withdrawals" for a debit card transaction is at the time it is made, at the point of sale. Once Capital One authorizes such a transaction, Capital One cannot "undo" that authorization, nor choose to "permit" such a transaction later. This "immediate decision, immediate debit" theme exists throughout the contract. For example, Capital One makes numerous promises that it will not assess overdraft fees on certain transactions unless authorized by the consumer: "we will not authorize . . . overdrafts for ATM withdrawals and everyday debit card transactions against your designated account unless you have authorized us to do so." Doc. 1-1, at 4. In order to make sense, this promise also means that Capital One controls for overdraft fees immediately, at the time of the transaction. Because of the nature of "must pay" transactions (which, again, prohibits Capital One from later refusing to pay an earlier authorized transaction), Capital One's promise to prevent overdrafts without authorization could only work if it was doing so immediately, at the time of authorization. In other words, this "we will not authorize" provision would be totally neutered if overdrafts were only determined at the time of transaction settlement.

The account documents misconstrue the Bank's true debit card processing and overdraft fee practices in at least four ways. First, and most fundamentally, the Bank charges overdraft fees on debit card transactions for which there *are* sufficient available funds to "cover" the transactions, since funds are held immediately at the time of authorization for those transactions. Second, the account documents repeatedly state that overdraft assessments are based on "available funds" or "available balance," but in reality, the Bank does not even use an "available funds" calculation or "available balance" to determine whether transactions are eligible for overdraft fees—it uses a different, secret balance to do so during nightly batch posting. If it exclusively used "available funds," there could never be overdraft fees on APPSN Transactions.

Third, Capital One is only able to manufacture overdraft fees on APPSN Transactions by debiting them twice: once at the time they are authorized, and again later when they "settle" to the account. The contract bars this double-debiting. Because debit card withdrawals occur immediately, upon initiation, they cannot be re-debited later. But Capital One does just that when it re-debits accounts during nightly batch posting—a key part of its policy that it misconstrues. Fourth, the Bank breaches a promise to "process" transactions "close[] to the time you actually made the debit transaction" and to use a "processing order" for debit card transactions based on "date and time." Doc. 1-1 at 3, 4. Capital One does not define the term "processing" in relation to debit card transactions. The most reasonable understanding of that term, consistent with the "immediate withdrawal or hold" language in the contract, is that processing happens instantly or near-instantly. Regardless, Capital One in no way processes transactions "close to the time" that the debit card was actually swiped, or even in the order in which they were initiated. In fact, Capital One allows transactions (debit or otherwise) that were initiated *after* the APPSN Transactions to process out of order, causing the APPSN Transactions to "settle" into a negative balance despite the following: (1) there were sufficient available funds at the time of purchase; (2) they were initiated first; and (3) had they truly been processed "close to the time" they were made, there would have been no overdraft.

Together, these provisions bar overdraft fees on APPSN Transactions because they require Capital One to immediately debit transactions, place meaningful holds, and preserve funds for the ultimate payment of the held transactions. At a minimum, the contract language discussed herein and in the Complaint is ambiguous and capable of multiple interpretations. "An ambiguous term is one about which reasonable minds could differ." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993); *see also Oppenheimer & Co., Inc. v.*

*Trans Energy, Inc.*, 946 F. Supp. 2d 343, 350-51 (S.D.N.Y. 2013) (deeming phrase ambiguous "because it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement'") (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)).[6] For that reason, it is appropriate to deny Capital One's and allow for the case to proceed to discovery. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous term is not dismissible on the pleadings."); *Bank of New York Trust, N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("The Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities.").

### A. The Contract Never Says Overdraft Fees Are Determined *Only* at the Time of Payment

Relying on the contract provision stating that "[w]e may in our sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an 'Overdraft')," Doc. 1-1, at 4, Capital One first argues that "overdrafts [are] triggered by a *payment* from a customer's account" (as opposed to whether or not sufficient funds exist at the time of authorization). Mot. at 8 (emphasis added).

