**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TAWANNA M. ROBERTS, on behalf of herself and
all others similarly situated,

Plaintiff,

- against -

CAPITAL ONE, N.A.,

Defendant.

No. 16 Civ. 4841 (LGS)

**DEFENDANT CAPITAL ONE, N.A.'S MEMORANDUM OF
<u>LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

PROCEDURAL HISTORY...................................................................................... 2

UNDISPUTED MATERIAL FACTS ...................................................................... 3

    A.    The Mechanics of Debit Card Transactions........................................ 3

    B.    Capital One's Overdraft Services ....................................................... 5

    C.    The Account Agreements .................................................................... 5

    D.    Capital One's Practices ....................................................................... 7

    E.    Plaintiff's Conduct and the Transactions At Issue............................. 9

    F.    Plaintiff's Calls With Capital One Representatives........................... 11

LEGAL STANDARD.............................................................................................. 12

ARGUMENT ........................................................................................................... 13

I.     PLAINTIFF LACKS STANDING AND HER CLAIMS FAIL AS A MATTER OF LAW BECAUSE SHE CANNOT ESTABLISH DAMAGES. ................................ 13

    A.    Plaintiff Cannot Show Injury in Fact. ................................................ 14

    B.    Plaintiff Was Not Harmed Because She Owes Capital One More Than Her Alleged Damages. ................................................................. 14

    C.    Plaintiff Was Not Harmed Because She Would Have Paid Many Times More in Overdraft Fees if Capital One Assessed Fees at Authorization. ........... 15

II.    CAPITAL ONE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM. ................................................... 17

    A.    The Extrinsic Evidence Establishes That The Deposit Agreement Provided For Assessment of Overdraft Fees At Settlement of Transactions. ..................... 17

         1.    Assessment of Overdraft Fees at Time of Posting is Consistent with Widespread Industry Practice. ....................................... 18

         2.    Both Parties' Course of Conduct During the Life of the Contract Confirms Overdraft Determinations Are Made at Payment. ................... 19

    B.    Plaintiff Did Not Perform Because She Overdrew Her Account With Unpaid Transactions Pending and Failed To Repay Her Overdraft. ................. 22

III.   PLAINTIFF'S SECTION 349 CLAIM FAILS AS A MATTER OF LAW. ................. 24

    A.    Plaintiff Cannot Show Any "Materially Misleading Conduct" Caused Her Any Harm Because She Did Not Read or Rely on the Account Agreements. ..................................................................................... 24

**TABLE OF CONTENTS**
(continued)

**Page**

B.       Any Alleged Misrepresentation in the Account Agreements Could Not
         Have Harmed Plaintiff after the Posting Process was Expressly Explained
         to Her. ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*,
565 F. Supp. 1485 (S.D.N.Y. 1983)...................................................................................19

*Anderson Clayton & Co. v. Alanthus Corp.*,
91 A.D.2d 985, 457 N.Y.S.2d 578 (2d Dep't 1983)..............................................................22

*Anthony v. GE Capital Retail Bank*,
321 F. Supp. 3d 469 (S.D.N.Y. 2017)...............................................................................22

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
No. 15 Civ. 9945 (LGS), 2018 WL 4253152 (S.D.N.Y. Sept. 6, 2018)..................................18

*Ballas v. Virgin Media, Inc.*,
18 Misc.3d 1106(A), No. 600014-2007, 2007 WL 4532509
(N.Y. Sup. Ct. Nassau Cnty. Dec. 6, 2007), *aff'd,* 60 A.D.3d 712, 875
N.Y.S.2d 523 (2d Dep't 2009)........................................................................................25

*Bank of Am., N.A. v. Fischer*,
927 F. Supp. 2d 15 (E.D.N.Y. 2013) ..........................................................................12, 13

*Behzadi v. David & Son Oriental Antique Rugs Corp.*,
No. 07 Civ. 7073(LGS)(FM), 2013 WL 5870343 (S.D.N.Y. Oct. 31, 2013),
*adopted by* 2013 WL 6409339 (S.D.N.Y. Dec. 6, 2013)......................................................15

*Big Tree Energy Partners v. Bradford*,
219 A.D.2d 27, 640 N.Y.S.2d 270 (3d Dep't 1996)............................................................17

*Boyce v. Soundview Tech. Grp., Inc.*,
464 F.3d 376 (2d Cir. 2006)...........................................................................................15

*Brady v. Town of Colchester*,
863 F.2d 205 (2d Cir. 1988)...........................................................................................13

*Charles Schwab & Co. v. Makowska*,
999 F. Supp. 2d 459 (E.D.N.Y. 2014) .........................................................................12, 13

*Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*,
979 F.2d 268 (2d Cir. 1992)...........................................................................................17

*Cifarelli v. Vill. of Babylon*,
93 F.3d 47 (2d Cir. 1996)...............................................................................................13

**TABLE OF AUTHORITIES**
**(continued)**

Page

*City of New York v. Smokes-Spirits.Com, Inc.*,
   12 N.Y.3d 616, 883 N.Y.S.2d 772 (2009) ..................................................................14, 24

*Coniglio v. Highwood Servs., Inc.*,
   495 F.2d 1286 (2d Cir. 1974).............................................................................................21

*Douyon v. N.Y. Med. Health Care, P.C.*,
   894 F. Supp. 2d 245 (E.D.N.Y. 2012), *order amended on reconsideration*,
   2013 WL 5423800 (E.D.N.Y. Sept. 25, 2013) ...................................................................24

*Faulkner v. Nat'l Geographic Soc'y*,
   452 F. Supp. 2d 369 (S.D.N.Y. 2006)..................................................................................21

*Freund v. Washington Sq. Press*,
   34 N.Y.2d 379 (1974) ..........................................................................................................15

*Gale v. Int'l Bus. Machs. Corp.*,
   9 A.D.3d 446, 781 N.Y.S.2d 45 (2d Dep't 2004) ................................................................24

*Gladstone Realtors v. Vill. of Bellwood*,
   441 U.S. 91 (1979)...............................................................................................................14

*Golden Pac. Bancorp v. F.D.I.C.*,
   No. 95 Civ. 9281(NRB), 2003 WL 21496842 (S.D.N.Y. June 27, 2003)........................14, 15

*Gottlieb v. Cnty. of Orange*,
   84 F.3d 511 (2d Cir. 1996)..................................................................................................13

*Harte v. Ocwen Fin. Corp.*,
   No. 13-CV-5410 MKB RER, 2016 WL 3647687 (E.D.N.Y. July 1, 2016)...........................22

*Hoyt v. Andreucci*,
   433 F.3d 320 (2d Cir. 2006).................................................................................................17

*Johnson v. Nextel Commc'ns, Inc.*,
   660 F.3d 131 (2d Cir. 2011).................................................................................................14

*Kruglov v. Copart of Conn., Inc.*,
   No. 1:17-CV-1306, 2018 WL 1399332 (N.D.N.Y. Jan. 16, 2018) ......................................14

*Last Time Beverage Corp. v. F & V Distribution Co.*,
   98 A.D.3d 947, 951 N.Y.S.2d 77 (2d Dep't 2012)...............................................................18

**TABLE OF AUTHORITIES**
(continued)

Page

*London Assur. Corp. v. Thompson*,
    170 N.Y. 94 (N.Y. 1902) ........................................................................18

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
    784 F.3d 78 (2d Cir. 2015) ..............................................................12, 17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................14

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012) ....................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    476 U.S. 574 (1986) ............................................................................13

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ..................................................................22

*Miller v. Forge Mench P'ship Ltd.*,
    No. 00 CIV. 4314 (MBM), 2005 WL 267551 (S.D.N.Y. Feb. 2, 2005) ................15

