## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TAWANNA ROBERTS, on behalf of herself
and all others similarly situated,

     Plaintiff,

     -   against -

CAPITAL ONE, N.A.,

     Defendant.

CASE No. 1:16-cv-04841-LGS

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S <u>CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... v

INTRODUCTION .................................................................................................................. 1

SUMMARY OF FACTS ......................................................................................................... 3

    A.    CAPITAL ONE WAS AWARE OF THE REVENUE-GENERATING POTENTIAL OF APPSN TRANSACTIONS AS FAR BACK AS 2009, AND EAGERLY EXPLOITED THAT POTENTIAL .................................................. 4

    B.    MS. ROBERTS ENTERED INTO AN ADHESION CONTRACT ......................... 4

    C.    WHEN MS. ROBERTS OPENED THE ACCOUNT, THE BANK REPRESENTATIVE SUMMARIZED KEY TERMS BUT NEVER DISCLOSED THE APPSN PRACTICE .......................................................... 5

    D.    CAPITAL ONE WAS AWARE OF CONSUMER CONFUSION REGARDING THE APPSN PRACTICE .......................................................... 5

    E.    THE CONSUMER FINANCIAL PROTECTION BUREAU HAS CONDEMNED THIS IDENTICAL PRACTICE AS DECEPTIVE ....................... 5

    F.    MS. ROBERTS RELIED ON THE AVAILABLE BALANCE DISPLAYED ON CAPITAL ONE'S MOBILE APPLICATION ............................ 6

    G.    MS. ROBERTS INCURRED NUMEROUS OVERDRAFT FEES ON APPSN TRANSACTIONS .................................................................... 6

    H.    MS. ROBERTS INCURRED OD FEES ON APPSN TRANSACTIONS BECAUSE CAPITAL ONE USED "MEMO POSTED" FUNDS TO BE CONSUMED BY LATER-MADE TRANSACTIONS IT COULD SIMPLY HAVE REJECTED ................................................................... 7

    I.    MS. ROBERTS UNDERSTOOD FUNDS FOR DEBIT CARD TRANSACTIONS MADE ON SUFFICIENT FUNDS TO BE TAKEN FROM AN AVAILABLE BALANCE IMMEDIATELY .................................. 7

    J.    MS. ROBERTS INFREQUENTLY AND IN THE CASE OF EMERGENCIES SOMETIMES KNOWINGLY OVERDREW HER ACCOUNT ............................................................................................ 8

    K.    WHILE CAPITAL ONE DOES NOT DO SO, OTHER BANKS IN THE INDUSTRY DO DEBIT ACCOUNT BALANCES IMMEDIATELY .................... 8

L.    IN 2010 CAPITAL ONE CONSIDERED ASSESSING OD FEES AT AUTHORIZATION, BUT REJECTED THE POSSIBILITY AS INCONSISTENT WITH ITS TECHNOLOGY ............................................. 9

M.    WHEN MS. ROBERTS NOTICED OD FEES ON APPSN TRANSACTIONS, SHE COMPLAINED AND CAPITAL ONE AGREED THAT THE OD FEES WERE A "BANK ERROR" ............................... 9

N.    MS. ROBERTS FULLY PAID ALL APPSN OD FEES SHE CLAIMS AS DAMAGES ....................................................................................... 10

LEGAL STANDARD ............................................................................................. 10

ARGUMENT ........................................................................................................ 11

I.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED ON MS. ROBERTS'S BREACH OF CONTRACT CLAIM AND INSTEAD PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF MS. ROBERTS ....................................................................... 11

A.    EXTRINSIC EVIDENCE OF THE PARTIES' INTENT IS IRRELEVANT IN THE CONTEXT OF A CONTRACT OF ADHESION ..................................... 12

B.    IN THE ABSENCE OF RELEVANT EXTRINSIC EVIDENCE, THE COURT MUST CONSTRUE THE CONTRACT AGAINST THE DRAFTER AND GRANT PLAINTIFF PARTIAL SUMMARY JUDGMENT ON HER BREACH OF CONTRACT CLAIM ................................. 13

C.    EVEN IF THE COURT CONSIDERS EXTRINSIC EVIDENCE, CAPITAL ONE'S PROFFERED EXTRINSIC EVIDENCE DOES NOT RESOLVE THE AMBIGUITY ........................................................... 15

    1.    Capital One May Not Rely on Industry Practice to Resolve the Ambiguity ........................................................................ 15

        a.    There is No Industry Practice ............................................. 16

        b.    There is No Evidence Both Parties Intended to Be Governed by Industry Practice at the Time of Contracting ....................... 17

    2.    Capital One May Not Rely on Employee Statements or Course of Performance to Resolve the Ambiguity, Since its Contract Bars It. Even if It Could, the Evidence Establishes Ms. Roberts's View is Correct ............ 19

        a.     The Contract Prohibits the Court from Considering Course of Performance Evidence ........................................................................... 19

        b.     Capital One Representatives' Statements and Course of Performance Evidence, Such as It is, Shows Ms. Roberts's Interpretation is Correct ........................................................................ 20

    D.    Ms. Roberts Did Not Breach the Contract By Overdrafting Her Account ................ 22

II.    MS. ROBERTS HAS STANDING ........................................................................ 26

    A.    Ms. Roberts's Alleged Debt to Capital One Doesn't Negate Standing ...................... 27

    B.    Ms. Roberts Didn't "Benefit" from Capital One's Breach ............................................ 29

III.   MS. ROBERTS'S GBL § 349 CLAIM SHOULD SURVIVE SUMMARY JUDGMENT ... 32

CONCLUSION ............................................................................................................ 35

CERTIFICATE OF SERVICE ....................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**                                                                                             **Page(s)**

*67 Wall St. Co. v. Franklin Nat'l Bank*,
   37 N.Y.2d 245, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975) ............................................... 14

*Ackerman v. Coca-Cola Co.*,
   No. 09 CV 395 DLI RML, 2013 WL 7044866 (E.D.N.Y. July 18, 2013) ......................................... 26

*Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*,
   775 F.2d 476 (2d Cir. 1985) ............................................................................................... 14

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................................................... 11

*Anthony v. Ge Cap. Retail Bank*,
   2015 U.S. Dist. LEXIS 178075 (S.D.N.Y. Sept. 30, 2015) ............................................. 24, 25

*Axiom Inv. Advisors, LLC v. Duetsche Bank AG*,
   No. 15 CIV. 9945 (LGS), 2018 U.S. Dist. LEXIS 152154 (S.D.N.Y. Sept. 6, 2018) ............ 13, 18

*Benevento v. RJR Nabisco, Inc.*,
   No. 89 CIV. 6266 (PKL), 1994 WL 577010 (S.D.N.Y. Oct. 20, 1994) ........................................ 21

*Caterpillar Overseas, S.A. v. S.S. Expeditor*,
   318 F.2d 720 (2d Cir. 1963) ............................................................................................... 14

*CS First Bos. Ltd. v. Behar*,
   No. 94 CIV. 7167 (LAP), 1996 WL 384893 (S.D.N.Y. July 9, 1996) ............................................ 20

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ................................................................................... 27, 29, 30

*EMI Music Mktg. v. Avatar Records, Inc.*,
   317 F. Supp. 2d 412 (S.D.N.Y. 2004) ................................................................................ 28

*Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*,
   422 F.2d 7 (2d Cir. 1969) .................................................................................................. 14

*Fed. Ins. Co. v. Great White Fleet (US) LTD.*,
   2008 U.S. Dist. LEXIS 58461 (S.D.N.Y. Aug. 1, 2008) ....................................................... 14

*Flower City Painting Contractors, Inc. v. Gumina Const. Co.*,
   591 F.2d 162 (2d Cir. 1979) .......................................................................................... 16, 18

*Gale v. IBM*,
   9 A.D.3d 446, 781 N.Y.S.2d 45 (App. Div. 2004) .............................................................. 34

*Gillis v. Respond Power, LLC*,
   677 F. App'x 752 (3d Cir. 2017) ........................................................................................ 13

*Golden Pac. Bancorp v. F.D.I.C.,*
  No. 95 CIV. 9281 (NRB), 2003 WL 21496842 (S.D.N.Y. June 27, 2003) .............................. 28, 29

*Hallinan v. Republic Bank & Tr. Co.,*
  519 F. Supp. 2d 340 (S.D.N.Y. 2007) ......................................................................... 24

*Hamilton v. SunTrust Mortg. Inc.,*
  6 F. Supp. 3d 1300 (S.D. Fla. 2014) ......................................................................... 28

*Harte v. Ocwen Fin. Corp.,*
  No. 13-CV-5410, 2018 U.S. Dist. LEXIS 21843 (E.D.N.Y. Feb. 8, 2018) ....................... 25, 26, 34

*In re Agent Orange Prod. Liab. Litig.,*
  517 F.3d 76 (2d Cir. 2008) ...................................................................................... 11

*In re Delta/AirTran Baggage Fee Antitrust Litig.,*
  317 F.R.D. 675 (N.D. Ga. 2016) .............................................................................. 28

*In re Matter of Stable Mews Assocs.,*
  49 B.R. 395 (S.D.N.Y. Bankr. 1985) ......................................................................... 29

*Jacobson v. Sassower,*
  489 N.E.2d 1283 (1985) .......................................................................................... 14

*Kerman v. City of N.Y.,*
  374 F.3d 93 (2d Cir. 2004) ................................................................................. 12, 26

*Kolbe v. BAC Home Loans Servicing, LP,*
  738 F.3d 432 (1st Cir. 2013) .................................................................................... 13

*L.A. Haven Hospice, Inc. v. Sebelius,*
  638 F.3d 644 (9th Cir. 2011) ............................................................................... 29, 30

*Last Time Beverage Corp. v. F & V Distribution Co., LLC,*
  98 A.D.3d 947, 951 N.Y.S.2d 77 (2d Dep't 2012) .................................................... 18, 19

*Lebovits v. PHL Variable Ins. Co.,*
  199 F. Supp. 3d 678 (E.D.N.Y. 2016) ....................................................................... 18

*Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie,*
  784 F.3d 78, 2015 U.S. App. LEXIS 6783 ................................................................. 20

*Markva v. Haveman,*
  317 F.3d 547 (6th Cir.2003) .................................................................................... 29

*McCarthy v. Am. Int'l Grp., Inc.,*
  283 F.3d 121 (2d Cir. 2002) .................................................................................... 14