---

[6] The cases Capital One references with respect to ambiguities—*Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 568 (2d Cir. 2011), and *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (Mot. at 8)—do not support its argument. Indeed, both merely stand for the uncontroversial proposition that when contract terms are unambiguous, they should be assigned their plain meaning. But for all the reasons discussed herein, that is not the case here. And moreover, *Shaw Group* instructs that "ambiguous language should be construed against the interest of the drafting party." 322 F.3d at 121 (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)).

This argument misses the point. Even if Capital One was right that the undefined term "pay" occurs at the time of settlement, and even if it is right that the time of "payment" is all that matters for overdraft fees (as discussed below, it's wrong on both counts)—the point is that the same held funds are available for use at the time of that "payment," just as they were at the time of authorization, when the transaction was made.[7] For all the reasons above, the provision cannot authorize overdrafts on APPSN Transactions for the simple reason that there are always sufficient available funds to "pay" that transaction when it settles (since funds are immediately held for that precise purpose).

The argument fails for a whole host of other reasons as well. The exclusive emphasis by Capital One on the term "pay" is misplaced. The contract says overdrafts may exist either when the bank "pays" or "permits" debits. Capital One focuses on the undefined "pay" term, but it ignores the fact that the provision actually says "pay or permit withdrawals against your account." As discussed above, the "permitting" occurs at authorization, not at posting. Facially, Capital One's argument that overdrafts may only be determined at "payment" is wrong.

Even if the Court were to ignore the term "permit," and focus only on the word "pay," the word "pay" is not defined in the contract. While Capital One argues that "in the context of a checking account transaction, a transaction is paid when funds are debited from the customer's checking account and transferred to the merchant payee, rather than when it is initially

---

[7] Capital One also argues that some debit card transactions change value. Plaintiff alleges as much in her Complaint, and alleges they are a tiny fraction of transactions. Capital One, without any factual record, argues it is "hardly a 'small number' of transactions that are impacted." That is, of course, a fact claim on which discovery is necessary. It appears to be belied by Plaintiff's transactions, none of which changed value. And such changed value transactions are not even part of Plaintiff's allegations: they would not be APPSN Transactions if they *increased* in value. However, sit-down restaurant transactions in which Capital One had 20% more than the value, would appear to be "*uber*-APPSN Transactions"—Capital One has set aside *more* money than necessary, causing more subsequent transactions to incur overdraft fees.

authorized" (Mot. at 8-9), *the contract nowhere says this*. The Court cannot credit Capital One's unfounded assertion as to the meaning of "pay." In light of the other contract provisions discussed above, the most reasonable understanding of that term is that withdrawal and payment are effected immediately for debit card transactions.

Another reason the Court cannot credit Capital One's unsupported assertion as to the meaning of "pay" is that the term "available balance" (also used in the subject contract provision) is itself a term of art in the banking industry, and describes a specific, real-time, running balance that is decremented at the moment a debit card transaction is made—regardless of when the transaction is actually "paid." Available balance is necessarily the balance that is impacted immediately upon the transaction initiation. As Plaintiff expressly alleges, Capital One does not use "available balance" during nightly batch processing to determine overdrafts. Compl. ¶ 21. Instead, it uses a different, secret processing balance. *Id.* Capital One's continued use of the term "available funds" in the contract undermines its lawyers' insistence that overdrafts are only determined at the time of "payment." If that were true, "available balance" would have nothing to do with it.

In sum, no reasonable, holistic reading of the contract's promises of (1) immediate debit; (2) to set aside funds at authorization; and (3) repeated use of "available balance" and "available funds" would cause a reader to understand that APPSN Transactions could still incur overdraft fees at "payment." Indeed, on this single argument, one would have to make all sorts of assumptions and leaps in order to make Capital One's reading even plausible.