*Morrissey v. Nextel Partners, Inc.*,
    22 Misc. 3d 1124(A), 880 N.Y.S.2d 874 (Sup. Ct. Albany Cnty. 2009), *aff'd*
    *as modified*, 72 A.D.3d 209, 895 N.Y.S.2d 580 (3d Dep't 2010) ..........................25

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010) ..............................................................17, 19

*Nichols v. BAC Home Loans Servicing LP*,
    No. 13-CV-224, 2013 WL 5723072 (N.D.N.Y. Oct. 18, 2013) ...........................22

*Preira v. Bancorp Bank*,
    885 F. Supp. 2d 672 (S.D.N.Y. 2012) .....................................................25

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
    890 F.2d 1264 (2d Cir. 1989) ................................................................18

*Roberts v. Capital One, N.A.*,
    719 F. App'x 33 (2d Cir. 2017) ...........................................................3, 17

*Roberts v. Capital One, N.A.*,
    No. 16 Civ. 4841 (LGS), 2017 WL 1750445 (S.D.N.Y. May 4, 2017).................3, 17

**TABLE OF AUTHORITIES**
(continued)

Page

*Smith v. United States*,
    58 Fed. Cl. 374 (2003), *aff'd*, 110 F. App'x 898 (Fed. Cir. 2004) ........................................15

*Sokolski v. Trans Union Corp.*,
    53 F. Supp. 2d 307 (E.D.N.Y. 1999) .....................................................................................25

*St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*,
    121 A.D.3d 1226, 994 N.Y.S.2d 704 (2014) .........................................................................15

*Matter of Stable Mews Assocs.*,
    49 B.R. 395 (S.D.N.Y. Bankr. 1985) .....................................................................................15

**Statutes**

New York General Business Law § 349(h) ........................................................................15, 16

**Other Authorities**

12 C.F.R.
    § 1005.17(a) ...........................................................................................................................9
    § 1030.8(f) ..............................................................................................................................9
    § 1030.11(b) *et seq.* ..............................................................................................................9

Federal Rules of Civil Procedure 56(c) ................................................................................12

**INTRODUCTION**

Plaintiff Tawanna Roberts claims she was "harmed" because Capital One assessed overdraft fees on her checking account when Capital One *paid* her transactions, rather than when those transactions were *authorized*.  Plaintiff also claims she was misled by Capital One's conduct.  On this basis, Plaintiff asserts claims for breach of contract and for violation of New York General Business Law section 349 ("Section 349").  Discovery, however, has established indisputable facts that show Plaintiff's claims are meritless.

Both of Plaintiff's claims are foreclosed because she cannot show she was injured.  First, Plaintiff has not suffered actual damages because when her account was closed she owed Capital One more money than she claims here.  Second, according to the methodology proposed by Plaintiff's own expert, Plaintiff would have been worse off in her own "but-for" world, because she would have incurred more than *250 additional* overdraft fees if Capital One had in fact assessed such fees at authorization instead of when the transaction was paid.

If the Court proceeds beyond this formidable initial obstacle, Capital One is entitled to summary judgment on Plaintiff's breach of contract claim for a number of additional reasons.  *First*, while the Second Circuit found that the Account Agreements were ambiguous as to whether overdraft fee determinations were to be made at transaction authorization or settlement, the extrinsic evidence—including the parties' course of conduct and industry practice—shows that there is no genuine dispute that the parties intended overdraft fees to be determined when a transaction is paid, not when it is authorized.  *Second*, Plaintiff cannot establish, as she is required to do, that she performed her obligations under the contract.  In her agreements with Capital One, Plaintiff promised not to withdraw or spend the funds needed to cover authorized transactions that had not yet been paid, and to promptly repay overdrafts when they occurred.

-1-

Plaintiff repeatedly breached these promises when she deliberately withdrew cash needed to pay the transactions at issue here and failed to repay Capital One the more than $550 she owed in overdrafts when her account was closed.

Plaintiff also asserts a claim under Section 349.  To prevail on this claim, Plaintiff must show "materially misleading" conduct on the part of the defendant that caused her injury.  But Plaintiff cannot have suffered injury as a result of the ambiguous language in the Account Agreements because *Plaintiff repeatedly disavowed ever reading* those agreements.  Further, after the first APSN transaction alleged in the Complaint, Plaintiff had a phone call with a Capital One representative where he explained that Plaintiff would incur overdraft fees if the funds in her account were insufficient at the time Capital One *paid* for the transaction, regardless of the balance that may have been in her account at the time of *authorization*.  Capital One also refunded the discussed fees as a customer courtesy.  Any alleged APSN overdraft fees incurred *after* that call could not have been caused by any alleged ambiguity in the Account Agreements.

Accordingly, Capital One's Summary Judgment Motion should be granted in its entirety.

## PROCEDURAL HISTORY

Plaintiff filed her class action complaint ("Complaint") on June 22, 2016, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, unjust enrichment, and violation of Section 349.  (ECF No. 1.)  The Complaint focused on transactions authorized at a time when Plaintiff's account would have had sufficient funds available to cover the amount authorized, but paid later, when Plaintiff's funds were no longer sufficient to cover the transaction amount.  Plaintiff refers to such assessments as "Authorize Positive Settle Negative" ("APSN").  APSN transactions occur when the customer's balance changes between authorization and payment—*i.e.*, when the customer has spent the funds needed to cover an

authorized transaction before it is paid.  On September 2, 2016, Capital One filed a Motion to

Dismiss each of these claims.  (ECF Nos. 18-20.)  The Court granted Capital One's Motion to

Dismiss.  *Roberts v. Capital One, N.A.*, No. 16 Civ. 4841 (LGS), 2017 WL 1750445 (S.D.N.Y.

May 4, 2017).  The Court found, among other things, that the Account Agreements provided that

overdraft fees would be assessed at the time of payment, that the Complaint's construction of the

Account Agreements was "unreasonable as a matter of law," and that Capital One's conduct was

"not materially misleading" under Section 349.  (*Id.* at *3, *5.)  The Second Circuit reversed as

to the breach of contract and Section 349 claims, finding that Capital One's definition of

"overdraft" was ambiguous but affirmed dismissal as to all other claims.  *Roberts v. Capital One,

N.A.*, 719 F. App'x 33, 36-37 (2d Cir. 2017).  Discovery in this action has concluded.  On

December 11, 2018, the Court granted Capital One's request to file a motion for summary

judgment, followed by Plaintiff's cross-motion for summary judgment. (ECF No. 91.)

### <u>UNDISPUTED MATERIAL FACTS</u>

**A.      The Mechanics of Debit Card Transactions**

A typical debit card transaction occurs in two parts.  (Statement of Facts ("SOF") ¶ 1.)  In

the first step, a debit cardholder swipes her card at a merchant, the card terminal connects, and

asks the bank that issued the card (here, Capital One) to authorize the transaction.  (*Id.*)  During

the authorization process, the transaction is routed from the merchant, to the merchant's

acquiring bank, to the payment card network (here, Mastercard), and then to Capital One's debit

processor.  (*Id.*)  The debit processor performs a series of checks, and then sends the transaction

to Capital One to determine whether to authorize the transaction.  (*Id.*)  Capital One determines

whether to authorize a transaction based on whether the transaction amount exceeds the

customer's available balance[1] and, if a customer is opted in to overdraft services for everyday debit card transactions, the customer's overdraft limit.[2]  (*Id.* ¶ 2.)