*Miller v. CitiMortgage, Inc.,*
  970 F. Supp. 2d 568 (N.D. Tex. 2013) ....................................................................... 25

*Miller v. Forge Mench P'ship Ltd.,*
   No. 00 CIV. 4314 (MBM), 2005 WL 267551 (S.D.N.Y. Feb. 2, 2005) .......................................... 29

*Murphy v. NCAA,*
   138 S. Ct. 1461, 200 L. Ed. 2d 854 (2018) ........................................................................ 27

*NCAA v. Governor of New Jersey,*
   730 F.3d 208 (3d Cir. 2013) ................................................................................... 27, 30

*Nichols v. BAC Home Loans Servicing LP,*
   No. 1:13-CV-00224, 2013 U.S. Dist. LEXIS 150564 (N.D.N.Y. Oct. 18, 2013) ................... 24, 25

*Oakgrove Const., Inc. v. Genesee Valley Nurseries, Inc.,*
   10 Misc. 3d 1053(A), 809 N.Y.S.2d 482 (Sup. Ct.) ...................................................... 12, 14

*Orlander v. Staples, Inc.,*
   802 F.3d 289 (2d Cir. 2015) .......................................................................................... 26

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.,*
   647 N.E.2d 741 (N.Y. 1995) ........................................................................................ 33

*Pelman ex rel. Pelman v. McDonald's Corp.,*
   396 F.3d 508 (2d Cir. 2005) .......................................................................................... 33

*Price v. L'Oreal USA, Inc.,*
   2018 U.S. Dist. LEXIS 138473 (S.D.N.Y. Aug. 15, 2018) ................................................ 33

*RBFC One, LLC v. Zeeks, Inc.,*
   367 F. Supp. 2d 604 (S.D.N.Y. 2005) .......................................................................... 24

*Record Club of Am., Inc. v. United Artists Records, Inc.,*
   890 F.2d 1264 (2d Cir. 1989) ....................................................................................... 15

*Record Club of Am., Inc. v. United Artists Records, Inc.,*
   No. 72 Civ. 5234 (WCC), 1991 U.S. Dist. LEXIS 5748 (S.D.N.Y. Apr. 29, 1991) ...................... 14

*Relativity Travel, Ltd. v. JP Morgan Chase Bank,*
   13 Misc. 3d 1221(A), 831 N.Y.S.2d 349 (Sup. Ct. 2006) .................................................. 34

*Roberts v. Capital One, N.A.,*
   719 F. App'x 33 (2d Cir. 2017) .......................................................................... 12, 13, 16, 18

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,*
   691 F.2d 1039 (2d Cir. 1982) ....................................................................................... 12

*Smith v. United States,*
   58 Fed. Cl. 374 (2003) ................................................................................................ 29

*St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.,*
   121 A.D.3d 1226, 994 N.Y.S.2d 704 ............................................................................. 30

*Sutton v. St. Jude Med. S.C., Inc.,*
    419 F.3d 568 (6th Cir. 2005) ................................................................................................ 29

*Texas v. U.S.,*
    809 F.3d 134 (5th Cir. 2015) ................................................................................................ 29

*Victory v. Pataki,*
    814 F.3d 47 (2d Cir. 2016) ................................................................................................... 11

*Young v. United Parcel Serv., Inc.,*
    135 S.Ct. 1338 (2015) .......................................................................................................... 11

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................................... 11

**Statutes**

New York General Business Law § 349 ...................................................................................... *passim*

12 C.F.R. § 1005.17 ...................................................................................................................... 16

22 N.Y.Jur.2d, Contracts § 200 .................................................................................................... 4

**Other Authorities**

2 E. Farnsworth, Contracts (3d Ed. 2004) § 7.9, p. 285 ............................................................. 12

2 Restatement (Second), Contracts § 211 (2), pp. 119–20 (1981) ............................................. 12

Wright & Miller, Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.) ................... 27

## INTRODUCTION

The Second Circuit has already held that Defendant Capital One Bank N.A. ("Capital One" or "the Bank")'s contract of adhesion is ambiguous. That ambiguity must be resolved against the drafter, Capital One. For that reason, Capital One's Motion for Summary Judgment should be denied, and Plaintiff's Cross-Motion for Partial Summary Judgment should be granted.

In an effort to avoid that cardinal principle of contract interpretation, Capital One seeks to introduce extrinsic evidence to try to show that Plaintiff Tawanna Roberts's ("Ms. Roberts") understood Capital One's complex debit card processing and overdraft fee ("OD Fee") assessment practices.  But extrinsic evidence of Ms. Roberts's subjective understanding is irrelevant in evaluating a contract of adhesion. Instead, the Court must resolve the meaning of the contract as a matter of law. That principle makes good sense: imagine if a bank were forced to adjust its policies based on each consumer's subjective understanding of the deposit agreement. Banks could not operate. Both Capital One and consumers are entitled to certainty and that certainty is derived from how a *reasonable consumer* would interpret the contract. Here, the Second Circuit has already held that the deposit agreement is subject to two equally reasonable interpretations. The "tie" therefore goes to the consumer.

Even if the Court were to consider Capital One's proffered extrinsic evidence, it does nothing to resolve the inherent ambiguities in the agreement. Capital One proffers evidence of "industry practice" and "course of performance." But extrinsic evidence of both supports Plaintiff's view of the contract, not Capital One's.  Emails to and from Capital One's own employees indicate that there is no uniform industry practice and that the Bank was aware other banks made OD Fee assessments at authorization, not at settlement. Indeed, in 2009 and 2010, Capital One itself considered following other banks and adopting the precise practice Capital One now claims is nonexistent in the industry. Further, even assuming there was an "industry practice," there is no evidence Ms. Roberts knew of the practice, nor should she have, as an unsophisticated consumer.

Capital One also argues the "course of performance" establishes that Ms. Roberts understood Capital One's OD Fee policies. But nothing could be further from the truth. Ms. Roberts, a struggling single mother who testified that even one $35 OD Fee would cost her a day and a half of work to repay, repeatedly and convincingly testified she never would have knowingly incurred the devastatingly expensive OD Fees on authorized positive, purportedly settled negative ("APPSN") transactions, some of which were for small purchases at fast food restaurants. Just as the Second Circuit confirmed Capital One's contract is ambiguous, the extrinsic evidence shows that Ms. Roberts was baffled by Capital One's practices. The evidence shows Ms. Roberts called Capital One numerous times, exasperated as to why she would have charged an OD Fee on an APPSN transaction. It further shows Capital One's own employees were just as confused.  As just one example, a Capital One customer service representative apologized profusely to Ms. Roberts for the bank's assessment of OD Fees on APPSN transactions, calling the Bank's actions a "mistake" and *confirming* Ms. Roberts should not have been charged OD Fees on those transactions.

Moreover, Ms. Roberts did not breach the contract when Capital One assessed OD Fees on APPSN transactions.  Capital One argues such OD Fees were caused because Ms. Roberts spent money that was needed to settle such transactions.  That is false.  Such overdrafts occurred because Capital One decided to authorize and approve subsequent transactions, and because Capital One decided to use "memo posted" funds for transactions other than the ones they were memo posted for.  Capital One's employees testified the Bank could have prevented OD Fees on APPSN transactions by simply not doing one of these things. In any event, Capital One offers its fee-based overdraft service *pursuant* to the contract—it was not a breach of the contract for Ms. Roberts to avail herself of that service.

Next, Capital One argues that Ms. Roberts does not have "standing" because, well after she paid the OD Fees she claims as damages in this case, Capital One closed her checking account with a

negative account balance.  But these are separate occurrences.  If, as Capital One states outright in its Motion that it record the amount as a loss (Mot., at 10), then she arguably owes nothing to Capital One and the argument is nonsensical; if, on the other hand, Ms. Roberts owes Capital One a separate debt (there is no record evidence that she does), she at the very least has standing to recover her improperly charged OD Fees and to reduce that debt.

Capital One also argues that Ms. Roberts does not have standing because under one hypothetical, she supposedly would have been worse off if the Bank had assessed OD Fees at authorization, but that hypothetical misapprehends Ms. Roberts's claim, is barred by the contract, and is riddled with implausible assumptions. In any event, neither the alleged "charged off" debt nor the authorization hypothetical eliminates Ms. Roberts's standing, which is grounded in her payment of improper OD Fees on APPSN transactions. At best, these arguments go to damages and should not be resolved at this stage in the case.

Finally, Ms. Roberts's GBL § 349 claim—which is premised not only on the misrepresentations and omissions in the contract but also on other misrepresentations and omissions Capital One made to Ms. Roberts, including through its online and mobile banking interfaces— survives summary judgment.

The Court should deny Capital One's Motion and grant Ms. Roberts's Cross-Motion.

<u>**SUMMARY OF FACTS**</u>

The facts necessary to resolve the Parties competing motions  are that the Second Circuit has already held to be ambiguous certain provisions in Capital One's Rules Governing Deposit Accounts ("Deposit Agreement") and Electronic Fund Transfer Agreement and Disclosure for Personal and Commercial Accounts ("EFT Agreement") (collectively "Agreements"), each contracts of adhesion, and facts showing extrinsic evidence does not resolve the ambiguity. Below is a recitation of the disputed facts which eliminate the possibility of granting summary judgment to Capital One, but

support summary judgment for Ms. Roberts

### A.   CAPITAL ONE WAS AWARE OF THE REVENUE-GENERATING POTENTIAL OF APPSN TRANSACTIONS AS FAR BACK AS 2009, AND EAGERLY EXPLOITED THAT POTENTIAL

In August 2009, a Capital One senior executive wrote



Plaintiff's Statement of Additional Facts ("Plaintiff's Facts"), ¶94 (emphasis added). The next month, in September 2009, he wrote that

*Id.* A later email confirmed that

*Id.* (emphasis added).

### B.   MS. ROBERTS ENTERED INTO AN ADHESION CONTRACT

Ms. Roberts entered into an adhesion contract with Capital One for a checking account. Plaintiff's Facts ¶90.  That contract contained certain terms applicable to the practices at issue in this case.  *See* Defendant's Statement of Undisputed Material Facts ("Defendant's Facts"), ¶¶14-23.[1] The following are the contractual provisions from the Agreements that are material to this Court's resolution of the competing summary judgment motions:

- The Deposit Agreement states: "You can avoid overdrafts on your account by always making sure you have enough available funds in your account to cover your transactions." Defendant's Facts ¶16.
- The Deposit Agreements states: "We may in our sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for an amount in excess of your available balance (an Overdraft)". Defendant's Facts ¶18.
- The EFT Agreement states: "An Overdraft occurs when you do not have enough money in your designated account to cover a transaction, but we pay it anyway." Defendant's Facts ¶22.