**B. Capital One's Debit Hold Process Means APPSN Transactions Always Have Sufficient Available Funds to "Cover" Them**

Next, relying on the provision that "[y]ou can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the

debits presented for payment against your account," Doc. 1-1, at 4, Capital One argues that "Plaintiff's agreements with Capital One specifically afford Capital One the right to overdraw Plaintiff's account and impose a fee." Mot. at 1. Again, no one disputes that Capital One can charge overdraft fees in certain circumstances when sufficient funds do not exist to "cover" transactions; the question posed by this lawsuit is: *when*? The quoted provision does nothing to support Capital One's argument that it can charge overdraft fees on APPSN Transactions. As discussed extensively above, Capital One's argument ignores the fact that the whole point of a hold—the immediate reduction in available funds at the time of a transaction—is to "cover" the transaction for which the hold is placed at the time it is "presented for payment."[8]

In short, the clause relied upon by Capital One offers the bank no help. Moreover, Capital One does not mention that a different, truncated version of that clause is found a only page earlier in the contract, and states, "You can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions." Doc. 1-1, at 3. In other words, the first discussion of "covering" transactions says nothing at all about "presentment for payment." To read the provisions consistently, the omission of the phrase "presented for payment" in the first provision indicates that both provisions mean exactly what Plaintiff alleges: "covering" is ensured at the time of authorization.[9] In sum, the contract

---

[8] There is no indication anywhere in the language Capital One points to about "payment" that Capital One can set aside funds immediately, but still allow those funds to be consumed by a later transaction. It's a nonsensical proposition because those holds have very real impacts. For example, while a hold is in place, if another debit (say a check or ATM withdrawal) posts, that transaction is considered an overdraft, even if the only reason is the "held" amount. So Capital One uses the hold to its benefit when it likes, and to the consumers' detriment when it can.

[9] Capital One references *SPCP Grp., LLC v. Eagle Rock Field Servs., LP*, No. 12 Civ. 3610 (PAC), 2013 WL 359650 (S.D.N.Y. Jan. 30, 2013) to argue that Plaintiff's reading of the contract is unreasonable. Mot. at 11. But that case is highly distinguishable. There, the Plaintiff argued that the phrase "any supplements or amendments" applied to only some supplements or

14

provision does not help Capital One.

### C.  The Provision That Consumers Agree Not to Withdraw Funds Needed for Not-yet-Posted Transactions Authorizes Overdraft Fees on Subsequent Transactions Only

Similarly, the other provision on which Capital One primarily relies—customers "agree not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted to your account," Doc. 20-1, ¶ 3(D)—is mere advice: advice that indicates to reasonable consumers that, should they make subsequent transactions after funds are held for earlier debit card transactions, they are in jeopardy of overdraft fees on the later transactions. But the provision in no way authorizes overdraft fees on the initial (APPSN) transactions. To the contrary, it makes clear that the crux of Plaintiff's Complaint is true: funds are immediately set aside to pay for given transactions and cannot be used for other purposes, and consumers must be cognizant of the unavailability of funds that are being held for "transactions that have not yet posted to your account" when they are making other transactions. So when *subsequent* transactions attempt to consume those off-limits funds, *those* transactions may incur an overdraft fee. That is all this provision means: it authorizes overdraft fees on certain transactions, but not APPSN Transactions.

It is this distinction that Capital One elides when it argues that "[h]ad plaintiff complied with this provision, her APPSN [T]ransactions would not have incurred overdraft fees." Mot. at 12. Of course—if she had "complied with this provision," there would have been no overdraft fees *at all* on her account.[10] This is tantamount to arguing, "Well, if you hadn't overdrawn your

---

amendments. *Id.* at *7. But the word "any" had been earlier interpreted to conclusively mean "all" or "every," without limit. *Id.* Conversely, in this case, Capital One presents no exemplar where the ambiguous terms at issue have been interpreted consistent with the reading it urges.

[10] *See* Mot. at 14 ("Plaintiff blames Capital One for allowing her intervening transactions . . . to process before the initial transaction, thus causing her initial transactions to settle into negative

account at all, you wouldn't have gotten fees, but since you did, we can charge as many as we want." The argument is not serious. The appropriate question is: "how many overdraft fees can Plaintiff legitimately be charged when she did not comply with the provision?"