An authorization is not a transaction—no money changes hands at that time.  Rather, an authorization is an approval the merchant obtains from the cardholder's bank to submit a request, later, for payment.[3]  (*Id.* ¶ 5.)  If a transaction is authorized, a temporary hold, or "memo post," is placed on the customer's account in the amount of the debit card authorization.  (*Id.*)  The memo post does not decrease the customer's ledger balance, but it does reduce Capital One's calculation of the available funds for future authorizations by the authorized amount.[4]  (*Id.*)  The authorized transaction will show as "pending" on Capital One's mobile app and online banking platform until it is paid or the hold expires.  (*Id.* ¶ 6.)

The second step in a typical debit card transaction is settlement or payment.  (*Id.* ¶ 8.)  Payment does not occur until the merchant processes the final transaction and submits the debit to Capital One for settlement.  (*Id.*)  There can be days between the original swipe at the point of sale and the merchant's request for payment.  (*Id.*)  Once Capital One receives the payment request, the Bank includes the transaction in its processing batch for the night (which occurs each banking business day), and then posts all the transactions for the day according to the posting order disclosed in the Account Agreements.  (*Id.* ¶ 9.)  During nightly batch processing, the memo posts (if any) for authorized debit transactions are removed and the ledger balance is used

---

[1] A customer's available balance starts with the ledger balance, which is the balance after the nightly batch processing, and takes into account any holds or memo posts placed on the account, such as memo posts associated with debit card transactions that have been authorized but have not yet posted.  (SOF ¶ 3.)  The available balance reflects the best information the Bank has available to it in real time; however, it does not reflect every transaction a customer makes, such as every check a customer may have written.  (*Id.*)

[2] An overdraft limit is assigned to each customer.  It is a risk assessment in terms of how much the Bank will allow a customer to overdraw his or her account.  (*Id.* ¶ 4.)

[3] While "typical" debit card transactions are authorized before they are submitted, merchants are not required to authorize all debit card transactions.  (*See id.* ¶ 7.)  Some such transactions are submitted for payment without being authorized.  (*Id.*)  As noted in the Deposit Agreement, Capital One retains the right to either permit debit card transactions to overdraw or return them unpaid. (*Id.*)

[4] Because a customer may initiate transactions that are known to the customer but not known to the bank until they are presented (e.g., written checks), Capital One can only estimate the customer's available balance at any time.

for payment of posted transactions and overdraft determinations.  (*Id.*)  After the batch

processing is completed, the memo posts (for transactions that have been pending for less than

three batch cycles) are reapplied if the posts have not been matched to a settled transaction.

(*Id.* ¶ 10.)  If a memo post has been pending for more than three batch cycles, Capital One does

not reapply it.  (*Id.*)  This drops the hold and increases the customer's available balance by the

formerly held amount.  (*See id.*)

### B.      Capital One's Overdraft Services

Capital One's standard overdraft service covers Automatic Clearing House ("ACH")

transactions, checks, and recurring debit card transactions, meaning that Capital One can

exercise its discretion to pay such items even where Plaintiff does not have sufficient funds to

cover the transaction amount.  (*Id.* ¶ 11.)  If a customer also wants the Bank to consider

automated teller machine ("ATM") and one-time (also referred to as "non-recurring" or

"everyday") debit card transactions for authorization and payment, even if they exceed the

customer's current available balance, the customer must affirmatively opt-in for that service.

(*Id.* ¶ 12.)  At account opening, Capital One provides its customers with an opt-in form ("Opt-In

Form"), which the customer must sign or otherwise agree to in order to have their ATM and one-

time debit card transactions considered for authorization and payment into overdraft.  (*Id.*)  It is

only by "opting in" to additional overdraft services that a customer can overdraw their account

with an ATM transaction or have a one-time debit card transaction authorized at a time when

they would not have sufficient funds available to pay it. (*Id.*)

### C.      The Account Agreements

Plaintiff opened a Capital One checking account on December 23, 2013.  (SOF ¶ 13.)

Plaintiff's checking account was governed by Capital One's Rules Governing Deposit Accounts

("Deposit Agreement"), and electronic transactions, including debit card transactions, were also

governed by the Electronic Funds Transfer Agreement (the "EFT Agreement").  (SOF ¶¶ 13, 14.)

The Deposit Agreement explains in detail how the Bank processes credits and debits to the customer's account and states that the Bank does so "in a *specific* order" that "might not be the same as the order you make transactions and could result in overdraft transactions[,]" and that customers "can avoid overdrafts on [their] account by always making sure [they] have enough available funds in [their] account to cover [their] transactions."  (SOF ¶ 16 (emphasis added).)  It further explains that the processing order "is how [Capital One] decide[s] what posts first and last each day" and "determines the order that [customers] will see the items on [their] statement."  (*Id.*)  It explains that Capital One processes all credits first and states that after it processes any credits, it processes the debits it received since the last batch cycle.  (*Id.*)

The Deposit Agreement also contains a chart explaining the specific order in which Capital One processes debits.  (SOF ¶ 17.)  For example, it specifically informs customers that the Bank processes all "Cash or cash-like withdrawals," which include "Teller and ATM withdrawals" before it processes any "Debit card transactions and fees."  (*Id.*)  It further explains that both of those specific types of transactions are processed by "Date and time, if available [and] [(e)verything else from lowest dollar amount to highest."  (*Id.*)

The Deposit Agreement also explains how it treats overdrafts, in a section aptly named "Overdrafts."  (*Id.* ¶ 18.)  This section provides that Capital One may in its "sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an "Overdraft")."  (*Id.*)  It further provides that:

- Capital One's "decision to pay Overdraft items is solely within our discretion."

- If Capital One "elect[s] to pay Overdraft items or to permit an Overdraft…[the customer] must deposit additional funds into [their] account promptly in an amount

sufficient to cover the Overdraft and to pay us Overdraft fees for each Overdraft item in accordance with our current Schedule of Fees and Charges."

(*Id.*)  The Deposit Agreement again specifically states that a customer "can avoid overdrafts on [their] account by always making sure that [they] have sufficient available funds in [their] account to cover all of the debits presented for payment against [their] account." (*Id.* ¶ 19.)

As noted above, electronic fund transfers—such as debit card transactions—are also governed by Capital One's EFT Agreement.  (*Id.* ¶ 20.)  The EFT Agreement explains that if Capital One "authorize[s] the transaction, the funds will be debited from your primary checking account immediately or a hold may be placed on your account for up to several days after the purchase transaction has occurred, depending upon the promptness with which the merchant processes your transaction." (*Id.* ¶ 21.)  Under the EFT Agreement, customers expressly promise not to do what the Plaintiff did here:  they "agree not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against [their] account." (*Id.*)

Capital One's Schedule of Miscellaneous Fees and Charges ("Schedule of Fees"),[5] informs customers that there is a $35 assessment for Non-sufficient Funds (NSF)/Overdraft (OD) and states:  "We may charge your account a fee for items drawn or transactions effected that *create* an overdraft in your account." (*Id.* ¶ 23 (emphasis added).)

### D.     Capital One's Practices

Throughout the period in which Plaintiff maintained an account with Capital One, Capital One determined whether to assess overdraft fees at the time an item was paid from the customer's account, not at the time (if any) the item was authorized.  (*Id.* ¶ 26.)

This is standard industry practice.  Overdraft practices regarding electronic fund transfers

---

[5] The Deposit Agreement, EFT Agreement, and Schedule of Fees are referred to as the "Account Agreements."

sf-3975721

are governed by Regulation E, originally promulgated by the Federal Reserve Board (the "Fed")

pursuant to the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* (*Id.* ¶ 27.)  In 2009, the

Fed amended Regulation E to prohibit the charging of overdraft fees on ATM and everyday debit

card transactions unless the consumer had "opted in" to such overdraft services. (*Id.* ¶¶ 27-28.)