---

[1] Citations to Plaintiff's responses to Defendant's Facts appear herein as "Plaintiff's Response to Defendant's Facts."

### C. WHEN MS. ROBERTS OPENED THE ACCOUNT, THE BANK REPRESENTATIVE SUMMARIZED KEY TERMS BUT NEVER DISCLOSED THE APPSN PRACTICE

Ms. Roberts testified that she would not have opened a Capital One account if she had known it charged overdraft fees on APPSN transactions. She also testified that while the account sign-up process was rushed, not leaving her time to read each page of the Agreements, a Capital One representative quickly went through the Agreements with her during account sign up.   Plaintiff's Response to Defendant's Facts ¶35.  That bank representative never told Ms. Roberts of the policy at issue in this litigation, an omission upon which Ms. Roberts relied.  *Id.*

### D. CAPITAL ONE WAS AWARE OF CONSUMER CONFUSION REGARDING THE APPSN PRACTICE

APPSN results when funds place on hold or "memo posted" for a debit card transaction are instead consumed by later-made transactions. Two Capital One executives expressly recognized consumer confusion associated with the consumption of "memo posts" or debit holds by unrelated transactions:

*See* Plaintiff's Response to Defendants Facts ¶54. An executive falsely confirmed as much:

*Id.* (emphasis added).

### E. THE CONSUMER FINANCIAL PROTECTION BUREAU HAS CONDEMNED THIS IDENTICAL PRACTICE AS DECEPTIVE

The CFPB has stated that accountholders may be deceived by the precise practice at the heart of this lawsuit, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and

when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. *Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed.* They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

Plaintiff's Response to Defendant's Facts ¶28.

### F. MS. ROBERTS RELIED ON THE AVAILABLE BALANCE DISPLAYED ON CAPITAL ONE'S MOBILE APPLICATION

Ms. Roberts checked her available balance on Capital One's mobile app often.  A Capital One employee admits the reason for displaying this available balance to consumers like Ms. Roberts is "so that if I open my app in the middle of the day, *I see the money that I have available to spend that will not cause me to overspend*."  Plaintiff's Response to Defendant's Facts ¶5.  The confusion to consumers of providing an available balance that was not really "available" was a known issue at Capital One.  One presentation stated prominently, ██████████████████████████████████████████ ████████████████████████████████████████████████████████ *See* Plaintiff's Facts ¶95.

Ms. Roberts testified that she reasonably relied on the available display in Capital One's mobile app to make purchases she believed would not incur OD Fees: "A. I think when you make a debit card transaction, I think the merchant has immediately received the money because the debit card is like cash. And if you're receiving a receipt for a transaction or a confirmation for a transaction, then it's been paid, I feel like, at that time."  Plaintiff's Response to Defendant's Facts ¶42.

### G. MS. ROBERTS INCURRED NUMEROUS OVERDRAFT FEES ON APPSN TRANSACTIONS

Ms. Roberts incurred numerous OD Fees on APPSN transactions. *See* Defendant's Facts ¶85. When such transactions were authorized, Capital One immediately placed a hold or "memo post" on her account's available balance.  A hold or "memo post" reduces an available balance for all purposes,

and the reduced available balance is immediately reflected to accountholders in online banking and on the mobile app as the positive amount the accountholder has to spend.  Plaintiff's Response to Defendant's Facts ¶5.

### H.   MS. ROBERTS INCURRED OD FEES ON APPSN TRANSACTIONS BECAUSE CAPITAL ONE USED "MEMO POSTED" FUNDS TO BE CONSUMED BY LATER-MADE TRANSACTIONS IT COULD SIMPLY HAVE REJECTED

Ms. Roberts incurred OD Fees on APPSN transactions because Capital One chose to authorize and pay *subsequent* transactions that consumed funds "memo posted" or "held" for the prior transactions.  Plaintiff's Response to Defendant's Facts ¶¶54, 71, 74, 77, 80, 83.  Such transactions could not incur OD Fees unless Capital One chose to authorize and approve *new* transactions into overdraft, thus consuming funds "memo posted" for the original transactions.  A Capital One employee admits Capital One could simply prevent APPSN transactions altogether by stopping subsequent transactions.  *See*  Plaintiff's Response to Defendant's Facts ¶54:  "Q. Would you agree that in most circumstances, if Capital One chose to do so, it could prevent the AP/SN [authorize positive, settle negative] condition from occurring?. . .THE WITNESS: As I believe I said earlier, I believe with sufficient technological development, either internal or external to Capital One, it is possible for that to be created." *Id.*  Similarly, Capital One's employee admits that Capital One could have stopped held funds from being used for other purposes.  *Id.*  And the same employee admits Capital One could have chosen to use funds held or memo posted for a debit card transaction only to cover that purchase when it settled*, id.*—something that would also eliminate APPSN transactions.  In fact, top Capital One employees themselves believe it is *impossible* to spend memo posted funds.  *Id.* ("yes, that is true, customers cannot spend against memo-posted deposit balances from the ATM.").

### I.   MS. ROBERTS UNDERSTOOD FUNDS FOR DEBIT CARD TRANSACTIONS MADE ON SUFFICIENT FUNDS TO BE TAKEN FROM AN AVAILABLE BALANCE IMMEDIATELY

Ms. Roberts gave extensive, consistent, and oft-repeated testimony that she believed funds for

authorized positive debit card purchases were withdrawn immediately at authorization—an occurrence that, if true, would make the practice at the heart of this lawsuit (APPSN) entirely impossible.   Plaintiff's Response to Defendant's Facts ¶42.

**J.     MS. ROBERTS INFREQUENTLY AND IN THE CASE OF EMERGENCIES SOMETIMES KNOWINGLY OVERDREW HER ACCOUNT**

Plaintiff never "intentionally" overdrew her account on the transactions she claims as damages in this case, because (as the above testimony indicates) she understood funds for APPSN to be deducted immediately and understood that overdraft fees would not be assessed on transactions that authorized positive and purportedly settle negative.   Plaintiff's Response to Defendant's Facts ¶43. On a limited number of occasions, Plaintiff understood a particular transaction would incur an overdraft fee because it would be authorized and would settle against a negative available balance.   *Id.* She knowingly used the overdraft service that Capital One offers to its customers only in "emergency" situations, when she felt she had no choice.   *Id.*   (one reason is because incurring even one overdraft fee was a grave matter for her; one OD Fee cost her a day and a half of work to repay.)   Capital One's overdraft service is touted to be for this very purpose.   Plaintiff's Facts ¶97

**K.     WHILE CAPITAL ONE DOES NOT DO SO, OTHER BANKS IN THE INDUSTRY DO DEBIT ACCOUNT BALANCES IMMEDIATELY**

Capital One recognized that certain banks in the industry did make OD Fee determinations based on the balance at the time of authorization—directly refuting its argument that there is an "industry standard" to the contrary.   *See* Plaintiff's Facts ¶96

Other Capital One employees recognized that other banks in the industry did debit at authorization (and thus make OD Fee

determinations at that time).

**L.    IN 2010 CAPITAL ONE CONSIDERED ASSESSING OD FEES AT AUTHORIZATION, BUT REJECTED THE POSSIBILITY AS INCONSISTENT WITH ITS TECHNOLOGY**

A Capital One employee wrote in an email on February 5, 2010 that



*See* Plaintiff's Facts ¶93.   Another

Capital One employee wrote back saying:

*Id.*

**M.    WHEN MS. ROBERTS NOTICED OD FEES ON APPSN TRANSACTIONS, SHE COMPLAINED AND CAPITAL ONE AGREED THAT THE OD FEES WERE A "BANK ERROR"**

After receiving OD Fees on APPSN transactions on an occasion, Ms. Roberts called Capital One to complain.  *See* Plaintiff's Response to Defendant's Fact ¶59.  According to the recording, the Capital One representative agreed that it was ludicrous that Ms. Roberts received OD Fees on APPSN transactions; confirmed that debit card transactions "happen" at the time they are authorized; and even confirmed there was a "bank error" when Capital One charged OD Fees on APPSN transactions. *Id.*  During the call, Plaintiff explained her complaint, which mirrors the Complaint in this matter.  *Id.* In response, the Capital One representative agreed completely:

> The Operator: Okay. The [merchant name] was one done on 7/29, that's when the actual transaction happened, on 7/29, so that one was, would have been covered. Let me make sure here. Hang on. So 7/29, you still did have funds in there to do that. So that's still covered and *that would be a bank error on our side . . . So those ones, I see when you made the transaction, I see you made it when you did have the available funds in there . . .*That fee wasn't your fault. You had funds when you tried to do it . . . . I can see you did it on the 29th. That's when you had the funds. That's no big deal. That's not your fault . . . So what I will do is I will cover you for the $70 there only because that is a timing error, I can see that on your card, it's all timing. *When you did the transactions, you did have the funds in there. So no big deal.* Cover you for both of those ones.

*Id.* (emphases added). On numerous occasions <u>after</u> this call, during which time she was expressly told

it was improper and an "error" to charge OD Fees on APPSN transactions, Ms. Roberts incurred OD

Fees on such transactions.  *See, e.g.,* Plaintiff's Response to Defendant's Facts ¶¶76, 79, 82.

On another occasion, Ms. Roberts called to complain about APPSN OD Fees and the Capital

One representative totally failed to correct misperceptions about Capital One's practices that Ms.

Roberts expressed repeatedly on the call.   Plaintiff's Response to Defendant's Fact ¶52. The

representative, in fact, did not mention fee assessment at all.  *Id.*  As such, Ms. Roberts testified: "when

he was talking about authorizations and things of that nature, those things aren't really clear. Those

are just -- those are words that maybe a bank representative uses or whatever. But, you know, to

somebody like me, or other average people, even just people in general, they are not really -- they are

not really understanding things like that." *Id.*  In short, Plaintiff had no idea what the customer service

representative was talking about.   Indeed, after the representative made the previously quoted

statements, Ms. Roberts reiterated that she didn't understand how fees could result when she made

the transactions at a time she had money in the account: "This is insane. This is ridiculous." *Id.*  The

call transcript and Ms. Roberts's testimony make clear that the Capital One representative never told

Ms. Roberts what "post" meant, nor how that could cause OD Fees on previously authorized

transactions.  *Id.* In the end, the representative then validated Ms. Roberts's position by stating that

he "understood" what she was trying to do, and he refunded her fees. *Id.*

### N.      MS. ROBERTS FULLY PAID ALL APPSN OD FEES SHE CLAIMS AS DAMAGES

Of the $245 in overdraft fees at issue in this case, Ms. Roberts had paid each and every one

them to Capital One, from account deposits, no later than May 27, 2016.  *See* Plaintiff's Response to

Defendants Facts ¶88.