Again, Plaintiff does not challenge the overdraft fees authorized by that provision: fees on subsequent transactions that overdraw an account because they were compared against a balance that was reduced by holds placed on previously-authorized transactions. That does not mean, however, it can charge overdraft fees on APPSN Transactions.

## IV.   CAPITAL ONE'S CONTRACT IS SIGNIFICANTLY MORE MISLEADING THAN THE CONTRACT AT ISSUE IN *BODNAR*

Capital One's practices are comparable to practices employed by one of its competitors, Bank of America, which were at issue in the recently-settled litigation in the Eastern District of Pennsylvania, *Bodnar v. Bank of America, N.A.*, No. 14:cv-03224 (E.D. Pa.). In that case, Judge Edward Smith denied a motion to dismiss the complaint and allowed the case to proceed to discovery. Ex. 1. The same outcome is even more appropriate in this case, where Capital One's contract is more misleading than the Bank of America contract at issue in *Bodnar*.

First, Capital One expressly promises to debit funds from accounts "***immediately***" following a debit card transaction. Doc. 20-1, ¶ 3(D). It is a crucial affirmative promise, because immediate debit (or hold) means that positive funds are put aside to "cover" a transaction— rendering subsequent overdraft fees on APPSN Transactions inappropriate.[11] No similar promise

---

balance. But under the plain terms of the agreement, the onus was on Plaintiff not to enter into those intervening transactions if she did not have funds to pay them. She may not like being charged overdrafts, but it was her responsibility under the parties' contract to avoid them.").

[11] Similarly, as discussed above, the Capital One contract also implies immediacy with the statement "If you provide your ATM card or ATM/Debit Card and personal access code to a third party, you have authorized the third party *to withdraw funds from your account at an ATM machine or point of sale terminal*," Doc. 1-1, at 2, suggesting that funds are instantly deducted "***at***" the location the transaction took place.

of an instantaneous debit was in the Bank of America contract at issue in *Bodnar*.[12] Additionally, the contract in this case contains a chart purporting to illustrate the processing order of various transactions. Doc. 1-1 at 4. With respect to debit card transactions, the contract explicitly specifies that transactions will be processed by "[d]ate and time, if available." *Id.* Again, there is no similar promise in the Bank of America contract.

There are also instances in which Capital One and Bank of America's promises are similar. For example, the Capital One contract states that "[y]ou can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions." Doc. 1-1 at 3. Almost identically, the Bank of America contract at issue in *Bodnar* stated that "[y]ou can avoid fees for overdrafts and declined or returned items by making sure that your account always contains sufficient available funds to cover all of your transactions." Ex. 3, at 16. On the whole, Capital One's contract contains many more misrepresentations than the analogous document in *Bodnar*. But even the areas in which the documents are similar argue in favor of allowing Plaintiff's claims to proceed here, on the same rationale Judge Smith employed.

## V.    CAPITAL ONE VIOLATES THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Capital One also violates the covenant of good faith and fair dealing by unfairly exploiting contractual discretion, contrary to the reasonable expectations of accountholders. "In New York, all contracts contain an implied covenant of good faith and fair dealing, under which 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Claridge v. N. Am. Power & Gas, LLC*, No.

---

[12] Excerpts of the contract documents ruled upon in the motion to dismiss in *Bodnar* are attached as Exhibits 2 and 3.

15-CV-1261 PKC, 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153 (2002)). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* (quoting *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995)). "[C]ourts employ the good faith performance doctrine to effectuate the intentions of the parties, or to protect their reasonable expectations." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 371 (1980)) (alteration in original). The bank violates the implied covenant in several ways.