In explaining the amended regulation, the Fed described industry practices:  "Generally,

institutions charge a flat fee each time an overdraft is ***paid*** . . . ."  (*Id.* ¶ 29 (emphasis added).)  It

also reported industry comment on the proposed amendment consistent with the practice of

charging overdraft fees at settlement, not authorization:  "Some industry representatives have

indicated that a majority of debit transactions that are authorized into overdraft later settle into

good funds, without fees being assessed on the customer's account." (*Id.* ¶ 30.)  The Fed noted

that in consumer testing, "participants understood the concept of overdraft coverage, and that

they would be charged fees if their institution ***paid*** their overdrafts." (*Id.* ¶ 31 (emphasis added).)

The Fed rejected suggestions that the model language it proposed for an "opt-in" focus on

"authorization" of transactions rather than "payment":  "While an institution decides whether or

not to *authorize* an overdraft, fees are typically charged for the institution's *payment* of the

transaction." (*Id.* ¶ 32 (emphasis in original).)  Thus, the model form—which was adopted by

Capital One[6]—defined "<u>overdraft</u> [as] occur[ing] when you do not have enough money in your

---

[6] The Model Consent Form language was widely adopted financial institutions, including major financial institutions like JP Morgan Chase Bank, N.A, Comerica Bank, Navy Federal Credit Union, PNC Bank, N.A., U.S. Bank, N.A., Wells Fargo Bank, N.A., amongst others. *See* Chase Bank, *Chase Overdraft Services*, at page 14, <u>https://www.chase.com/content/dam/chasecom/en/checking/documents/how-your-transaction-will-work.pdf</u>; Comerica Bank, *Consent Form for Overdraft Services*, <u>https://www.comerica.com/site-tools/resources/reg_e.html</u>; Navy Federal Credit Union, *Optional Overdraft Protection Service (OOPS) Disclosures*, at page 1, <u>https://www.navyfederal.org/pdf/applications-forms/NFCU_657.pdf</u> ; PNC Bank, *Overdraft Notification*, <u>https://www.pnc.com/content/dam/pnc-com/pdf/personal/Services/Overdraft-Notification-Document.pdf</u> ; U.S. Bank, *ATM and Debit Overdraft Coverage Confirmation*, <u>https://apply.usbank.com/apply/common/ATM_DebitCard_ODCoverage_Yes.pdf</u>; Wells Fargo, *Important Information About Overdrafts*, at 1, <u>https://www.wellsfargo.com/fetch-pdf?formNumber=CNS8058&subProductCode=ANY</u>.

sf-3975721

account to cover a transaction, but we pay it anyway." (*Id.* ¶¶ 33, 34.)[7]

Regulation E itself also explicitly defines "overdraft services" in terms of payment, not authorization. 12 C.F.R. § 1005.17(a). It provides: "the term 'overdraft service' means a service under which a financial institution assesses a fee or charge on a consumer's account held by the institution for ***paying*** a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account." (*Id.* (emphasis added).) Regulation DD, the implementing regulation for the federal Truth in Savings Act, 12 U.S.C. § 4301 *et seq*., (12 C.F.R. § 1030), which governs new deposit account disclosures, likewise refers *throughout* to overdraft services as the "payment of overdrafts." *See id.* § 1030.11(b) (1)-(2) ("Advertising disclosures for overdraft services" requires disclosure of "the fee or fees for the payment of each overdraft" and "the categories of transactions for which a fee for paying an overdraft may be imposed. . ."); *see also id.* § 1030.11(b) (2) ("Communications about the payment of overdrafts . . ."); § 1030.11(b) (4) ("advertisements for the payment of overdrafts"); § 1030.8(f) ("Additional disclosures in connection with the payment of overdrafts").

### E.    Plaintiff's Conduct and the Transactions At Issue

When Plaintiff opened her Capital One account, she did no research on Capital One's overdraft policies or compare any other banks' overdraft policies. (*Id.* ¶ 35.) Nor did she choose to open her account at Capital One because of the Bank's overdraft policies. (*Id.*) Instead, she opened her account with Capital One because "[i]t was the nearest bank that was easily accessible to [her], to the job location where [she] was at, and [she] just picked it." (*Id.*) Further, despite receiving the Account Agreements and alleging claims based on them, Plaintiff admits

---

[7] Rulemaking authority for Regulation E and Regulation DD was transferred to the Consumer Financial Protection Bureau, but the relevant regulations and model form have not changed. *Compare* 12 C.F.R. pt. 205.17, app. A, A-9 Model Consent From for Overdraft Services § 205.17 *to* 12 C.F.R. pt. 1005.17, app. A, A-9 Model Consent From for Overdraft Services § 1005.17.

sf-3975721

that she never read the agreements or relied on them in any way.  (*Id.* ¶ 38.)  Rather, Plaintiff

stated that her understanding of how overdraft fees should be assessed is derived from "[her]

own personal knowledge . . . not [from] reading anything."  (*Id.* ¶ 39.)

Plaintiff actively managed the overdraft services on her account.  She first opted into

overdraft services for ATM and one-time debit card transactions on April 27, 2015.  (*Id.* ¶ 37.)

She then opted out of those services on May 1, 2015, then back in on May 7, 2015, and then out

again on May 8, 2015.  (*Id.*)  On May 22, 2015, Plaintiff opted back into these overdraft services

and she stayed opted in until Capital One closed her account on July 26, 2016. (*Id.*)

Over the life of her account, Plaintiff overdrew her account 76 times, often multiple times

per month, and for several months in a row.  (*Id.* ¶ 40; *see e.g., id.* ¶¶ 46, 53, 56, 61.)  Plaintiff

insists that she regularly checked her account balance using the Bank's mobile app or website

before using her debit card for a purchase or at an ATM withdrawal.  (*Id.* ¶ 41.)  She admits that

several of her overdrafts were intentional, and believes that she should only be charged fees

when she overdraws her account deliberately.  (*Id.* ¶ 43.)  In July 2016, Capital One closed

Plaintiff's account when she did not repay $561.20 that she overdrew and recorded the amount

owed as a loss. (*Id.* ¶ 89.)

In her Complaint, Plaintiff challenges eight overdraft fees that she alleges were assessed

on transactions that were authorized when her balance was sufficient, but were paid when her

balance was no longer sufficient.  (*Id.* ¶ 45.)  In a declaration prepared to support a motion for

class certification, Plaintiff's retained opinion witness, Arthur Olsen, identified only three of the

foregoing transactions as having actually "authorized positive, settled negative."  (*Id.* ¶ 67.)  He

identifies six transactions not in the Complaint as instances of "harm" to the Plaintiff.  (*Id.* ¶ 68.)

All of the overdraft fees assessed on Plaintiff's account either in the Complaint or in

Mr. Olsen's declaration were assessed by Capital One at the time of payment, when the posting of the item in question created or increased an overdraft on Plaintiff's account.  (*Id.* ¶¶ 46, 53, 56, 61, 64, 70, 73, 76, 79, 82, 85.)  For all but one of the at-issue transactions, Plaintiff used an ATM to withdraw the funds needed to pay for those transactions before they settled, *i.e.* before Capital One paid for the transactions.  (*Id.* ¶¶ 47, 54, 57, 65, 71, 74, 77, 80, 83, 85.)  The single overdraft that was not caused by an ATM withdrawal was triggered by paying a check Plaintiff wrote that overdrew her account before her debit card transaction settled.  (*Id.* ¶ 71.)