### LEGAL STANDARD

Summary judgment is appropriate where the record before the Court establishes that there is

no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "In assessing the record to determine whether there is a genuine dispute as to any material fact, [a court should] resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, with the burden on the moving party to demonstrate the absence of any material fact genuinely in dispute." *Victory v. Pataki*, 814 F.3d 47, 58-59 (2d Cir. 2016). *See also Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1347 (2015); *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

I.   **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED ON MS. ROBERTS'S BREACH OF CONTRACT CLAIM AND INSTEAD PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF MS. ROBERTS**

Capital One's Motion for Summary Judgment must be denied, and Ms. Roberts's Cross-Motion for Partial Summary Judgment must be granted, because Capital One's contract is ambiguous, and all ambiguities must be resolved strictly against the drafter. Capital One's attempt to rely on extrinsic evidence fails, because in the context of a contract of adhesion, extrinsic evidence of subjective "understanding" is generally irrelevant—rather, the Court should ascribe one meaning to the form contract as a matter of law. Further, even if the Court were to consider the extrinsic evidence Capital One offers (it should not), the evidence is at best inconclusive and certainly does not support summary judgment. Finally, Ms. Roberts did not breach the contract, so as to excuse Capital One's performance, by overdrafting her account. Under Capital One's faulty logic, no consumer could ever sue Capital One for assessing an improper overdraft fee. Capital One's motion should be denied, and Plaintiff's partial motion should be granted.

### A.   EXTRINSIC EVIDENCE OF THE PARTIES' INTENT IS IRRELEVANT IN THE CONTEXT OF A CONTRACT OF ADHESION

The Second Circuit has already held that Capital One's contract is ambiguous. *Roberts v. Capital One, N.A.*, 719 F. App'x 33, 34-37 (2d Cir. 2017). Because Capital One cannot overcome that law of the case, *Kerman v. City of N.Y.*, 374 F.3d 93, 109 (2d Cir. 2004), Capital One attempts to turn to extrinsic evidence to resolve the ambiguity the Second Circuit deciphered.  But its reliance on extrinsic evidence fails.

Basic principles of contract law dictate that extrinsic evidence of subjective understanding is generally irrelevant in the context of a contract of adhesion. Contracts of adhesion should have only one meaning—not varying meanings that depend on the subjective mental state of each consumer. Indeed, the Second Circuit has held that in the case of boilerplate provisions in a contract of adhesion, the meaning of the contract should be a question of law for the court, not a question of fact dependent on the parties' intent.  *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir. 1982) ("Boilerplate provisions are thus not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture. There are no adjudicative facts relating to the parties to the litigation for a jury to find and the meaning of boilerplate provisions is, therefore, a matter of law rather than fact."); *see also* 2 Restatement (Second), Contracts § 211 (2), pp. 119–20 (1981) (standardized agreements are interpreted "wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing"); 2 E. Farnsworth, Contracts (3d Ed. 2004) § 7.9, p. 285 ("Interpretation cannot turn on meanings that the parties attached if they attached none, but must turn on the meaning that reasonable persons in the positions of the parties would have attached if they had given the matter thought"); *Oakgrove Const., Inc. v. Genesee Valley Nurseries, Inc.,* 10 Misc. 3d 1053(A), 809 N.Y.S.2d 482 (Sup. Ct.), *judgment entered,* (N.Y. Sup. Ct. 2005) ("[W]here one party has only slight participation in the process by which the agreement is drafted, the court may decline to

consider extrinsic evidence and further decline to search out the meaning of ambiguous language, instead reaching a coherent and reasonable interpretation of the ambiguity by construing the agreement against the drafter."); *see also Gillis v. Respond Power, LLC*, 677 F. App'x 752, 756 (3d Cir. 2017) ("In the context of standard form contracts . . . extrinsic evidence of individual understandings is especially irrelevant."); *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 436–37 (1st Cir. 2013) ("Extrinsic evidence of the parties' unique intentions regarding a uniform clause is generally uninformative because unlike individually tailored contracts, uniform clauses do not derive from the negotiations of the specific parties to a contract. Instead, courts seek to determine the uniform meaning of the clause as a matter of law[.]").[2]

Here, it is undisputed that Ms. Roberts did not participate in the drafting of the Agreements. As Capital One's corporate representative testified, customers are not permitted to change the contract.  *See* Plaintiff's Facts ¶90 (addressing the Deposit Agreement). In the context of a form agreement, evidence of Ms. Roberts's subjective understanding is irrelevant. Nor is it necessary to consider extrinsic evidence of how a reasonable consumer would construe the agreement, given that the Second Circuit has already held that Ms. Roberts's interpretation of the agreement is objectively reasonable. *Roberts*, 719 F. App'x at 37.  Therefore, Capital One's proffered extrinsic evidence is irrelevant, and the Court should decline to consider it.

### B.   IN THE ABSENCE OF RELEVANT EXTRINSIC EVIDENCE, THE COURT MUST CONSTRUE THE CONTRACT AGAINST THE DRAFTER AND GRANT PLAINTIFF PARTIAL SUMMARY JUDGMENT ON HER BREACH OF CONTRACT CLAIM

In the absence of relevant extrinsic evidence to resolve the ambiguity identified by the Second

---

[2] Plaintiff is aware this Court declined to apply *Kolbe* and *Gillis* in *Axiom Inv. Advisors, LLC v. Duetsche Bank AG,* No. 15 CIV. 9945 (LGS), 2018 U.S. Dist. LEXIS 152154, at *27-28 (S.D.N.Y. Sept. 6, 2018). However, in *Axiom*, which did not involve consumer claims, the contracts at issue were not uniform but instead were individually negotiated by counsel. Here, on the other hand, there is no dispute that the contracts were uniform and *not* individually negotiated by Ms. Roberts or other consumers.

Circuit, the Court must construe the contract against the drafter and partial summary judgment must be entered in favor of Plaintiff.  "In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language." *Jacobson v. Sassower*, 489 N.E.2d 1283, 1284 (1985) (citing *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 187 (1975)). "This is particularly true as to a contract of adhesion." *Oakgrove Constr., Inc.*, 809 N.Y.S.2d at 482 (quoting 22 N.Y.Jur.2d, Contracts § 200).  "If the language supplied by one party is reasonably susceptible to two interpretations, one of which favors each party, the one that is less favorable to the party that supplied the language is preferred. Such interpretation *contra proferentum* is favored in the interpretation of standard form contracts, particularly contracts of adhesion, and operates against a party that is at a distinct advantage in bargaining." *Record Club of Am., Inc. v. United Artists Records, Inc.*, No. 72 Civ. 5234 (WCC), 1991 U.S. Dist. LEXIS 5748, at *18-19 (S.D.N.Y. Apr. 29, 1991) (citing Restatement Second of Contracts § 206; Farnsworth, *Contracts* § 7.11 at 518 (2d. ed. 1990)); *see also McCarthy v. Am. Int'l Grp., Inc.,* 283 F.3d 121, 127 (2d Cir. 2002) ("[E]quivocal contract provisions are generally to be construed against the drafter").

Because language supplied by Capital One has been determined by the Second Circuit to be reasonably susceptible to two interpretations, the Court must construe the adhesion contract against its drafter, Capital One. *See Record Club of Am., Inc.*, 1991 U.S. Dist. LEXIS 5748, at *18-19.  Such interpretation *contra proferentum* is favored. *Id.*; *accord Fed. Ins. Co. v. Great White Fleet (US) LTD.*, 2008 U.S. Dist. LEXIS 58461, at *15 (S.D.N.Y. Aug. 1, 2008) ("[B]ills of lading are 'contracts of adhesion and, as such, are strictly construed against the carrier.'" (quoting *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir. 1985)); (also citing *Monica Textile Corp. v. S.S. Tana*, 952 F.2d 636, 643 (2d Cir. 1991); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 15 (2d Cir. 1969); *Caterpillar Overseas*, S.A. v. S.S. Expeditor, 318 F.2d 720, 722 (2d Cir. 1963)).

The Court should therefore construe the Agreements against the drafter and conclude Capital One was not permitted to charge OD Fees on APPSN transactions. That contract construction wholly supports granting partial summary judgment to Ms. Roberts, leaving the parties to litigate the issue of the amount of Capital One's liability for the OD Fees she paid on APPSN transactions.

### C. EVEN IF THE COURT CONSIDERS EXTRINSIC EVIDENCE, CAPITAL ONE'S PROFFERED EXTRINSIC EVIDENCE DOES NOT RESOLVE THE AMBIGUITY

Even if the Court considers extrinsic evidence of the Parties' intent (it should not), the extrinsic evidence supports Ms. Roberts's view of the contract, not Capital One's; such evidence is *at best* inconclusive and does not support summary judgment in Capital One's favor. Capital One offers evidence of "industry practice" and "course of performance." But Capital One cannot establish that any uniform "industry practice" exists, and even if it did, that Ms. Roberts was aware or should have been aware of such a "practice." Indeed, the Second Circuit has already held that it would be reasonable for Ms. Roberts, as an unsophisticated consumer, to interpret the contract the way she did. Capital One's course of performance evidence similarly fails. First, the contract expressly bars the Court from considering such evidence to modify the express terms of the contract. Moreover, the record evidence supports Ms. Roberts, who called Capital One numerous times to express her confusion and dissatisfaction with being charged OD Fees on APPSN transactions. On at least one instance, a representative from Capital One *agreed* with her, expressly telling Ms. Roberts the APPSN OD Fee was a "*bank error.*" In the face of such (at best) inconclusive evidence, summary judgment in favor of Capital One is plainly improper. *See Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989) ("The question of which of the two plausible interpretations should be credited was a question of fact and could not properly be decided on summary judgment.").