First, the term "to cover" is undefined: *e.g.*, "You can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions." Doc. 1-1, at 3. The Bank uses its discretion to define "to cover" in a manner contrary to any reasonable, common sense understanding of that term. In the Bank's self-serving, after-the-fact definition, a transaction is not "covered" even if the Bank immediately sequesters sufficient available funds for that transaction. Capital One unreasonably defines that term in a way guaranteed to harm to consumers in the form of extra overdraft fees.

Second, the Bank promises that for transactions where it "know[s] the time you made the transaction," it will "post" "close[] to the time you actually made the debit transaction[.]" *Id.* at 3. Here, the Bank made no effort to post "close" to the time the transactions were made—or even to ensure that earlier-made transactions were given priority access to available funds in an account. At the very least, this provision should be read, in good faith, to prohibit Capital One from allowing "held" funds to be consumed by intervening transactions. Posting "close to the time you actually made the transaction" is certainly not consistent with Capital One's actual

practice of posting transactions well after initiation, and well after the funds available at the time

of initiation have been depleted. In reality, then, Capital One's posting has nothing whatsoever to

do with the time the transaction was "made"—rendering this contract promise meaningless, and

violating the reasonable expectations of consumers.

Third, the Bank uses its contractual discretion to cause APPSN Transactions to incur

overdraft fees by knowingly "permitting" subsequent transactions to consume available funds

previously sequestered for APPSN Transactions, knowing full well the result will be overdraft

fees on the APPSN Transactions (and, often, the subsequent transactions as well):

> **We may in our sole discretion,** and without obligation, elect to pay checks and
> other items drawn on your deposit account or to permit automatic bill payments
> and withdrawals against your account for an amount in excess of your available
> balance (an "Overdraft"). . . . You have no right to overdraw your account at any
> time, for any reason, and **our decision to pay Overdraft items is solely within
> our discretion.**

*Id.* at 4 (emphasis added).

Plaintiff's allegations in this case resemble those found to adequately allege a breach of

the implied covenant in *Claridge*. There, electricity consumers brought implied covenant claims

against a utility on behalf of a proposed class. 2015 WL 5155934, at *6. The claims involved

allegations that the agreement between the utility and its customers contained undefined or

confusing terms, and that the utility abused its discretion by raising prices in a manner not

consistent with reasonable expectations. *Id.* at *4-5.[13] Namely, the agreement left undefined the

"method" by which electricity prices would be calculated, in addition to not making clear the

definition of "variable market based rates." *Id.* Refusing to dismiss the implied covenant claims,

the court found that, "[g]iven the ambiguous language of the Agreement, the plaintiffs plausibly

---

[13] Although the discussion cited took place under the heading of GBL § 349, the court found that
the plaintiffs adequately pleaded an implied covenant claim (in addition to a breach of contract
claim) "[f]or largely the same reasons" as the GBL § 349 claim. *Id.* at *6.

allege that [defendant] could have exercised its discretion in a manner contrary to customers' expectations." *Id.* at *6. The same finding is appropriate here, where terms such as "to cover," "pay," "process[ing]," and "available balance" are undefined and interpreted in a manner contrary to any reasonable consumer expectation, and where the Bank explicitly grants itself contractual discretion, only to abuse it at its accountholders' expense.

Capital One characterizes Plaintiff's implied covenant claim as one that conflicts with the express terms of the contract and adds to the contract "a substantive provision not included by the parties." Mot. at 15 (quoting *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005)). But as discussed in Section III, *supra*, no express contractual provisions authorize Capital One to levy overdraft fees on the APPSN Transactions. Plaintiff's implied covenant claim adds no substance to the contract; rather, it attacks Capital One for abusing its discretion to charge overdraft fees in a manner inconsistent with any reasonable expectation.[14]

Capital One's argument that Plaintiff's implied covenant claims are merely "duplicative" of the contract claims (and, therefore, must be dismissed) is also incorrect. Plaintiff's implied covenant claim, explained above and found at paragraphs 101-110 of her complaint, differs from