### F.    Plaintiff's Calls With Capital One Representatives

When Plaintiff incurred overdraft fees, she sometimes reached out to Capital One customer service either through social media or by phone.  (*Id.* ¶¶ 49, 50, 59.)  That is what happened on June 12, 2015.  (*Id.* ¶¶ 49-50.)  After Plaintiff complained about her overdraft fees on Twitter, Arthur B., a Capital One customer service agent, called Plaintiff to discuss her complaint.  (*Id.* ¶¶ 49-52.)  During the call, Plaintiff explained that three of the transactions for which she was charged overdraft fees occurred prior to her ATM withdrawal, which Plaintiff claims is the only transaction that should have overdrawn the account.  (*Id.* ¶ 51.)  Plaintiff further explained that she overdraws her account only in cases of emergency and would not overdraw her account for small purchases.  (*Id.*)  In her explanation, Plaintiff acknowledged that she intentionally overdrew her account when she made the ATM withdrawal, but stated she believed the other three transactions should not have incurred overdraft fees because she had funds in her account at the time of purchase.  (*Id.*)  Arthur B. explained to Plaintiff that debit card transactions may take several days to settle and that she needs to take pending transactions into consideration if she is going to overdraw her account so that she does not incur additional fees.  (*Id.* ¶ 52.)  On the call, Arthur B. cautioned Plaintiff to be more careful in the future and, as a courtesy, waived the three overdraft fees for the APSN transactions.  (*Id.*)

-11-

On August 7, 2015, Plaintiff spoke to another Capital One representative, Brianna E.,

regarding overdraft fees she incurred as a result of debit card transactions and an ATM

withdrawal she made.  (*Id.* ¶¶ 59-60.)  Although Brianna E. mistakenly classified the fees as a

"timing error" and refunded two overdraft fees, Brianna E. correctly explained that the refunds

were "discretionary," and warned Plaintiff to be careful as debit card transactions "post a few

days later" and cautioned Plaintiff to "keep an eye and make sure it's in the transaction

history."  (*See* ¶ 59.)  Plaintiff admitted that she knew from a prior conversation that when debit

card transactions are pending, it "doesn't mean [the transaction] cleared.  It means the bank is

just holding the funds for the purchase to be made."  (*Id.* ¶ 60.)  As such, Plaintiff stated that she

usually waited until transactions cleared before making an overdraft.  (*Id.*)  Brianna E. confirmed

that Plaintiff's understanding was "exactly right."  (*Id.*)

## LEGAL STANDARD

A court may grant summary judgment where admissible evidence demonstrates the

absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of

law.  *Charles Schwab & Co. v. Makowska*, 999 F. Supp. 2d 459, 461-62 (E.D.N.Y. 2014); *see*

*also* Fed. R. Civ. P. 56(c).  No genuinely triable factual issue exists when the moving party

demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all

inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could

find in the non-movant's favor.  *Bank of Am., N.A. v. Fischer*, 927 F. Supp. 2d 15, 25-26

(E.D.N.Y. 2013); *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,

784 F.3d 78, 94 (2d Cir. 2015) (explaining summary judgment is proper in a contract dispute

involving ambiguous language where the extrinsic evidence meets summary judgment standard).

Where the non-moving party will bear the ultimate burden of proof on an issue at trial,

-12-

the moving party's burden under Rule 56 will be satisfied if it "can point to an absence of evidence to support an essential element of the" nonmoving party's claim.  *Charles Schwab*, 999 F. Supp. 2d at 462 (citing *Brady v. Town of Colchester*, 863 F.2d 205, 210-11 (2d Cir. 1988)).  A motion for summary judgment will not be defeated by a scintilla of evidence or by casting some "metaphysical doubt" upon the evidence produced by the moving party.  *Bank of Am., N.A.*, 927 F. Supp. 2d at 25-26 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 476 U.S. 574, 586-87 (1986)).  Nor can the nonmoving party survive summary judgment by relying on allegations, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Id.* at 25 (*quoting Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).)  Rather, a nonmoving party must "set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial." *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  Where, as here, the nonmoving party cannot show any genuine issues of material fact, the Court should grant summary judgment.

## ARGUMENT

## I.     PLAINTIFF LACKS STANDING AND HER CLAIMS FAIL AS A MATTER OF LAW BECAUSE SHE CANNOT ESTABLISH DAMAGES.

Plaintiff lacks standing to pursue either the breach of contract claim or the Section 349 claim because she was not injured even under her interpretation of the Account Agreements.  Not only was Plaintiff's account closed with a negative balance that exceeds her claimed contract damages, Plaintiff's own purported expert analysis demonstrates that she benefited greatly from Capital One's assessment of overdraft fees based on the balance at settlement instead of at authorization.  Because damages are an essential element of both claims, and she cannot prove them, Capital One is entitled to summary judgment.

sf-3975721

## A.    Plaintiff Cannot Show Injury in Fact.

To have standing, Plaintiff must plead and prove "injury in fact," causation, and
redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).  Plaintiff must show
for each asserted claim, that she has "suffered a distinct and palpable injury to [her]self."  *Mahon
v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (citing *Gladstone Realtors v. Vill. of
Bellwood,* 441 U.S. 91, 100 (1979)).  Plaintiff also must show she was harmed or injured by the
challenged conduct to establish a claim under both her breach of contract claim and her Section
349 claim.  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (noting that the
element of damages was required for plaintiff to state a breach of contract claim); *City of New
York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 883 N.Y.S.2d 772, 776 (2009) (injury is a
necessary element of a Section 349 claim).

## B.    Plaintiff Was Not Harmed Because She Owes Capital One More Than Her Alleged Damages.

Plaintiff was not harmed by the alleged breach of contract because the amount of her
claimed damages is less than the amount she owed Capital One at the time it closed her account.
*See Golden Pac. Bancorp v. F.D.I.C.*, No. 95 Civ. 9281(NRB), 2003 WL 21496842, at *2
(S.D.N.Y. June 27, 2003) (granting summary judgment because, where plaintiff's outstanding
debts exceeded plaintiff's possible damages, plaintiff is not entitled to any recovery and thus
lacks standing to sue).  Plaintiff seeks recovery for the overdraft fees assessed on her checking
account resulting from several alleged APSN transactions.  But regardless of whether the Court
considers the amount of the fees challenged in the Complaint ($280) (Compl. ¶¶ 74-79), the
amount of damages claimed by her expert ($245) (SOF ¶ 88), or considers both ($525)—she still
owes more ($561.20) to Capital One than she could recover from her breach of contract claim.
(*Id*. ¶ 89); *Kruglov v. Copart of Conn., Inc.*, No. 1:17-CV-1306 (DNH/DJS), 2018 WL 1399332,

-14-

at *3 (N.D.N.Y. Jan. 16, 2018) (noting that only actual damages are available for a breach of contract claim).  Because Plaintiff has no standing to sue where she owes more than she could recover, she lacks standing to pursue her breach of contract claim here.[8]  The Court need not look further than Plaintiff's basic lack of standing to grant summary judgment.

### C.    Plaintiff Was Not Harmed Because She Would Have Paid Many Times More in Overdraft Fees if Capital One Assessed Fees at Authorization.

Plaintiff also lacks standing for a different, independent reason:  she cannot show she was harmed for either claim because, even under her expert's methodology, Capital One's interpretation of the contract was to her benefit.  Plaintiff cannot recover more than she would have received if the alleged breach did not occur.  *St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*, 121 A.D.3d 1226, 1227, 994 N.Y.S.2d 704, 705–06 (2014) (noting that it is "fundamental that the injured party should not recover more from the breach than [it] would have gained had the contract been fully performed") (quoting *Freund v. Washington Sq. Press,* 34 N.Y.2d 379, 382 (1974)).[9]  While the Court may award up to $1,000 (plus actual damages) for willful or knowing violations of Section 349, Plaintiff must have been injured to state a claim.  N.Y. Gen. Bus. Law § 349(h).  Here, there was no injury regardless of whose interpretation of the contract the Court adopts.