#### 1. Capital One May Not Rely on Industry Practice to Resolve the Ambiguity

Capital One may not rely on an alleged "industry practice" because (a) there is no standard

industry practice; (b) there is no evidence Ms. Roberts knew of the supposed "industry practice" at the time she opened her account; and (c) no knowledge of a supposed "industry practice" can be imputed onto Ms. Roberts, given that she is a consumer rather than a sophisticated corporate entity. *See Flower City Painting Contractors, Inc. v. Gumina Const. Co.,* 591 F.2d 162, 165 (2d Cir. 1979) (declining to consider evidence of "industry practice" because the plaintiff had no experience in the industry and therefore did not know, nor had reason to know, the alleged "industry practice"). Moreover, the Second Circuit has already held that Ms. Roberts's interpretation of the contract is objectively reasonable from a consumer's perspective. *Roberts*, 719 F. App'x at 37.

### a. There is No Industry Practice

At the outset, Capital One's reliance on "industry practice" fails because there is zero evidence of industry practice that OD Fees are always determined at payment for all types of transactions. To the contrary, evidence exists industry practice is mixed, *see supra* at 8-9, and Capital One actually considered assessing OD Fees at authorization. *See* Plaintiff's Facts ¶93.

Capital One's resort to Regulation E to try to prove industry practice fails. The regulation never states what industry practice is, and it is not intended to do so. Capital One strains to make it so, mostly by italicizing and bolding a few passages that include the word *"***paid***"*:

> "Generally, institutions charge a flat fee each time an overdraft is ***paid*** . . . ." (Id. ¶ 29 (emphasis added).) …The Fed noted that in consumer testing, "participants understood the concept of overdraft coverage, and that they would be charged fees if their institution ***paid*** their overdrafts." (Id.¶ 31 (emphasis added).)… Regulation E itself also explicitly defines "overdraft services" in terms of payment, not authorization. 12 C.F.R. § 1005.17(a). It provides: "the term 'overdraft service' means a service under which a financial institution assesses a fee or charge on a consumer's account held by the institution for ***paying*** a transaction (including a check or other item) when the consumer has insufficient or unavailable funds in the account." (Id. (emphasis added).)"

Mot., at 8-9. But Capital One's liberal and generous use of bold and italic font does not make "pay" mean what it wants it to mean. The word "pay" is the same word that the Second Circuit held could reasonably mean "authorization" to reasonable consumers. *Roberts*, 719 Fed. App'x at 36. It cannot

mean what Capital One wants it to mean here to prove "industry practice."

Internally, Capital One acknowledged an industry split as to when to assess OD Fees. *See* Plaintiff's Facts ¶96 ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ emphasis added).  In another Capital One document outlining Capital One's practice *vis a vis* the rest of the banking industry, a Capital One employee wrote: ████

████████████████████████████████████████████████

████████████████████████████████████████████████ *See* Plaintiff's Facts ¶96 (emphasis added).[3]

As further evidence that there is no uniform industry practice, one need only look to the 2015 guidance from another Federal regulator, the Consumer Financial Protection Bureau, which warns that consumers can and are deceived when certain banks use the APPSN practice at issue here. *See supra* at 5-6. Ms. Roberts was one such bank customer being deceived by Capital One.

> **b.  There is No Evidence Both Parties Intended to Be Governed by Industry Practice at the Time of Contracting**

Putting aside the fact there is no "industry practice," there is also no record that Ms. Roberts was aware of the (non-existent) industry practice. Capital One cites to no testimony from Ms. Roberts that she was aware of these alleged industry practices, nor that the Parties discussed Capital One's overdraft policies in general or the challenged aspect of the policies specifically, when she opened the account. To the contrary, consistent with a reasonable consumer's expectations, Ms. Roberts understood that she would *not* be charged overdraft fees on APPSN transactions. *See* Plaintiff's

---

[3] Capital One's citation to cases filed by Plaintiff's counsel does not prove a "widespread industry practice," but rather only that nine other banks are engaging in similar wrongful conduct. Most important, it does not prove any knowledge by Plaintiff, but by Counsel, which is irrelevant.

Response to Defendant's Facts ¶43, 52. The Second Circuit endorsed this understanding, expressly holding that "a reasonable consumer likely considers something to have been paid for when they swipe their debit card, not when their bank's back-office operations are completed." *Roberts*, 719 F. App'x at 37. Both the record and the Second Circuit's Opinion therefore foreclose any intention to be governed by Capital One's supposed "industry practice" because the Bank "elected to pay" the items at the time of authorization.  Once authorized debit card transactions must be paid.  *See* Plaintiff's Response to Defendants Facts ¶¶11-12.

That is fatal to the argument, even according to Capital One's own authority. "'A party who seeks to use trade usage to define language or annex a term to a contract must show either that *the other party was actually aware* of the trade usage, or that the usage was *so notorious in the industry* that a person of ordinary prudence in the exercise of reasonable care would be aware of it.'" *Axiom Inv. Advisors, LLC*, 2018 U.S. Dist. LEXIS 152154, at *19 (emphasis added) (quoting *Last Time Beverage Corp. v. F & V Distribution Co., LLC*, 98 A.D.3d 947, 951 N.Y.S.2d 77, 81-82 (2d Dep't 2012)). Capital One's effort to dig deep into the Federal Reserve Board's regulations is baseless. Capital One has cited no evidence that most consumers even know these regulations exist—let alone that most consumers understand that these regulations could allow Capital One to impose overdraft fees on APPSN transactions.  *See Flower City Painting Contractors, Inc.,* 591 F.2d at 165 (evidence of "industry practice" may not be imputed to a plaintiff with no experience in the "industry"); *see also Lebovits v. PHL Variable Ins. Co.,* 199 F. Supp. 3d 678, 681 (E.D.N.Y. 2016) (declining to consider evidence of industry practice and instead construing the contract against the drafter because "the extrinsic evidence on which [defendant relies] concerns its unilateral intent and industry practice, not the parties' mutual understanding when the [contract] was drafted.").

Capital One's cases do not require a finding to the contrary. All of Capital One's cases involve disputes between sophisticated corporate entities, not disputes between a sophisticated corporate

entity and a consumer. For example, *Axiom* was a dispute between a sophisticated investment advisor and an investment bank, in which the bank had published its complained of practices in industry publications for years. 2018 U.S. Dist. LEXIS 152154, at *19. *Last Time* involved a dispute between "experienced distributors of Coca-Cola and Pepsi products" and another beverage distributor who was assigned certain rights from Last Time. 98 A.D.3d at 951.

In sum, Capital One has not and cannot put forth any evidence to show that Ms. Roberts had any actual knowledge of the alleged "industry practice," or that charging OD Fees on APPSN transactions is so notorious that knowledge of the practice could be imputed to an unsophisticated consumer. Thus, this Court should reject Capital One's attempt to use supposed extrinsic evidence "industry practice" to resolve the ambiguity.

> **2. Capital One May Not Rely on Employee Statements or Course of Performance to Resolve the Ambiguity, Since its Contract Bars It. Even if It Could, the Evidence Establishes Ms. Roberts's View is Correct.**

Capital One may not rely on what its employees said to Ms. Roberts or supposed "course of performance" extrinsic evidence because the contract bars the Court from considering it. Even if the Court were to consider such evidence, the "course of performance" establishes Ms. Roberts's interpretation of the contract is correct. That is demonstrated both by Ms. Roberts's numerous complaint calls to Capital One, in which she expressed frustration and confusion as to why she was charged OD Fees on APPSN transactions, and by a call with a Capital One employee during which the employee *admitted* Ms. Roberts should not have been charged OD Fees on an APPSN transactions and admitted such fees were improper and a "bank error." At a minimum, there is a reasonable inference to be drawn in Ms. Roberts' favor on this issue.

> **a. The Contract Prohibits the Court from Considering Course of Performance Evidence**

As a threshold matter, the Deposit Agreement specifically disclaims Capital One's reliance on anything Ms. Roberts was told by any bank representative or course of performance evidence, stating:

> You acknowledge and agree that no oral or other statement made to you by any of our officers or employees, or any course of dealing under which we may, from time to time, or one or more times, elect to pay and honor Overdrafts on your account, may be construed by you, or by any third person, or by any court or arbitrator, to in any way modify, amend, or contravene the foregoing provisions . . . .

Plaintiff's Facts ¶99. Thus, Capital One cannot rely upon oral statements by its customer service representatives, or the fact that it continuously breached the Agreements by assessing OD Fees on APPSN transactions, as evidence of what the Agreement means. Capital One's attempt to introduce such evidence therefore fails *ab initio. See CS First Bos. Ltd. v. Behar*, No. 94 CIV. 7167 (LAP), 1996 WL 384893, at *4 (S.D.N.Y. July 9, 1996) ("[N]o oral modification clauses . . . consistently have been enforced under New York law[.]").

### b. Capital One Representatives' Statements and Course of Performance Evidence, Such as It is, Shows Ms. Roberts's Contract Interpretation is Correct

Even if the Court considered course of performance evidence, it does not show that the Parties had the mutual understanding that OD Fees could or would be charged on APPSN transactions at the time they entered into the contract—which, because of the above contract provision barring reliance on employee statements or course of dealing modification—is all that could matter. It certainly has not done so to the exclusion of all genuine issues of material fact. In fact, the evidence shows the opposite.

The above-referenced call with a Capital One employee is <u>alone</u> enough to defeat the Bank's course of performance argument. That employee expressly told Ms. Roberts that she should not have incurred OD fees on APPSN transactions and Capital One was wrong to charge her an OD Fee in that circumstance. *See* Plaintiff's Response to Defendant's Facts ¶59. When a Capital One employee expressly tells Ms. Roberts that an OD Fee on an APPSN transaction is improper and a "bank error," there cannot possibly be evidence in this case "about the parties' intended meaning [that] is so one-sided that no reasonable person could decide the contrary." *Luitpold Pharm., Inc.*, 784 F.3d at 88. Even

Capital One's own employees didn't understand what the Bank now says Ms. Roberts understood.

Further, Ms. Roberts' repeated calls to customer service wherein she complained she was wrongly charged OD Fees on APPSN transactions further demonstrates the futility of relying on course of performance here. "When one party performs under the contract and the other party accepts his performance without objection it is assumed that this was the performance contemplated by the agreement." *Benevento v. RJR Nabisco, Inc.,* No. 89 CIV. 6266 (PKL), 1994 WL 577010, at *2 (S.D.N.Y. Oct. 20, 1994). Here, the opposite was true. Ms. Roberts's numerous angry telephone calls to Capital One demonstrate she *never* accepted Capital One's "performance without objection" and, to the contrary, consistently insisted Capital One was wrong to assess her OD Fees on APPSN transactions.