---

[14] The cases Capital One references do not support its argument. In *Broder*, the plaintiff sued a cable television provider for breach of contract and breach of the implied covenant (among other claims), arguing that the cable provider was *obligated* to change rates based on a contract provision that stated that "[r]ates for the installation of service or equipment and rates for programming or other services are subject to change in accordance with applicable law." 418 F.3d at 196-97 (citations omitted). The Second Circuit affirmed the dismissal of the implied covenant claim, finding that the implied covenant "cannot transform an obligation to refrain from changing the customer's rates except in accordance with applicable law into an affirmative obligation to change his rates." *Id.* at 199. Here, Plaintiff does not ask the Court to alter or add any contractual terms and, rather, simply alleges that Capital One abused contractual discretion by acting contrary to any consumer's reasonable understanding of the contract. Similarly, in *Mark Patterson, Inc. v. Bowle*, the contract at issue contained a provision that directly negated the plaintiff's reading of the contract. 654 N.Y.S.2d 769, 771 (Add. Div. 1st Dep't 1997). Here, no contractual provisions authorize Capital One's behavior, as discussed at length above.

her contract claims. Namely, the claim focuses on Capital One's abuse of contractual discretion, leaving key terms undefined and interpreting them in an unreasonable manner, in charging overdraft fees on some transactions (but not others), and by knowingly causing the APPSN Transactions to settle into a negative balance by authorizing intervening transactions. Compl., ¶¶ 105-107. This differs from *ICD Holdings S.A. v. Frankel*, relied upon by Capital One for its "duplicativeness" argument, where the implied covenant claim "rest[ed] entirely on the breaches of the purchase agreement alleged in the [contract] claim." 976 F. Supp. 234, 243 (S.D.N.Y. 1997). As discussed above, Plaintiff's implied covenant claim is no mere cut-and-paste of her contract claim, and dismissal on that basis would be improper.[15]

## VI.    CAPITAL ONE VIOLATES GBL § 349 EVEN IF IT HAS NOT VIOLATED EXPRESS TERMS OF THE CONTRACT

The elements of a claim under section 349 are proof of "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Claridge*, 2015 WL 5155934, at *3 (quoting *City of New York v. Smokes–Spirits.Com, Inc.,* 12 N.Y.3d 616, 621 (2009)).[16] Section 349 was enacted "[i]n order to ensure an honest marketplace," and it "prohibits all deceptive business practices" that take place in New York. *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 287 (1999). It "appl[ies] to virtually all economic activity, and [its] application[] has been correspondingly broad." *Id.* at 290. Indeed,

---

[15] It would likewise be improper to follow *Spread Enters., Inc. v. First Data Merch. Servs. Corp.*, No. 11-CV-4743 (ADS)(ETB), 2012 WL 3679319 (E.D.N.Y. Aug. 22, 2012). In that case, the court found that the same facts underpinned both the contract and implied covenant claims. *Id.* at *4. Here, while in a general sense, both claims take issue with Capital One's fee-charging practices, the contract claim concerns provisions that, reasonably understood, expressly bar overdraft fees on APPSN Transactions, while the implied covenant claim focuses on Capital One's abuse of discretion in defining ambiguous, unclear terms in a bad faith manner.

[16] Capital One does not dispute that the conduct in which it engaged was "consumer-oriented." Capital One also does not challenge that plaintiff suffered injury as a result of the practice.

section 349 "contemplates actionable conduct that does not necessarily rise to the level of fraud," *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343 (1999) ("*Gaidon I*"), and it "encompasses a significantly wider range of deceptive business practices that were never previously condemned by decisional law." *Gaudion v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 210 (2001) ("*Gaidon II*"). Neither scienter nor reliance are elements of section 349 claim. *Ward*, 3 F. Supp. at 168; *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995); *see also Koch v. Acker, Merall & Condit Co.*, 18 N.Y.3d 940, 941 (2012) ("Justifiable reliance by the plaintiff is not an element of the statutory claim.").[17]