The Second Circuit held that the Account Agreements were ambiguous as to whether

---

[8] *See also See Golden Pac. Bancorp*, 2003 WL 21496842, at *2; *Miller v. Forge Mench P'ship Ltd.*, No. 00 CIV. 4314 (MBM), 2005 WL 267551, at *4-5 (S.D.N.Y. Feb. 2, 2005) (no standing where debt exceeded the value of debtor's foreclosed-upon assets and exceeded the judgment owed to plaintiff); *Smith v. United States*, 58 Fed. Cl. 374, 390-91 (2003) ("the FDIC did not possess standing because its damage claim against the United States did not constitute an Article III case or controversy since the amounts claimed were not in excess of what the thrift in this case owed the government."), *aff'd*, 110 F. App'x 898 (Fed. Cir. 2004); *Matter of Stable Mews Assocs.,* 49 B.R. 395, 397 (S.D.N.Y. Bankr. 1985) (holding that debtor lacked standing to contest size of trustee's fees appended to mortgagee's claim, where mortgage and priority tax lien together exceeded value of estate).

[9] *See also Behzadi v. David & Son Oriental Antique Rugs Corp.*, No. 07 Civ. 7073(LGS)(FM), 2013 WL 5870343, at *3 (S.D.N.Y. Oct. 31, 2013) ("The damages awarded for 'breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.'" (quoting *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006).), *adopted by* 2013 WL 6409339, at *1 (S.D.N.Y. Dec. 6, 2013).

they provided for the determination of overdraft fees at settlement or at authorization; but under either interpretation Plaintiff was not harmed.  If, as the extrinsic evidence now confirms, the Account Agreements provide for the assessment of overdraft fees at payment, the challenged fees were contractually authorized and do not constitute injury or damage.  *See infra* at 19-22.  If Capital One should have determined whether to assess overdraft fees at the time of authorization, shifting to that assessment scheme would leave Plaintiff owing Capital One significantly more money, not the other way around.

Plaintiff's own expert's methodology demonstrates that Plaintiff benefitted greatly from Capital One making overdraft determinations at settlement instead of authorization.  Mr. Olsen devised a methodology to recreate Plaintiff's available balance at authorization for each transaction.  (SOF ¶ 68.)  Under his methodology, Plaintiff initiated *259* debit card transactions that authorized with a negative balance but settled with a positive balance and were not assessed a fee.  (*Id.* ¶ 87.)  Thus, if the Account Agreements were interpreted to require overdraft fee assessments at authorization, Capital One could have assessed as many as 259 additional overdraft fees for $9,065.[10]  (*Id.*)  In stark contrast, Plaintiff's expert only identifies nine debit card transactions that were authorized positive and should not have been charged overdraft fees if overdraft fee assessments were required at authorization; two such fees were reversed.  (*Id.* ¶¶ 68, 88.)  Thus, because the amount of fees that Plaintiff challenges ($245) are much less than the additional fees she would have incurred under her interpretation of the contract ($9,065), Plaintiff cannot show that she was harmed by Capital One's practice of assessing overdraft fees at settlement instead of at authorization.   Because Plaintiff has suffered no damage from the conduct she complains of, the Court need not even reach the contract interpretation question to

---

[10] Capital One also limits overdraft fees to four per day and waives any overdrafts if the ending day balance is more than -$5.00.  (Morgan Decl., Ex. 1 at CO_RBTS00000325.) The calculation above does not take into account any potential waivers under this policy.  (Kaufman Decl., Ex. E ¶ 78.)

sf-3975721

grant summary judgment in favor of Capital One.

## II.     CAPITAL ONE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM.

### A.     The Extrinsic Evidence Establishes That The Deposit Agreement Provided For Assessment of Overdraft Fees At Settlement of Transactions.

Summary judgment is warranted on Plaintiff's contract claim because the extrinsic evidence—including both parties' conduct and industry practice—overwhelmingly demonstrates that the parties intended for overdraft fee determinations to be made at payment, not authorization.

While the Second Circuit found ambiguity as to when overdraft fee determinations are made, discovery has now confirmed this Court's conclusion that Plaintiff's construction of the Account Agreements is "unreasonable as a matter of law." *See Roberts*, 2017 WL 1750445, at *3; *Roberts*, 719 F. App'x at 36.  Summary judgment on an ambiguous contract is appropriate where  "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary," *or*  "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Luitpold Pharm., Inc.*, 784 F.3d at 88.

"[T]he court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (applying New York law).  Extrinsic evidence may include "the parties' course of conduct throughout the life of the contract," and industry custom and practice. *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) (citing *Big Tree Energy Partners v. Bradford*, 219 A.D.2d 27, 30, 640 N.Y.S.2d 270, 273 (3d Dep't 1996)); *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992)

(citing *London Assur. Corp. v. Thompson*, 170 N.Y. 94, 99 (N.Y. 1902)).[11]

        1.      **Assessment of Overdraft Fees at Time of Posting is Consistent with Widespread Industry Practice.**

As noted in the Fed's 2009 explanation of its amendment to Regulation E, the vast majority of banks—if not all—make overdraft determinations at the time of payment.[12] *See supra* at 8.  This industry practice supports Capital One's interpretation of the Account Agreements.  A party may cite to industry custom and practice to construe an ambiguous contract where the other party was "actually aware" of the usage, or the usage was "so notorious in the industry that a person of ordinary prudence in the exercise of reasonable care would be aware of it."  *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, No. 15 Civ. 9945 (LGS), 2018 WL 4253152, at *6 (S.D.N.Y. Sept. 6, 2018) (citing *Last Time Beverage Corp. v. F & V Distribution Co.*, 98 A.D.3d 947, 951-52, 951 N.Y.S.2d 77, 81-82 (2d Dep't 2012)).  That the Fed has purposely defined overdrafts and overdraft fees in *both* Regulation E and Regulation DD in terms of payment sheds additional light here because some of the language that Plaintiff challenges, such as "cover" and "have enough money in your account" (*see, e.g.,* Compl. ¶¶ 10, 17), are taken directly from the Fed's model Regulation E form.  (SOF ¶¶ 22, 33, 34.)  That the parties adopted language based on the Federal Reserve Board regulations and model form that both *specifically describe overdrafts being assessed at payment* further demonstrates that the parties also intended to define overdrafts based on the time the transaction is paid, not when it is

---

[11] The rule of *contra proferetem* (construction against the drafter) does not apply under New York law because it is a principle of "last resort" that should only "be invoked when efforts to fathom the parties' intent have proved fruitless." *Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989).

[12] Plaintiff cannot dispute that charging overdraft fees based on the balance at payment instead of authorization is established industry practice—her counsel has filed at least ten lawsuits, including against the country's largest banks, challenging that exact practice. *See, e.g., Bodnar v. Bank of Am., N.A.*, No. 5:14-cv-03224 (E.D. Pa. June 6, 2014); *Clamor v. Wells Fargo & Co.*, No. 3:17-cv-03782-JD (N.D. Cal. June 30, 2017); *McGovern v. U.S. Bank, N.A.*, 18-cv-01794-CAB-JMA (S.D. Cal. Aug. 2, 2018); *Seegert v. MUFG Union Bank, N.A.*, 18-cv-00742-AJB-BGS, ECF. No. 14-2 (S.D. Cal. July 12, 2018); *Harrold v. MUFG Union Bank, N.A.*, No. BC 680214 (Cal. Super. Ct., Oct. 19, 2017); *Lloyd v. Navy Federal Credit Union*. No. 17-cv-1280-BAS-RBB (S.D. Cal. June 22, 2017); *Robinson v. Bank of Hawaii*, Civ. No. 17-1-0117-01 GWBC (Haw. Jan. 20, 2017); *Robinson v. First Hawaiian Bank*, Civ. No. 17-1-0167-01 KTN (Haw. Jan. 27, 2017).

authorized.