Capital One quotes out-of-context statements from a telephone call in an attempt to demonstrate Ms. Roberts knew "that overdraft determinations were made at payment." Mot., at 20. To the contrary, Plaintiff testified extensively and consistently that she believed funds for positive funds debit card purchases were withdrawn immediately at authorization. Defendant's Facts ¶42. When Ms. Roberts said she checked to see what was pending or cleared, she was using those terms interchangeably with "authorized," as she stated expressly when asked. *Id.*, ¶60. Plaintiff testified repeatedly that she believes funds are withdrawn immediately, that "cleared" simply means funds deduction (which, again, she believed happened immediately); and that she does not know what "post" means, or how that is different from "authorize." As Plaintiff testified, a transaction is "clear" in her mind when it shows as deducted from her account (which occurs immediately):

> Q. What is the difference between a pending transaction and one that's cleared?
> […]
> Q. It's a word that you used during the call, "clear."
> A. To my understanding, that would be the same thing. Like clear, pending, because the transaction is pending, it's cleared. To my understanding it's the same thing, because the transaction has, the money has been withdrawn from my account. And it's clear. And when I check my account, then I see that there are no fees, then I take that as something being clear.

*Id.* In short, Ms. Roberts' testimony does not support Capital One's argument that she understood

its posting and fee practices; it shows the opposite.

Capital One also argues that because Ms. Roberts sought to have certain transactions authorized into a negative balance, but later made a covering deposit, she necessarily understood Capital One's OD practices. This is baseless. Ms. Roberts testified repeatedly and persuasively that she did not understand why she was charged overdraft fees on APPSN transactions. *See* Plaintiff's Response to Defendant's Facts ¶¶52, 55, 60. As discussing the standing section, *infra*, whether or not Ms. Roberts believed she would be charged OD Fees on authorize *negative* settle *positive* transactions is wholly irrelevant to this case.

Ultimately, an objective contract construction must control the resolution of Plaintiff's claim. That is the point of having a written form contract. No call recording can compel a different result.

### D.    Ms. Roberts Did Not Breach the Contract By Overdrafting Her Account

Capital One also argues that, even if Ms. Roberts's interpretation of the contract is correct, her breach of contract claim fails because her use of the Capital One overdraft service is a breach of contract such that Ms. Roberts did not uphold her end of the bargain. The argument defies logic. According to Capital One, for the challenged transactions, Ms. Roberts made withdrawals far exceeding her ledger balance, withdrawing funds needed to pay pending transactions that triggered the fee. Mot., 23-24. Ms. Roberts concedes she should be charged OD Fees on such ATM withdrawals, which were provided by Capital One in its discretion from new money it loaned her. She was not clearing out her account, she was asking Capital One to cover an actual overdraft, which Capital One eagerly provided in exchange for a fee pursuant to its overdraft service.

First, Capital One argues that Plaintiff breached the contract by spending money "needed to pay pending transactions." But it had already "memo posted" funds for those previously authorized debit card transactions. It had, in other words, already set money aside for those "pending" transactions; as even Capital One employees admit, one cannot spend "memo posted" funds.

Defendants Facts ¶5; Plaintiff's Response to Defendant's Facts ¶54.[4] *See.* Ms. Roberts did not and could not spend that "memo posted" money. Rather, standing at an ATM, she sought a withdrawal, Capital One considered the request in its discretion, and granted it by loaning her new money in exchange for the OD Fee. Capital One had the final say as to whether the overdraft would be approved, not Ms. Roberts. When Capital One decided to use memo posted funds for those later made ATM withdrawals, that was its own choice, and it was a choice that violated the contract.

Second, overdrafts are a profit-driven, fee-based service offered pursuant to the contract—not a breach of contract by the consumer. Importantly, Capital One retains the discretion to permit or deny overdrafts. Capital One exercises its discretion to pay overdrafts based on the transaction type, whether the customer was opted-in for non-recurring debit card transactions, and the applicable hidden overdraft limit assigned by Capital One. Capital One SOF ¶¶11, 12, 18, 22, 28.[5] Given that Capital One could choose to decline any overdraft transaction in its sole discretion, whether or not any customer has opted into overdraft service, Capital One has no basis to claim Ms. Roberts breached its contract when Capital One authorized transactions against insufficient funds. Notably, Capital One, like many banks, market its overdraft service as making funds available to a customer to make a purchase in the event of an emergency. *See* Plaintiff's Facts ¶97 █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ It cannot be a contract breach to avail oneself of this "benefit."

Third, Capital One's argument would lead to absurd results. Take the following unambiguous provision of the Deposit Agreement: "We will not assess more than four (4) fees per day for

---

[4] A contract term states "Plaintiff "agree[d] not to withdraw, write checks or make point of sale purchases against funds that are needed to pay ATM/Debit Card transactions that have not yet posted against [her] account." Mot., at 22-23.

[5] Notably, this is why Capital One includes a provision in its Deposit Agreement disclaiming any customer reliance on course of performance. It wants to control whether it will pay overdrafts. However, none of that means it can control the construction of the contract as it pertains to APPSN transactions.

overdrawing your account." Plaintiff's Additional ¶98. If overdrafting constituted a breach excusing Capital One's performance, under Capital One's logic, accountholders would be barred from bringing a breach of contract claim if Capital One assessed five OD fees in a day. That cannot be the law.

Fourth, even assuming, *arguendo*, that overdrafting by a consumer was a breach, by electing to pay the overdraft and charging a fee, Capital One elected that remedy to the exclusion of any other. "The New York doctrine of election of remedies provides that upon learning of a breach, a party must choose between terminating the contract and continuing performance. If a party chooses to continue performance, it must give notice of breach to the other side, or it waives its rights to sue the breaching party." *Hallinan v. Republic Bank & Tr. Co.*, 519 F. Supp. 2d 340, 351 (S.D.N.Y. 2007) (quoting *RBFC One, LLC v. Zeeks, Inc.*, 367 F. Supp. 2d 604, 610 (S.D.N.Y. 2005)). Here, after assessing OD Fees on Ms. Roberts's transactions, Capital One allowed Ms. Roberts's continued use of her account. Capital One never claimed she breached by overdrafting because its adhesion contract contains the elected remedy of charging an OD Fee.

The cases cited by Capital One are inapposite. First, in *Anthony v. Ge Cap. Retail Bank* a consumer attempted to avoid a credit card debt by accusing the credit card company of "issuing an unauthorized credit card in his name and then engaging in illegal efforts to collect the debts owed on those accounts." *Id.*, at 472–73. The bank "brought a counterclaim for breach of contract alleging Plaintiff owed money on the unpaid debt." *Id.*, at 473. At summary judgment, the court held the undisputed evidence showed that the plaintiff authorized the opening of the credit card, was the one who incurred the transactions, and then defaulted on payment. *Id.*, at 479. *Anthony* was not a case where the court found each party breached, but the bank's breach was excused due to the consumer's prior breach. Rather, the evidence simply proved the bank's case and disproved the consumer's case.

Likewise, in *Nichols v. BAC Home Loans Servicing LP*, the plaintiff alleged his loan servicer erroneously applied his mortgage payment and he subsequently refused to make further mortgage

payments "pending the resolution of this alleged billing error." *Id.* at *6. But in dismissing plaintiff's claim, the court found that not only did the plaintiff fail to plead his own performance under the contract, he did not "identify the terms of the agreement that were breached" by the defendant. No. 1:13-CV-00224, 2013 U.S. Dist. LEXIS 150564, at *26–27 (N.D.N.Y. Oct. 18, 2013). *Anthony* and *Nichols* are simply two meritless *pro-se* lawsuits.  As to the APPSN transactions at issue, Ms. Roberts used her debit card exactly as intended, including with regard to Capital One's overdraft service. Capital One is the only party that breached by charging the OD Fees on those transactions.

*Harte v. Ocwen Fin. Corp.* is also distinguishable. That case involved a mortgagor's breach of contract suit alleging the lender's failure to provide the proper post-default pre-foreclosure notice letter. No. 13-CV-5410 (MKB) (RER), 2016 U.S. Dist. LEXIS 86127, at *5-6 (E.D.N.Y. July 1, 2016). Although Capital One cites it as example of a case showing how a plaintiff's failure to perform can constitute a material breach, here the very fact that Ms. Roberts performed exactly as intended in using her debit card means *Harte* does not help Capital One.  Even if it were a breach, it is not so material as to excuse Capital One's obligation to comply with its obligations.

This case is far more similar to *Miller v. CitiMortgage, Inc.*, 970 F. Supp. 2d 568, 580 (N.D. Tex. 2013), a case cited in *Harte*. In that case, the plaintiff challenged the defendant's lack of pre-foreclosure notice, a notice she was entitled to under her contract. The defendant countered that plaintiff could not challenge the lack of pre-foreclosure notice because by failing to make timely payments, the plaintiff had herself breached the contract. The court rejected defendant's argument holding: "It is illogical for the Court to conclude that Plaintiff cannot enforce [Defendant's] obligations, assumed to be contractual, which arise after Plaintiff's default merely because Plaintiff is in default. If that were appropriate, then the [alleged contractual notice provisions] would become practically meaningless." *Miller v. CitiMortgage, Inc.,* 970 F. Supp. 2d 568, 580 (N.D. Tex. 2013). The same is true here.

Finally, as to Capital One's argument that Ms. Roberts is barred from recovery due to her

failure to repay the balance that Capital One recorded as a loss when her account was closed, that breach, if true, is irrelevant to Ms. Roberts's affirmative claim because it occurred *after* Capital One breached by charging OD Fees on APPSN transactions (and notably after Ms. Roberts paid the OD Fees on the APPSN transactions). Even when a party is in material breach of a contract "it is only the injured party's *further* performance — and not the injured party's past nonperformance — that may, in some instances, be excused in view of the other party's breach." *Harte*, 2016 U.S. Dist. LEXIS 86127, at *8-9 (citing *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015)). As such, Ms. Roberts is not barred from seeking relief for Capital One's breach of contract in this case.