With respect to whether Capital One's conduct was "materially misleading," the Bank merely argues that "[b]ecause the overdraft fees charged to Plaintiff complied with the express terms of the Account Agreements, there is no 'materially misleading' conduct supporting this claim." Mot. at 19. This argument is a mere regurgitation of Capital One's arguments regarding Plaintiff's contract and implied covenant claims, which fail for the reasons discussed above.[18]

The conduct challenged here unquestionably is "materially misleading." Conduct is materially misleading, or is deceptive, where a representation is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *E.g.*, *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26; *see also Gaidon I*, 94 N.Y.2d at 344 (same) (quoting *Oswego Laborers' Local 214*); *Karlin*, 93 N.Y.2d at 294 (same). Here, Capital One materially misled

---

[17] Proof of scienter does, however, make a plaintiff eligible to recover treble damages. GBL § 349(h); *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26.

[18] Although Capital One does not argue that a claim under section 349 cannot coexist with a contract claim, it states in passing that Plaintiff's "claim is based on the same allegations as Plaintiff's contract claims." Mot. at 19. To be clear, a claim under section 349 can stand in concert with contract claims, or can stand even where no express contract breach is found. *E.g.*, *Claridge*, 2015 WL 5155934, at *3-6; *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 162, 169-70 (S.D.N.Y. 2014).

consumers through account disclosures that indicated that debit card transactions that were immediately authorized with a positive available balance would not later be subjected to overdraft fees.[19] It made this misleading disclosure despite knowing that reasonable consumers understood debit card transactions resulted in immediate debit of funds. Even the provision on which Capital One hangs virtually its entire argument—"You agree not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transaction that have not yet posted against your account." Doc. 20-1, ¶ 3(D)—can be reasonably read only to indicate that consumers will be subjected to fees on any transactions *subsequent* to the APPSN Transactions. If that is the *best* provision Capital One has to offer to support its claim that it did not mislead consumers, there can be no question that the account documents are sufficiently deceptive to survive a motion to dismiss.

Indeed, the Capital One account agreement, through its reliance on key terms that are undefined and phrasing which suggests that fees will not be assessed to APPSN Transactions, appears to be designed to mislead. This is comparable to the circumstance in *Claridge*, also discussed in the implied covenant section, *supra*, where the term "method" was left undefined, and the phrase "variable market based rates" could have reasonably been interpreted in multiple ways. 2015 WL 5155934, at *4-5. Namely, the court found that reasonable consumers could interpret "variable market based rates" to "approximate the market price, *i.e.*, what other [energy service companies] charged their customers," when in fact, other providers charged much lower than the defendant in *Claridge*. Against the backdrop of that materially misleading contract

---

[19] Capital One states that any arguments premised on a "failure to disclose" fee-charging practices is preempted by federal banking regulations. Mot. at 19-20. Plaintiff's allegations are presently limited to affirmative misrepresentations that Capital One made. Thus, there is no need, at present, for Plaintiff to respond to Capital One's preemption argument.

language, the court declined to dismiss claims under section 349, finding that "[b]ecause the Agreement is plausibly alleged to be confusing and ambiguous, this is not . . . an instance in which a defendant has simply published truthful information and allowed consumers to make their own assumptions about the nature of the information." *Id.* at *5 (citations and quotations omitted). The same finding is appropriate here, where despite Capital One's urging, Capital One has not simply published true, non-misleading information in its account agreement.[20]

## VII.   PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT

Regardless of whether Plaintiff can ultimately *recover* under both contract and unjust enrichment theories, Plaintiff can *plead* these theories in the alternative, and dismissal is improper at the motion to dismiss stage. As the court found in *Schatzki v. Weiser Capital Mgmt., LLC*, for example, "even though the Plaintiffs bring breach of contract claims against the Defendants, the Plaintiffs' unjust enrichment claim survives as an alternative to the alleged breach of contract claims." No. 10 Civ. 4685, 2012 WL 2568973, at *4 (S.D.N.Y. July 3, 2012). Simply put, "[a]t the pleading stage, Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims." *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010). Here, the Court could determine that the contract does not specifically "cover the relevant subject matter," and "at this early stage of the litigation, it is reasonable to permit plaintiffs to plead unjust enrichment claims in the alternative to their breach of contract claims." *Casey v. Citibank, N.A.*, 915 F. Supp. 2d 255, 263 (N.D.N.Y. 2013).