2.    **Both Parties' Course of Conduct During the Life of the Contract
Confirms Overdraft Determinations Are Made at Payment.**

The course of conduct during the life of the contract, by both Capital One and Plaintiff,
confirms that the parties intended for overdraft fees to be determined at the time of payment—
not authorization. "[T]here is no surer way to find out [the intent of the parties to a contract] . . .
than to see what they have done.'" *N.Y. Marine & Gen. Ins. Co..*, 599 F.3d at 119 (quoting *Am.
Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1503 (S.D.N.Y. 1983).)

*First*, the evidence shows Capital One made its overdraft fee determinations at the time
of payment, *i.e.* when the posting of Plaintiff's transactions created or increased an overdraft on
her account. (SOF ¶¶ 46, 53, 56, 61, 64, 70, 73, 76, 79, 82, 85.)  Plaintiff has not identified and
cannot identify any overdraft fee assessed for a transaction that authorized negative, but settled
positive—even though, using her expert's methodology, there were at least 259 times where
Plaintiff used her debit card and did not have a sufficient balance at the point of sale. (*Id.* ¶ 87.)
Plaintiff's monthly statements also confirm (and repeatedly advised Plaintiff) that overdraft fees
were assessed at payment. (*Id.* ¶¶ 48, 55, 58, 63, 66, 72, 75, 78, 81, 84, 85.)

*Second*, the evidence now shows the absurd results that would occur if Capital One's
course of conduct were reversed, *i.e.* if it made overdraft determinations at authorization instead
of settlement.  If Capital One decided whether an overdraft occurred based on the customer's
balance at authorization instead of at payment, it could charge fees on transactions paid at a time
when the customer had actually deposited sufficient funds to cover them. (*See, e.g.*, *id.* ¶ 87.)
Moreover, determining whether an overdraft occurred at authorization would mean that
customers could be charged fees for transactions authorized for more than the ultimate payment
amount—such as a restaurant that presumed a 20% tip at authorization, even though the

-19-

customer opted to tip in cash, or a deposit on a rental car that is only partially redeemed.  (*See, e.g.,* Kaufman Decl., Ex. B at 158:8-13.)  And because some authorized transactions (e.g. rental car deposits) never result in a payment request, Capital One could charge fees for "overdraft" transactions that never even occurred.  Plaintiff's own transaction history suggests that her interpretation would have resulted in a huge number of additional, nonsensical, fees for her and other customers like her.  (*See* SOF ¶¶ 86-87.)

*Third*, Plaintiff's avowed attentiveness to her balance, combined with her frequently initiating small dollar transactions that authorized without sufficient funds available, demonstrates that Plaintiff also intended for overdraft determinations to be made at posting, not authorization.  Plaintiff testified that she "repeatedly, sometimes throughout the day," checked her available balance on the mobile app or website prior to initiating transactions and that she was careful to only overdraw her account for big transactions.  (SOF ¶ 41.)  The "available balance" reconstruction methodology Mr. Olsen advocates shows that Plaintiff authorized more than 100 small-dollar (under $35) transactions that she did not have sufficient funds to pay, but later deposited sufficient funds to cover it.  (*Id.*¶ 86.)  As such—crediting Plaintiff's testimony that she regularly checks her balance before making a transaction and is careful about overdrafts—this conduct confirms that she did not expect to be charged an overdraft fee if she deposited sufficient funds to cover the transaction before it settled, *i.e.* she did not expect an overdraft fee to be assessed based on her balance at authorization.

*Fourth,* Plaintiff's recorded conversations with Capital One representatives likewise confirm that she knew that overdraft determinations were made at payment.  As described *supra*, Capital One repeatedly explained to Plaintiff that overdraft fees are assessed at payment, not authorization.  (*See supra* at 11-12.)  Indeed, Plaintiff explicitly acknowledged that "when I get

-20-

ready to make an overdraft purchase, what I usually do is I check my bank account and I see what's pending because I know that things post later."  (SOF ¶ 60.)  She even reiterated that "I know from years ago somebody told me something is pending, that doesn't mean it's cleared…[s]o that's why I usually if I'm making an overdraft purchase, I wait until stuff has cleared."  (*Id.*)[13]   If Plaintiff thought that overdraft fees were assessed based on the balance at authorization, she would not have needed to double check for pending transaction prior to intentionally overdrawing her account. [14]  (*See id.*)  She also never contended that the Account Agreements provided that overdraft fee determinations should be made at authorization.  (*See* Kaufman Decl., Exs. F, H.)  Plaintiff *knew* overdraft fees were assessed at and on the basis of settlement.

Because these recorded calls occurred prior to the litigation, they are entitled to more weight than Plaintiff's *post-hoc* contractual interpretation.  *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 381 (S.D.N.Y. 2006) (noting that unlike *post hoc* conclusions of contracting parties, "[g]enerally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

Capital One's course of conduct, Plaintiff's course of conduct, and the parties' recorded interactions all confirm that the parties intended for overdraft fees to be determined when the transaction was paid.  Because both the parties' course of conduct and industry practice confirms that the parties intended for overdraft fee determinations to be made at payment and not at

---

[13] That Brianna E. incorrectly stated that the fees were charged in "error" does not negate that both parties knew and intended for overdraft fees to be determined at payment.

[14] Plaintiff testified at deposition that she thought money was withdrawn "instantly" at the debit swipe, but such self-serving testimony cannot defeat summary judgment especially in light of Plaintiff's prior inconsistent statements that she has known for "years" that money is not instantly withdrawn.  *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974) (vague assertions supported only by self-serving statements by the nonmovant are insufficient to defeat a properly supported summary judgment motion).

authorization, Capital One's practices do not breach the Account Agreements.

### B. Plaintiff Did Not Perform Because She Overdrew Her Account With Unpaid Transactions Pending and Failed To Repay Her Overdraft.

Even if the Court adopted Plaintiff's interpretation of the Account Agreements, Plaintiff's failure to perform her contractual obligations—by failing to refrain from withdrawing or spending funds needed for pending transactions and by failing to repay Capital One after she overdrew her account—is fatal to her breach of contract claim. Courts routinely conclude that accountholders cannot state a claim as a matter of law against their banks where they do not comply with the provisions of their account agreements. *See, e.g.*, *Anthony v. GE Capital Retail Bank*, 321 F. Supp. 3d 469, 478-79 (S.D.N.Y. 2017) (granting summary judgment in favor of credit card issuer where consumer breached account agreement by failing to pay the balance on his account); *Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410 MKB RER, 2016 WL 3647687, at *5 (E.D.N.Y. July 1, 2016) (finding plaintiff's breach of contract claim failed where she did not properly allege that she performed under her mortgage agreement); *Nichols v. BAC Home Loans Servicing LP*, No. 13-CV-224, 2013 WL 5723072, at *9-10 (N.D.N.Y. Oct. 18, 2013) (dismissing Plaintiff's breach of contract claim where he failed to show that he made the payments required under the loan account agreement). Summary judgment can be awarded in cases like here "where the inferences [of non-performance] are certain." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186-87 (2d Cir. 2007), 500 F.3d at 186–87 (citing *Anderson Clayton & Co. v. Alanthus Corp.*, 91 A.D.2d 985, 457 N.Y.S.2d 578 (2d Dep't 1983)).