## II.   MS. ROBERTS HAS STANDING

Capital One incorrectly contends Ms. Roberts lacks standing because she is not entitled to any damages and thus was not injured in fact. (Dkt. 97 at 13-17.) Specifically, Capital One argues she cannot be said to have suffered any harm because (a) she owed more money at the time Capital One closed her account than she stands to recover for her breach of contract claim (though not from her GBL 349 claim) and (b) in a hypothetical world in which Capital One assessed overdraft fees at authorization rather than settlement, Capital One *may* have charged her more in OD Fees than she actually incurred. Both arguments improperly conflate the issue of *damages* with the issue of *standing*. Ms. Roberts has standing because she paid Capital One improper overdraft fees. *See Ackerman v. Coca-Cola Co.*, No. 09 CV 395 DLI RML, 2013 WL 7044866, at *13 (E.D.N.Y. July 18, 2013) ("economic injury suffices as a form of injury-in-fact for standing purposes"). That is the end of the analysis.

That Capital One may arguably be entitled to some sort of damages offset based on an *unrelated and unproven debt* is entirely irrelevant to the standing analysis; here, Ms. Roberts fully repaid the challenged damages, out of her own pocket, well before incurring any alleged debt to Capital One. Further, the Court need not engage in a hypothetical damage calculation premised on baseless assumptions. The contract as written prohibits Capital One from charging OD Fees on APPSN

transactions; yet, Ms. Roberts paid OD Fees on APPSN transactions. She therefore has standing. In any event, the counterfactual proposed by Capital One is itself barred by the contract and implausible.

### A.  Ms. Roberts's Alleged Debt to Capital One Doesn't Negate Standing

Capital One first argues Ms. Roberts lacks standing to pursue her contract claim because— well after she incurred and fully paid the OD Fees at issue in this case—she allegedly incurred a debt to Capital One that remains unpaid.  <u>First</u>, as a factual matter, Ms. Roberts paid the OD Fees she seeks as damages, out of her own pocket, well before incurring any alleged debt to Capital One. *See* Plaintiff's Response to Defendant's Facts ¶88. <u>Second</u>, there is no record evidence that Ms. Roberts still owes Capital One any debt—at the very least, this fact is in dispute.  <u>Third</u>, even if she does have this purported debt, she still has standing to recover improper OD Fees and to reduce the debt amount.

Ms. Roberts's injury-in-fact (the OD Fees on APPSN transactions that she paid) is not negated merely because she purportedly later incurred a debt to Capital One, which may or may not currently exist.  "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury." Wright & Miller, Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) (explaining that "the fact that an injury may be outweighed by other benefits . . . does not negate standing"); *NCAA v. Governor of New Jersey,* 730 F.3d 208, 223 (3d Cir. 2013), *abrogated by Murphy v. NCAA,* 138 S. Ct. 1461, 200 L. Ed. 2d 854 (2018) ("standing is not defeated by a plaintiff's alleged unclean hands and does not require balancing the equities").

It would be irrelevant if Capital One were to prove Ms. Roberts owes the bank more money than Capital One owes her. As with any bilateral dispute, each party may pursue a judgment for what each believes is owed, and the party who recovers a bigger judgment will be entitled to recover from

the other. In other words, the potential existence of a meritorious counterclaim merely offsets damages—it does not affect standing. *See EMI Music Mktg. v. Avatar Records, Inc.,* 317 F. Supp. 2d 412, 424 (S.D.N.Y. 2004) ("A meritorious counterclaim in any litigation will nearly always offset a defendant's liability on a plaintiff's claim. With this in mind, the Supreme Court has held that the 'mere presence' of 'nonfrivolous counterclaims' does not prevent an entry of final judgment[.]"); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.,* 317 F.R.D. 675, 685–86 (N.D. Ga. 2016) (Even if the "offsetting benefits were deemed relevant . . . they would go at most to calculation of damages, not the fact of injury.").

That counterclaims do not affect a plaintiff's standing is only further supported by the well-established principle that the reduction of a debt is sufficient to confer standing. *See, e.g., Hamilton v. SunTrust Mortg. Inc.,* 6 F. Supp. 3d 1300, 1307 (S.D. Fla. 2014) (finding a mortgagor had standing to sue when mortgage debt owed to mortgagee exceeded amount claimed stating, "[i]f Hamilton is successful in this action, her total debt may be reduced."). Put simply, if Capital One hypothetically were to seek the $561.20 recorded as a loss from Ms. Roberts, and Ms. Roberts were to recover her claimed $245 from Capital One, Ms. Roberts would owe Capital One $245 less than if she had not brought this case. That $245 deduction in the potential debt owed to Capital One is sufficient to confer standing. *See id.*

None of Capital One's case cites are on-point or suggest Ms. Roberts cannot demonstrate injury in fact. To the contrary, all Capital One's supporting case law involves inapplicable creditor priorities in bankruptcy, receivership, or mortgage contexts. *Golden Pac. Bancorp v. F.D.I.C.*, No. 95 CIV. 9281 (NRB), 2003 WL 21496842, *3 (S.D.N.Y. June 27, 2003), involved an FDIC receivership, in which the court held that even if Bancorp prevailed on its unjust enrichment and waste claims against the FDIC while Bancorp was in receivership, claims by other creditors "clearly ha[d] priority over [Bancorp's] shareholders, who are only entitled to the proceeds remaining after all claims have

been fully paid." And because payments due from the receivership to these higher priority creditors would extinguish any available funds in the receivership beyond the maximum claimed amount by Bancorp, there was an "impossibility of any recovery" for Bancorp's shareholders. *Id.* at *3 n.9.[6] By contrast here, no such creditor priority exists to deny Ms. Roberts all interest in or benefit from pursuing her breach of contract claim against Capital One, which was an indispensable part of *Golden Pac. Bancorp*'s holding, just as it was in every case cited by Capital One for this proposition.[7]

### B.   Ms. Roberts Didn't "Benefit" from Capital One's Breach

Capital One next argues that Ms. Roberts "benefitted greatly" from its contract interpretation, since (it claims) she would have been charged nearly $10,000 in OD Fees if it interpreted the contract in the manner she urges.   First, Capital One again confuses the issue of damages with the issue of standing. As explained, *supra*, the potential for "offsetting benefits" does not defeat standing. *See Denney*, 443 F.3d at 265 (Holding that certain costs incurred by class members "[we]re not offset (for standing purposes) by the taxes saved by implementing the tax strategies challenged by the IRS"); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655–59 (9th Cir. 2011) (holding that a hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years).[8] The fact that Capital One must rely

---

[6] *Smith v. United States*, 58 Fed. Cl. 374, 390-91 (2003), similarly involved an FDIC receivership, where the government had priority over any potential shareholder claims. The court thus held that because the government's priority meant any recovery by the FDIC would simply flow back to the government, the FDIC and the United States were "engaged in an intergovernmental dispute rather than a genuine Article III 'case or controversy.'" *Id.* at 390.

[7] In *Matter of Stable Mews Assocs.*, 49 B.R. 395, 397 (S.D.N.Y. Bankr. 1985), the bankruptcy court found all of debtor's assets would be depleted by creditors with priority claims, such that the debtor could not claim any interest in the litigation's outcome. And *Miller v. Forge Mench P'ship Ltd.*, No. 00 CIV. 4314 (MBM), 2005 WL 267551, at *4 (S.D.N.Y. Feb. 2, 2005), is a fraudulent conveyance case, in which an unsecured creditor lacks standing to challenge a conveyance as fraudulent unless "some portion of the debtor's assets would have been available to satisfy the unsecured creditor's claims had there been no conveyance."

[8] *See also Texas v. U.S.*, 809 F.3d 134, 155–156 & n.60 (5th Cir. 2015) (holding that Texas had standing to challenge a federal government program that would have required the state to incur additional costs associating with issuing drivers licenses and that standing was not defeated by the government's argument that Texas would receive offsetting benefits, such as greater revenue from vehicle registrations); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570–75 (6th Cir. 2005) (concluding that a patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased risk of medical problems even though it had not malfunctioned and had benefited him); *Markva v. Haveman*, 317 F.3d 547, 557–58 (6th Cir.2003) (deciding that grandparents had standing to challenge a

on expert testimony only demonstrates that this argument is a damages question, for trial, rather than

a standing question. *See Denney,* 443 F.3d at 265 ("Our threshold inquiry into standing 'in no way

depends on the merits of the plaintiff's claim.'").

The sole case Capital One cites to support its position is not on point. *St. Lawrence Factory Stores*

*v. Ogdensburg Bridge & Port Auth.,* 121 A.D.3d 1226, 994 N.Y.S.2d 704 (S.Ct. 3d App. Div. 2014), does

not even address standing. In that case, a state trial court held in its capacity as factfinder that the facts

did not support plaintiff's claim for reliance damages—a specific type of contractual damages that

Plaintiff does not seek here. That case only supports Plaintiff's view that this is a merits issue for trial.

Second, courts consistently refuse to speculate in matters regarding standing. For example, in

*L.A. Haven Hospice,* the Ninth Circuit held that a hospice care provider had standing to challenge a so-

called "hospice cap regulation," rejecting the Government's argument that the hospice provider was

required to "prove that it suffered a 'net' increase in its liability" vis-à-vis "the amount it would have

been required to pay for the same period under . . . a hypothetical regulation drawn in conformity with

the statute." 638 F.3d at 656. In reasoning equally applicable here, the Ninth Circuit found that "such

an alternative calculation under a nonexistent regulation would necessarily be hypothetical and

speculative in nature," and, even more importantly, found that "[t]here is harm in paying rates that

may be excessive, no matter what [a plaintiff] may have saved." *Id.* at 657; *see also NCAA,* 730 F.3d

208 at 223 (to have standing, the plaintiff need not "construct counterfactuals analyzing whether they

would have done better if . . . [the challenged statute] had not existed"). Because Capital One's

hypothetical is entirely speculative, this Court ought to reject it outright.

Third, Capital One's hypothetical fails because it mischaracterizes Plaintiff's claim about what

the contract actually means. Contrary to Capital One's argument, Ms. Roberts's allegation of the

---

requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents
may have received more of other types of welfare benefits).

breach is <u>not</u> that Capital One *must* assess OD Fees on all transactions at authorization.  Rather, Ms. Roberts argues it was a breach of the contract for Capital One to charge OD Fees on APPSN transactions. Plaintiff has never argued for the binary proposition that Capital One now urges (that the Bank must either assess OD Fees on all transactions *authorized* negative <u>or</u> that it must assess OD Fees on all transactions that *settle* negative). The <u>only</u> question in this litigation is what the contract says the bank will do when a transaction authorizes positive and settles negative.