---

[20] Capital One's reliance on *Mendez v. Bank of America Home Loans Servicing, L.P.*, 840 F. Supp. 2d 639 (E.D.N.Y. 2012) is unavailing. In that case, the contract stated that certain "default related servicing fees" could be charged, but were not affirmatively detailed. That is not the same as the situation here, where the contact materially misled reasonable consumers into believing she could not be charged overdraft fees for the APPSN Transactions—unlike *Mendez*, which merely did not go into a high level of detail about the fees at issue.

## VIII.    PLAINTIFF STATES A CLAIM FOR CONVERSION

At the motion to dismiss stage, courts regularly find that a defendant's alleged wrongful collection and retention of funds that belong to the plaintiff supports a conversion claim independent of any contract claim. *E.g.*, *Moses v. Martin*, 360 F. Supp. 2d 533, 542 (S.D.N.Y. 2004); *Farby's S.R.L. v. IFT Int'l, Inc.*, No. 02 Civ. 9855(SAS), 2003 WL 21203405, at *4 (S.D.N.Y. May 21, 2003); *Kubin v. Miller*, 801 F. Supp. 1101, 1118 (S.D.N.Y. 1992). That is especially true here, where Plaintiff's conversion claim supports Plaintiff's request for punitive damages, which are not available under her contract claim. This alone renders her conversion claim non-duplicative. *St. John's Univ., N.Y.*, 757 F. Supp. 2d at 178 (citation omitted).

Further, contrary to Capital One's argument, a conversion claimant can plead a right to possession, rather than ownership: "plaintiffs, to sustain a conversion claim, need not establish legal ownership of the funds in question: it is sufficient if they establish 'an immediate right of possession.'" *Bank Brussels Lambert v. Credit Lyonnais*, No. 93 CIV. 6876 LMM, 2000 WL 174955, at *6 (S.D.N.Y. Feb. 15, 2000) (quoting *AMF Inc. v. Algo Distributors, Ltd.*, 369 N.Y.S.2d 460, 464 (N.Y. App. Div. 1975). In multidistrict litigation that also concerned checking account overdraft fees, the Southern District of Florida addressed this very question:

> Here, Plaintiffs unquestionably had the right to possess the funds in their bank accounts upon demand to the bank, and they have alleged the Defendants wrongfully took funds from their accounts so that Plaintiffs were unable to possess and use those funds. This interference with Plaintiffs' property interest in the funds in their accounts constitute a cause of action for conversion.

*In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1323 (S.D. Fla. 2010) (citing *White v. Wachovia, Bank, N.A.*, 563 F. Supp. 2d 1358, 1371 (N.D. Ga. 2008)).

## IX.    CONCLUSION

The motion to dismiss should be denied in its entirety.

Dated: October 11, 2016

/s/ Jeffrey Kaliel
Jeffrey Kaliel (*pro hac vice*)
Hassan A. Zavareei (*pro hac vice*)
Andrew Silver (*pro hac vice*)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
jkaliel@tzlegal.com
hzavareei@tzlegal.com
asilver@tzlegal.com

Laurie Rubinow
James E. Miller
**SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP**
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
lrubinow@sfmslaw.com
jmiller@sfmslaw.com

Jeffrey M. Ostrow (*pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
200 S.W. First Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com
alpersteinkolawyers.com

*Counsel for Plaintiff and the Proposed Classes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 11, 2016, the foregoing document was filed via

the Court's ECF system, causing it to be served on all counsel of record.

 /s/ Jeffrey Kaliel          
Jeffrey Kaliel
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
jkaliel@tzlegal.com