Here, Plaintiff's breach of contract claim fails as a matter of law because, in direct contravention of her promise in the EFT Agreement, she repeatedly overdrew her account when debit card and/or ATM transactions were pending, and she failed to repay the $561.20 overdraft on her account. Plaintiff "agree[d] not to withdraw, write checks or make point of sale purchases

-22-

against funds that are needed to pay ATM/Debit Card transactions that have not yet posted

against [her] account." (SOF ¶ 21.)  Plaintiff also agreed that if Capital One "elect[ed] to pay

Overdraft items or permit an Overdraft to exist in [her] account, [she] has no right to defer

payment, and [she] must deposit additional funds into [her] account promptly." (*Id.* ¶ 18.)  Yet,

it is undisputed that Plaintiff repeatedly broke the first promise by overdrawing her account when

she had debit card transactions that had not yet posted to her account, and broke the second when

she failed to repay her $ 561.20 overdraft. (SOF ¶¶ 85, 89.)  Plaintiff admitted in her deposition

that she repeatedly and, at times deliberately, overdrew her account when she had pending debit

card transactions. (*Id.*¶¶ 41, 43.)  Indeed, Plaintiff frequently made large cash withdrawals that

exceeded her ledger balance before pending transactions settled, *i.e.* before Capital One was able

to pay the merchants for her purchases. (*See id.* ¶ 85.)

      The overdraft fees Plaintiff incurred in June 2015 illustrate Plaintiff's non-performance.

On Monday June 29, 2015, Plaintiff withdrew $400 even though she only had an effective

starting day ledger balance of 347.07.[15]  (*See* Kaufman Decl. Ex. G at ROBERTS00048-49; SOF

¶ 85.)  At the time she made the withdrawal, Plaintiff had five pending transactions for a total of

$294.97 and an incoming ACH transaction for $149.89. (*Id.*)  Thus, Plaintiff emptied her

account (and then some) despite having authorized over $400 in transactions that had not yet

been paid.  As discussed *supra* and depicted in the chart in paragraph 74 in the SOF, all but one

of her challenged transactions follow a similar pattern. (SOF ¶ 85.)  For thirteen out of the

fourteen challenged transactions, Plaintiff made large (or cumulative) ATM withdrawals that far

exceeded her ledger balance, and thus withdrew the funds needed to pay for the pending

---

[15] Plaintiff's starting day ledger balance was $470.07, but she made ATM withdrawals over the weekend totaling
$123, effectively depleting her balance to $347.07 because according to Capital One's stated processing order, cash
and cash-like transactions are processed first by date.  *Id.*

sf-3975721

transactions that triggered the challenged fee.[16]  (*Id.*)  For the one overdraft that was not triggered by an ATM withdrawal, a check that Plaintiff wrote was cashed by the payee before the pending debit card transaction was posted.  (*Id.* ¶¶ 71, 85.)  This also breaches her promise to "not …write checks … against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against [her] account."  (*See id.* ¶ 21.)  Thus, because all of the transactions that triggered the challenged fees were caused by Plaintiff's breach of her agreement not to spend the money needed for authorized transactions, her breach of contract claim fails as a matter of law.

## III.   PLAINTIFF'S SECTION 349 CLAIM FAILS AS A MATTER OF LAW.

Capital One is also entitled to summary judgment on Plaintiff's Section 349 claim. Plaintiff cannot establish that any alleged misrepresentation in the Account Agreements caused her any harm because she repeatedly disavowed reading them.  Further, Capital One representatives explained the posting process to her once she incurred an alleged APSN overdraft fee and refunded her the fees she had incurred to date.

### A.   Plaintiff Cannot Show Any "Materially Misleading Conduct" Caused Her Any Harm Because She Did Not Read or Rely on the Account Agreements.

Plaintiff cannot establish a Section 349 claim because she admits she never read the allegedly deceptive material.  To have a claim under Section 349, the "materially misleading conduct" must have caused the alleged injury.  *City of New York*, 12 N.Y.3d at 621.  Here, the only allegedly "materially misleading conduct" is the alleged misstatements in the Account Agreements.  (Compl. ¶¶ 136-37.)  Because Plaintiff repeatedly disavowed reading or relying on the Account Agreements, they could not have *caused* her any harm.  (SOF ¶ 38); *Gale v. Int'l*

---

[16] Other debit card and ACH transactions contributed to the further depletion of Plaintiff's account.  (SOF ¶ 85.)  To the extent Plaintiff argues those transactions (instead of the ATM withdrawal) caused her to overdraw, Plaintiff's promise not to withdraw or make point of sale transactions that utilize authorized funds applies equally to those transactions.

*Bus. Machs. Corp.*, 9 A.D.3d 446, 447, 781 N.Y.S.2d 45, 47 (2d Dep't 2004) (dismissing GBL

349 claim where plaintiff did not see any of the statements so they could not have cause the

plaintiff's injury); *Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 263 (E.D.N.Y.

2012) (same), *order amended on reconsideration*, 2013 WL 5423800 (E.D.N.Y. Sept. 25, 2013).

> **B.      Any Alleged Misrepresentation in the Account Agreements Could Not Have Harmed Plaintiff after the Posting Process was Expressly Explained to Her.**

Even putting aside that Plaintiff did not read or rely on the Account Agreements,

Plaintiff's recorded interactions with a Capital One representative demonstrate that, as of June

12, 2015, she was informed overdraft fees would be charged if there were insufficient funds in

her account at the time of settlement.  (SOF ¶¶ 50-52.)  All of the alleged APSN overdraft fees

challenged in the Complaint that were assessed prior to the June 2015 phone call were refunded

as a customer courtesy.  (*Id*. ¶ 52)  Thus, any fees incurred after the Capital One representative

explained the posting process and how overdraft fees are assessed are simply not actionable.

*See, e.g.*, *Preira v. Bancorp Bank*, 885 F. Supp. 2d 672, 680 (S.D.N.Y. 2012) (no § 349 injury

where all relevant terms of gift card were fully disclosed prior to transaction); *Sokolski v. Trans

Union Corp.*, 53 F. Supp. 2d 307, 315-16 (E.D.N.Y. 1999) (finding plaintiff failed to allege

injury under § 349 where he "was well aware of his rights").[17]

## CONCLUSION

For all the foregoing reasons, Capital One requests the Court grant its Motion for

Summary Judgment in its entirety.

---

[17] *See also Morrissey v. Nextel Partners, Inc.*, 22 Misc. 3d 1124(A), 880 N.Y.S.2d 874 (Sup. Ct. Albany Cnty. 2009) ("[I]f the terms and conditions associated with the use of "bonus minutes" were fully disclosed to customers prior to their purchase, it cannot be said that such customers sustained an injury caused by the alleged deceptive practices"), *aff'd as modified*, 72 A.D.3d 209, 895 N.Y.S.2d 580 (3d Dep't 2010); *Ballas v. Virgin Media, Inc.,* 18 Misc.3d 1106(A), No. 600014-2007, 2007 WL 4532509, at *4-5 (N.Y. Sup. Ct. Nassau Cnty. Dec. 6, 2007) (because back of cell phone package directed consumers to check **terms and conditions on defendant's** website and Terms of Service booklet was provided inside package to every purchaser, Section 349 claim dismissed where alleged deceptive practice fully revealed), *aff'd*, 60 A.D.3d 712, 713, 875 N.Y.S.2d 523, 525 (2d Dep't 2009).

sf-3975721

Dated: January 25, 2019     MORRISON & FOERSTER LLP

            By: /s/  *Jessica Kaufman*
               Jessica Kaufman


              Jessica Kaufman
              Tiffani Figueroa
              250 West 55th Street
              New York, New York 10019
              Telephone: (212) 468-8000
              jkaufman@mofo.com
              tfigueroa@mofo.com

              James R. McGuire (*pro hac vice*)
              Sarah Davis *(pro hac vice)*
              Lauren Wroblewski *(pro hac vice)*
              425 Market Street
              San Francisco, California
              Telephone: (415) 268-7000
              jmcguire@mofo.com
              sarahdavis@mofo.com
              lwroblewski@mofo.com

              *Attorneys for Defendant Capital One, N.A.*