For those transactions that fall into the scenario proposed by Capital One (those that authorize positive but settle negative), the contract, reasonably read against its drafter, means an OD Fee will not be charged on those transactions. But what Capital One should do when a transaction authorizes negative and settles positive is an entirely separate question and an entirely separate contract analysis. It is not one that the Second Circuit considered, and it is not at issue in this litigation. Put another way, it does not follow that simply because Capital One *may not* charge OD Fees on transactions that authorize positive that it *must* charge OD Fees on transactions that authorize negative but settle positive. There is certainly no bar on Capital One doing what is fair and reasonable for consumers— both refraining from charging OD Fees on APPSN transactions *and* not charging OD Fees on transactions that authorize negative and settle positive; they are not logically inconsistent.

In fact, the contract likely bars OD Fees on transactions that authorize negative but settle positive. Just as reasonable consumers do not expect to be charged OD Fees on APPSN transactions, they also do not expect to be charged OD Fees on transactions that authorize negative but settle positive. And this, too, is a reasonable interpretation of the ambiguities in the contract, which at numerous points, indicates to consumers that they will have the opportunity to "cover" a negatively authorized transaction and avoid an OD Fee.[9]

---

[9] *See, e.g.,* Defendant's Facts ¶16 ("You can avoid Overdrafts on your account by always making sure that you have sufficient available funds in your account to cover all of the debits presented for payment against your account."); *id.* ¶22 ("You further agree that if we elect to pay Overdraft items, you must deposit additional funds into your designated account

Finally, Capital One's hypothetical is flawed in other respects as well. It is implausible to suggest Ms. Roberts, a single mother struggling to make ends meet, would incur $10,000 in OD Fees without opting out of Capital One's overdraft protection service or without closing her account. It is equally far-fetched to suggest Capital One would have assessed OD Fees on authorize negative but settle positive transactions because Capital One did not have the technological capacity to do so; it considered adopting such a policy but rejected the idea because its systems would not support it. *See* Plaintiff's Response to Defendant's Facts ¶54. These facts, among others, highlight why courts do not use hypotheticals to evaluate standing.

In sum, there is no plausible world in which Capital One would have been able to charge Ms. Roberts an additional $10,000 in OD Fees. At the very least, the plausibility of the counterfactual is a merits question to be resolved by the factfinder, not a standing question for summary judgment.

## III.   MS. ROBERTS'S GBL § 349 CLAIM SHOULD SURVIVE SUMMARY JUDGMENT

In arguing for summary judgment on Plaintiff's GBL § 349 claim, Capital One incorrectly reads a reliance element into such a claim; it also incorrectly attempts to cabin Plaintiff's § 349 claim as being based exclusively on the Agreements. Both are incorrect.

First, there is no doubt that Capital One's omissions, misrepresentations and ambiguities in its Agreements failed to inform reasonable consumers, including Ms. Roberts of the APPSN OD Fee practice and would render futile renders futile any accountholder's reading of them.  In any event, Ms. Roberts testified she would not have banked with Capital One if she had known the truth.  *See* Plaintiff's Response to Defendant's Facts ¶¶35, 40.

Second, while it is true that the material misrepresentations and omissions in Capital One's

---

immediately in an amount sufficient to cover the Overdraft and to pay us Overdraft fees for each Overdraft item[.]"); *id.* ¶16("All credits to your account that are received by the close of our business day will be processed to your account first…After we have processed any credits to your account, we will process debits."). Such provisions, taken together, lead reasonable consumers to believe they have the opportunity to make intervening deposits to avoid OD Fees on transactions that authorize negative.

Agreements form *part* of the basis of Plaintiff's § 349 claim, they are not the only basis. Capital One also omitted and misrepresented key facts about its overdraft policies in other ways as well. Specifically, Capital One affirmatively misled Ms. Roberts in its online and mobile banking interfaces by showing debit card transactions being immediately deducted from available balances—a misrepresentation upon which Ms. Roberts repeatedly relied. *See* Plaintiff's Facts ¶100.  Further, Capital One misled Ms. Roberts through omission by failing to disclose the APPSN policy when Ms. Roberts opened her account. *See* Plaintiff's Response to Defendant's Facts ¶35. Ms. Roberts testified that she would not have opened the account if she had been told of the APPSN policy. *See id.*, ¶40. Finally, Capital One misled Ms. Roberts by providing her false information on customer service calls with its representatives—again, misrepresentations on which Ms. Roberts relied. *See id.*, ¶¶52, 55, 60.

Summary judgment on Ms. Roberts's § 349 claim is improper because Capital One has not met its burden of showing that it did not engage in materially misleading conduct. "To establish a prima facie case under GBL § 349, 'a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result.'" *Price v. L'Oreal USA, Inc.*, 2018 U.S. Dist. LEXIS 138473, at *14 (S.D.N.Y. Aug. 15, 2018) (citations omitted). Capital One only challenges the lack of materially misleading conduct. But "[m]ateriality under section 349 is an objective inquiry; a deceptive act is defined as one 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Id.*  Deceptive acts under section 349 may be an affirmative representation or an omission. *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995).  There is no actual reliance requirement in New York. *See Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) ("§ 349 does not require proof of actual reliance").

The Second Circuit's finding of ambiguity is alone enough to meet the materially misleading standard. But in addition to the ambiguities the Second Circuit identified, the Agreements omit key

information regarding Capital One's OD Fee practices.  The Agreements say nothing of Capital One's

policy of assessing OD Fees on APPSN transactions. In cases of omission, a court must not grant

summary judgment—even when the customer did not read the agreement—because reading the

Agreements would have left the plaintiff in the same position in which Ms. Roberts now finds herself.

*See Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410, 2018 U.S. Dist. LEXIS 21843, at *30 (E.D.N.Y. Feb.

8, 2018) (denying defendant's summary judgment motion on § 349 claim when plaintiff did not read

the loan modification letters, stating the letters "are contradictory at best and provide a significant

amount of ambiguity when read in their entirety").[10] This is especially true given that the court should

focus on the overall business practice in determining whether a bank charge is deceptive.  *See Relativity*

*Travel, Ltd. v. JP Morgan Chase Bank*, 13 Misc. 3d 1221(A), 1221A, 831 N.Y.S.2d 349, 349 (Sup. Ct.

2006) ("Viewing Chase's practices as a whole including the failure to list the surcharge on the Account

Statement or on Chase's website and the failure to properly inform its representatives about the

surcharge are sufficient, if proved, to establish a *prima facie* case." (citations omitted)).[11]

      In addition, Ms. Roberts may maintain her GBL § 349 claim based on Capital One's misleading

and deceptive online banking interface and the misleading statements made on customer service calls.

First, the online banking interface was materially misleading because it showed debit card transactions

being immediately deducted from Ms. Roberts's available balance. Ms. Roberts testified repeatedly

that she relied on these representations of the immediate deduction when deciding when to make

withdrawals and deposits and in forming her understanding that APPSN transactions would not incur

OD Fees. *See* Plaintiff's Fact ¶100.  Second, Capital One misrepresented its OD policies on customer

service calls with Ms. Roberts, again causing Ms. Roberts to misunderstand Capital One practices and

---

[10] The court granted summary judgment on a promissory estoppel claim that required proof of reliance.
[11] Capital One's cases on this point are distinguishable. While in *Gale v. IBM*, 9 A.D.3d 446, 447, 781 N.Y.S.2d 45, 47 (App. Div. 2004), the court affirmed the dismissal of a § 349 claim because the plaintiff had not read the allegedly misleading statements, here, the ambiguity inherent in the Agreements renders futile any accountholder's reading of them. In any event, *Gale* has no applicability to all the other bases of Plaintiff's GBL claim, described herein.

thus incur more OD Fees. *See id.*, ¶¶52, 55, 60.

Each of the misrepresentations and omissions above were "material" to reasonable consumers like Ms. Roberts. For example, Capital One's own internal documents evidence that it was keenly aware of customer dissatisfaction and surprise with the APPSN practice: "the fact that we don't debit the account on authorization, rather at settlement, came up as a big dissatisfier." *See* Plaintiff's Facts ¶96. And two Capital One executives expressly recognized the consumer confusion associated with the consumption of "memo posts" or debit holds by unrelated transactions: "OK, some misconceptions for me:  Memo posts cannot ever be spent by a customer, no matter what happens. They may think they can spend it, but we do not draw checks or debits against memo post balances. They will get overdrafts. Right?" *See* Plaintiff's Response to Defendants Facts ¶54.  A Capital One executive falsely confirmed as much: "Yes, I agree, memo posts cannot actually be spent by the customer, but the memo post does factor into authorization decisions.  So, *this will lead to customer confusion and potential overdrafts*." *Id.* Capital One knew full well that consumers were confused by the available balance provided in online bank, which hampered Ms. Roberts's understanding of what was occurring with APPSN transactions. One internal presentation document stated prominently, "Customers are often confused between the difference in available, current balance displayed on [online banking] and its associated implications."  *See* Plaintiff's Facts ¶95.

At the very least, whether Capital One made materially misrepresentations resulting in Ms. Roberts's injury is a disputed issue of material fact, rendering summary judgment inappropriate.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion for Summary Judgment and grant Plaintiff's Motion for Partial Summary Judgment.

Dated:  February 25, 2019

*By: /s/ Jonathan Streisfeld*
Jonathan M. Streisfeld (*pro hac vice*)
Jeff Ostrow (*pro hac vice*)
Joshua R. Levine (*pro hac vice*)
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT**
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
Facsimile: 954-525-4300
*streisfeld@kolawyers.com*
*ostrow@kolawyers.com*

Jeffrey D. Kaliel (*pro hac vice*)
**KALIEL PLLC**
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
(202) 350-4783
*jkaliel@kalielpll.com*
*sgold@kalielpllc.com*

## CERTIFICATE OF SERVICE

I, Jonathan M. Streisfeld, hereby certify that on February 25, 2019, caused the foregoing to be

served via CM/ECF and email on the following counsel of record:

James R. McGuire (pro hac vice)
Sarah N. Davis (pro hac vice)
Lauren Wroblewski (pro hac vice)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California
Telephone: (415) 268-7000
jmcguire@mofo.com
sarahdavis@mofo.com
lwroblewski@mofo.com

Jessica L. Kaufman
Tiffani B. Figueroa
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
jkaufman@mofo.com

*Attorneys for Defendant Capital One, N.A.*

*/s/ Jonathan M. Streisfeld*
Jonathan M. Streisfeld